RECEIPT NUMBER
516 438

96

ORIGINAL

Attach A - N

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THYSSENKRUPP FABCO CORP.,
*A Nova Scotia Corporation,*

    *Plaintiff,*

v.

HEIDTMAN STEEL PRODUCTS, INC.,
*an Michigan corporation,*

    *Defendant.*

```
JUDGE : Edmunds, Nancy G.
DECK  : S. Division Civil Deck
DATE  : 11/05/2004 @ 13:02:08
CASE NUMBER : 2:04CV74331
CMP THYSSENKRUPP V. HEIDTMAN
(KC)
```

MAGISTRATE JUDGE MONA K. MAJZOUB

Daniel N. Sharkey (P53837)
Eric M. Mathis (P65384)
Butzel Long
Attorneys for Plaintiff
150 West Jefferson, Suite 100
Detroit, MI 48226
313-225-7000

U.S. DIST. COURT CLERK
EAST. DIST. MICH.
DETROIT-PSC

FILED

'04 NOV -5 P1 :09

There is no other pending or resolved civil
action arising out of the transaction or
occurrence alleged in this complaint.

## VERIFIED COMPLAINT FOR SPECIFIC
## PERFORMANCE AND INJUNCTIVE RELIEF

  Plaintiff ThyssenKrupp Fabco Corp. ("Fabco"), for its Verified Complaint against

Defendant Heidtman Steel Products, Inc. (Heidtman) alleges:

### PARTIES, JURISDICTION AND VENUE

  1.  Fabco is a corporation organized and existing under the laws of Ontario, Canada

with its principal place of business at 850 Division Rd., Windsor, ON N9A 6P7.

  2.  Upon information and belief, Heidtman is a Michigan corporation with its

principal place of business at 19800 Gilbralter Road, Gilbralter, MI 48173.

3.     This Court has jurisdiction pursuant to 28 USC § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

4.     Venue is proper in this Court and is appropriate and consistent with 28 USC § 1391(a) *et seq.* because Fabco and Heidtman conduct business in this District on a systematic and continuous basis.

## FACTUAL BACKGROUND ALLEGATIONS

5.     Fabco is a Tier 1 supplier of, among other things, medium and heavy metal stampings, modular assemblies, weldments and systems, that it produces for the world's original equipment manufacturers.  Fabco's automotive customers include nearly every major automotive manufacturer worldwide.

6.     Heidtman is a supplier of, among other things, steel-based products, to Tier 1 automotive suppliers such as Fabco.

7.     On February 11, 2003, Fabco and Heidtman executed a Long-Term Agreement (the Contract, attached as **Exhibit A**) for the supply of flat rolled steel coil (the Steel Coil).

8.     The Steel Coil is specially designed and formulated for Fabco's specific engineering requirements.  Heidtman's Butler, Indiana plant sends shipments of the Steel Coil each week to Fabco's Springfield, Tennessee assembly plant.  Heidtman is the only supplier of the Steel Coil to Fabco.

9.     Fabco incorporates Heidtman's Steel Coil into support beam assemblies (Assemblies) that it manufactures for the Nissan Motor Co., Ltd. ("Nissan").

10.    Fabco sends multiple shipments of the Assemblies each day to Nissan's assembly plant in Smyrna, Tennessee.  Fabco is the only supplier of the Assemblies to Nissan.  Nissan

2

incorporates the Assemblies into the Pathfinder and Xterra vehicle programs, vehicles that Nissan manufactures.

11.   Fabco cannot make the Assemblies without the Steel Coil supplied by Heidtman; nor can Nissan make the Pathfinder and Xterra vehicles without the Assemblies from Fabco.

12.   The Contract requires that Heidtman supply Fabco with Fabco's requirements of the Steel Coil until September 25, 2006.  **Exhibit A.**

13.   The Contract fixes the price for the Steel Coil at $.3585.  **Exhibit A.**

14.   On June 24, 2004, Heidtman sent an e-mail to Fabco demanding that Fabco pay an increased price of $.4785 for the Steel Coil, based upon increased raw material costs.  June 24, 2004 Email attached as **Exhibit C.**

15.   On June 28, 2004, Fabco informed Heidtman that Fabco would not pay a price above the Contract's fixed price, and that Fabco expected Heidtman to continue shipping the Steel Coil pursuant to the terms of the Contract.  June 28, 2004 Email attached as **Exhibit D.**

16.   On July 2, 2004, Heidtman informed Fabco that Heidtman would continue shipping the Steel Coil to Fabco, but would bill Fabco at the demanded increased price, and that Fabco must pay the demanded increase price to avoid interruptions of Heidtman's shipments to Fabco.  Also attached as **Exhibit D.**

17.   On July 15, 2004, Heidtman informed Fabco that it was charging a surcharge to each Steel Coil as follows:

|  |  |
|---|---|
| March 2004 | $5.00cwt |
| April 2004 | $6.25cwt |
| May 2004 | $6.25cwt |
| June 2004 | $3.50cwt |
| July 2004 | $3.50cwt |

July 15, 2004 Email attached as **Exhibit E.**

3

18.     On July 23, 2004, Heidtman demanded that Fabco pay $.4435 for the Steel Coil, plus a .075 surcharge, equating to a total price of $.5185.   July 23, 2004 Email attached as **Exhibit F**.  Heidtman's demand constitutes a 45% increase over the Contract's fixed price of $.3585.

19.     On August 11, 2004, Heidtman threatened to stop shipping the Steel Coil unless Fabco yielded to Heidtman's demand for a price increase:

> Effective today, August 11/04 Heidtman Steel halt [sic] all Direct
> Sales Shipments to TKA Fabco until all price increase or
> Surcharges that were deducted from invoices are paid in full.

August 11, 2004 Email attached as **Exhibit G**.  Despite Heidtman's threat, and Fabco's refusal to pay a higher price for the Steel Coil, Heidtman continued to ship for nearly three more months.

20.     On November 2, 2004, Heidtman advised that it was making its last shipment of the Steel Coil to Fabco that day, and that it would not make the next scheduled weekly shipment of the Steel Coil on Tuesday, November 9, 2004.

21.     On November 3, 2004, Fabco sent Heidtman a letter:

a.      stating that Fabco would not accept Heidtman's request for a price increase;

b.      requesting written assurances from Heidtman that it would continue to deliver the Steel Coil at the contractually specified price; and

c.      reminding Heidtman of its contractual obligations and the disastrous consequences that would result if Heidtman disrupted its supply of the Steel Coil, including the shutdown of Fabco's and Nissan's plants, causing irreparable harm to our relationships and millions of dollars in damages.

November 3, 2004 Email attached as **Exhibit H**.

22.     Heidtman agreed under the Contract that the price the Steel Coil would be fixed at $ .3585 until September 25, 2006.  In direct contravention of the Contract's requirement that Heidtman supply Fabco's requirements of the Steel Coil at $.3585, Heidtman is demanding a total price of $.5185, a 45 % increase over the Contract's fixed price of $.3585.

23.     Heidtman's request for this price increase is in direct contravention of Heidtman's agreement to supply Fabco's requirements of the Steel Coil at the fixed price.

24.     Fabco incorporates the Steel Coil into the Assemblies that it sells to Nissan. Fabco makes the Assemblies and acts as a Tier I supplier to Nissan, which in turn incorporates the Assemblies into its Pathfinder and Xterra vehicles, which are produced and sold to the public.

25.     Heidtman is Fabco's sole supplier of Steel Coil for the Assemblies, and Fabco cannot obtain an alternative supplier of Steel Coil in time to avoid catastrophic interruptions of its production operations and the shutdown of its Springfield, Tennessee assembly plant, and Nissan's Smyrna assembly plant.

26.     Even when accelerated, the Production Parts Approval Processes can take several months.  Because Heidtman is Fabco's sole supplier of Steel Coil for the Assemblies, Fabco cannot obtain an alternative supplier of Steel Coil in time to avoid catastrophic interruptions of its production operations and the shutdown of its Springfield, Tennessee production plant, and Nissan's Smyrna assembly plant.  **Exhibit B, ¶ 20.**

27.     Because of the "just-in-time" inventory method employed by the automotive industry, Fabco currently possesses only a one-week supply of the Steel Coil for Nissan's Smyrna assembly plant.  Thus, Fabco will begin running out of the Steel Coil on Wednesday, November 10, 2004, and will be forced to stop making the Assemblies.  **Exhibit B, ¶ 21.**

28.     Nissan maintains less than one-day's worth of inventory of Fabco's Assemblies, relying on daily shipments from Fabco.  Thus, Nissan will run out of Assemblies less than a day after Fabco runs out of the Steel Coil, and will stop manufacturing the Pathfinder and Xterra either that day or the next day, November 11.  **Exhibit B**, ¶ 22-23.

29.     If Heidtman breaches the Contract by refusing to ship the Steel Coil to Fabco, it will result in the shutdown of Fabco's Springfield, Tennessee plant and, as early as November 11, 2004, a shutdown of Nissan's Smyrna assembly plant.  **Exhibit B**, ¶ 24.

30.     Nissan has informed Fabco that a shutdown of its Smyrna assembly plant will result in damages of millions of dollars per day.  Nissan employs thousands of workers at its Smyrna assembly plant; and the plant manufactures approximately 240,000 vehicles per year, an average of 1,000 vehicles each business day.  Moreover, damages to other suppliers of Nissan resulting from such a plant shutdown will result in additional millions of dollars per day. **Exhibit B**, ¶ 25.

31.     Also, thousands of other automotive suppliers, ranging from large Tier I Fortune 100 corporations to "mom and pop" tool and die shops that are in the supply chain for the automotive industry will be affected, because production of the Nissan Pathfinder and Xterra vehicles, which incorporates the Assemblies, will be halted.  **Exhibit B**, ¶ 26.

32.     Fabco cannot obtain sufficient production volumes of and requisite engineering and safety approvals for a substitute Steel Coil from a new supplier for at least three months or perhaps longer.  If Heidtman is allowed to refuse to supply Fabco with the Steel Coil, Fabco will be unable to obtain it from an alternative source on a timely basis so as to avoid an interruption of production, resulting in thousands of employees of Fabco, Nissan, and the supply chain that feeds the Nissan Pathfinder and Xterra vehicle assembly programs.  **Exhibit B**, ¶ 27.

6

33.     Such shutdowns will cause Fabco to suffer an irreparable loss of customer relations and goodwill.   In addition, Nissan will also suffer a loss of customer relations and goodwill as a result of their inability to deliver Pathfinder and Xterra vehicles as ordered by its customers.  **Exhibit B, ¶ 28.**

34.     Heidtman agreed in the Contract to fix the price for the Steel Coil until 2006, and has absolutely no right under the Contract to the price increase it has demanded from Fabco.  Nor is Fabco under any obligation to yield to Heidtman's demands.  **Exhibit B, ¶ 29.**

35.     Fabco has complied in good faith with all of its known contractual obligations to Heidtman.  **Exhibit B, ¶ 30.**

36.     The Contract requires Heidtman to supply the Steel Coil at the agreed-upon fixed price, and does not allow Heidtman to unilaterally increase the fixed price.

37.     Heidtman is unlawfully using its disruption of the supply of the Steel Coil as leverage in an attempt to coerce Fabco into paying the demanded price increase in direct contravention of the agreed-upon, fixed price listed in the Contract.

38.     Fabco's use of the just-in-time and sole-source supply methods make the continuity of Fabco's operations dependent upon its suppliers' continuous delivery of parts and products.  Any interruption in delivery creates serious, adverse cascading affects throughout the operations of Fabco and Nissan, stopping assembly lines and preventing delivery of the Assemblies to Nissan's Smyrna assembly plant.

39.     Heidtman has provided no legitimate basis permitting it to cease supplying Fabco with the Steel Coil prior to the expiration of the Contract or without providing Fabco with a reasonable time to re-source the supply of the Steel Coil to another supplier.  An increase of the price of raw materials used by Heidtman to produce the Steel Coil does not render its

7

performance commercially impracticable under MCL § 440.2615 or a *force majeure* under the Contract. **Exhibit A.**

40. Fabco has not voluntarily agreed to, and is not obligated to agree to, any increase in the fixed price to be paid for Heidtman-supplied parts.

41. As set forth in the Affidavit of Jeff Tessier (attached as **Exhibit B**), Heidtman's interruption of the supply of the Steel Coil beginning November 9 will cause the shutdown of factories and the lay-off of thousands of workers within a few days after November 9, costing millions of dollars per day because Fabco cannot obtain the Steel Coil from an alternate supplier for at least several months.

42. An interruption of Fabco's production caused by Heidtman's breach of its obligations under the Contract will prevent Fabco from fulfilling its contractual obligations to its customer, Nissan, will adversely affect the employment of thousands of workers at Fabco's Springfield, Tennessee assembly plant, and Nissan's Smyrna assembly plant, will cause irreparable harm to Fabco's reputation, and will jeopardize other potential business opportunities between Fabco and Nissan.

## COUNT I – BREACH OF CONTRACT/SPECIFIC PERFORMANCE

43. Fabco re-alleges each of the preceding paragraphs.

44. The Contract, attached as **Exhibit A**, is a valid and binding, and requires Heidtman to fulfill Fabco's requirements for the Steel Coil at agreed fixed price through September 25, 2006.

45. Fabco has satisfied all of its contractual obligations to Heidtman under the Contract.

46.    Heidtman, in flagrant violation of its contractual obligations, is demanding that Fabco pay a price for the Steel Coil higher than the price specified by the Contract, and will not deliver its next scheduled shipment on November 9, 2004, because Fabco refused to capitulate to Heidtman's unlawful demand.

47.    Fabco requests that this Court order Heidtman to continue to supply the Steel Coil pursuant to the Contract at the contractually-specified price.

48.    If Heidtman does not perform its obligations under the Contract, Fabco's manufacturing operations, and the manufacturing operations of Fabco's customer, Nissan, will be shut down because the Heidtman-supplied Steel Coil are specially manufactured for Fabco and Fabco cannot readily substitute the Steel Coil from another supplier.  MCL § 440.2716.

49.    Moreover, given the millions of dollars of damages that would result if supply were interrupted for even one day, Fabco would have no adequate remedy at law for the devastating impact such a shutdown would have on the manufacturing operations of Fabco and Nissan, their goodwill and reputation, as well as the devastating effect on the local and national economics.

**WHEREFORE**, Fabco requests that this Court order as follows to preserve the status quo:

A.    Declaratory relief under Fed. R. Civ. P. 57 that Heidtman has anticipatorily and in bad faith repudiated its obligations under the Contract;

B.    Preliminary and permanent injunctive relief, under Fed. R. Civ. P. 65 preventing Heidtman and its parent, affiliates, or subsidiaries from taking any action inconsistent with its supply obligations to Fabco;

C.    Temporary, preliminary and permanent mandatory injunctive relief, under Fed. R. Civ. P. 65, requiring Heidtman and its parent, affiliates, or subsidiaries to supply Fabco with necessary quantities of the Steel Coil to satisfy Fabco's requirements under the Contract throughout the duration of the Contract, or at minimum until such time as established by the Court or by arbitration as a permissible termination date of the Contract (and if such date is prior to September 25, 2006,

at least until such time as sufficient production volumes of quality (validated) substitute Steel Coil are obtained by Fabco);

D.    In addition, or in the alternative, an award of money damages in favor of Fabco sufficient to compensate it for all forms of economic loss, including without limitation, coverage damages, incidental damages, consequential damages, lost profits, lost goodwill and other costs incident to having to re-source the Contract;

E.    An award of legal fees and other costs arising out of Heidtman's threatened failure to perform under the Contract; and

F.    All such other relief as this Court may deem just, equitable or appropriate under the circumstances.

## COUNT II – DECLARATORY RELIEF

50.    Fabco re-alleges each of the preceding paragraphs.

51.    Heidtman has stopped supplying Fabco with the Steel Coil at the agreed-upon fixed price in the parties' Contract, even though Fabco has not breached any of its obligations under the Contract.  Heidtman has asserted that it will impose an increased price for the Steel Coil, even though the parties' Contract is a fixed-priced agreement of a specified duration and has not yet expired.

52.    Fabco is entitled to a declaration that it has not breached, and is not currently breaching, any provision of the Contract.

53.    Fabco is entitled to a declaration that Heidtman is obligated to perform all of its obligations and commitments to Fabco under the terms of the parties' Contract, including the obligation to provide Fabco with its requirements of the Steel Coil at the agreed-upon fixed price for the duration of the Contract.

54.    Fabco is entitled to a declaration that Heidtman is not entitled to either a retroactive or a prospective price increase, but instead is bound by the fixed price specified in the Contract.

10

55.     Fabco is entitled to a declaration that any unilateral modification of the parties' fixed-priced Contract purporting to provide Heidtman with a price increase for the Steel Coil is unenforceable.

56.     An actual controversy now exists between Fabco and Heidtman as to the proper interpretation of the Contract, and it is within the jurisdiction of this Court, under Fed. R. Civ. P. 57, to render a declaratory judgment as to the parties' respective rights under the Contract.

**WHEREFORE**, Fabco requests that this Court order as follows to preserve the status quo:

A.     Declaratory relief under Fed. R. Civ. P. 57 that Heidtman has anticipatorily and in bad faith repudiated its obligations under the Contract;

B.     Preliminary and permanent injunctive relief, under Fed. R. Civ. P. 65 preventing Heidtman and its parent, affiliates, or subsidiaries from taking any action inconsistent with its supply obligations to Fabco;

C.     Temporary, preliminary and permanent mandatory injunctive relief, under Fed. R. Civ. P. 65, requiring Heidtman and its parent, affiliates, or subsidiaries to supply Fabco with necessary quantities of the Steel Coil to satisfy Fabco's requirements under the Contract throughout the duration of the Contract, or at minimum until such time as established by the Court or by arbitration as a permissible termination date of the Contract (and if such date is prior to September 25, 2006, at least until such time as sufficient production volumes of quality (validated) substitute Steel Coil are obtained by Fabco);

D.     In addition, or in the alternative, an award of money damages in favor of Fabco sufficient to compensate it for all forms of economic loss, including without limitation, coverage damages, incidental damages, consequential damages, lost profits, lost goodwill and other costs incident to having to re-source the Contract;

E.     An award of legal fees and other costs arising out of Heidtman's threatened failure to perform under the Contract; and

F.     All such other relief as this Court may deem just, equitable or appropriate under the circumstances.

## COUNT III - ANTICIPATORY REPUDIATION OF REQUIREMENTS CONTRACT

57.     Fabco re-alleges each of the preceding paragraphs.

58.     Heidtman's oral and written communications that it will not satisfy Fabco's requirements for the Steel Coil during the remainder of the Contract constitute a blatant, unreasonable and bad faith repudiation of the Contract.

59.     Fabco has sought assurances from Heidtman that it will honor its contractual obligations, but Heidtman has informed Fabco that it will no longer ship the Steel Coil to Fabco after November 2, 2004.

60.     Heidtman's failure to perform its contractual obligations will substantially impair the value of the Contract to Fabco.  Consequently, Heidtman has anticipatorily repudiated the Contract under MCL § 440.2610 and the common law.

61.     In good faith and without unreasonable delay, Fabco will attempt to locate and secure an alternative supply of the Steel Coil in substitution for those which are or may become due from Heidtman.   Sufficient production volumes of the Steel Coil, however, cannot be obtained until an alternative supplier (or suppliers) can be put in place, which cannot be accomplished for at least three months, or perhaps longer.

62.     Fabco is entitled to recover from Heidtman the difference between the cost of cover and the contract price over the terms of the Contract, together with any incidental or consequential damages allowed by law.  MCL § 440.2712(2).

**WHEREFORE**, Fabco requests that this Court order as follows to preserve the status quo:

A.     Declaratory relief under Fed. R. Civ. P. 57 that Heidtman has anticipatorily and in bad  faith repudiated its obligations under the Contract;

B.     Preliminary and permanent injunctive relief, under Fed. R. Civ. P. 65 preventing Heidtman and its parent, affiliates, or subsidiaries from taking any action inconsistent with its supply obligations to Fabco;

C.     Temporary, preliminary and permanent mandatory injunctive relief, under Fed. R. Civ. P. 65, requiring Heidtman and its parent, affiliates, or subsidiaries to supply

Fabco with necessary quantities of the Steel Coil to satisfy Fabco's requirements under the Contract throughout the duration of the Contract, or at minimum until such time as established by the Court or by arbitration as a permissible termination date of the Contract (and if such date is prior to September 25, 2006, at least until such time as sufficient production volumes of quality (validated) substitute Steel Coil are obtained by Fabco);

D.   In addition, or in the alternative, an award of money damages in favor of Fabco sufficient to compensate it for all forms of economic loss, including without limitation, coverage damages, incidental damages, consequential damages, lost profits, lost goodwill, and other costs incident to having to re-source the Contract;

E.   An award of legal fees and other costs arising out of Heidtman's threatened failure to perform under the Contract; and

F.   All such other relief as this Court may deem just, equitable or appropriate under the circumstances.

## COUNT IV – BREACH OF IMPLIED OBLIGATION OF GOOD FAITH

63.   Fabco re-alleges each of the preceding paragraphs.

64.   Every contract involving the sale of goods contains an implied obligation of good faith.  MCL § 440.1203.

65.   Heidtman's threatened total cessation of the production and supply of the Steel Coil to Fabco prior to the expiration of the parties' Contract is a breach of Heidtman's implied obligation of good faith, because Heidtman has failed to give Fabco sufficient notice of termination to allow it to re-source the Steel Coil in time to avoid supply disruptions and shutdowns of its and its customer Nissan's plant.

66.   As a result of Heidtman's breach of its implied obligation of good faith, Fabco has sustained economic damages in excess of $75,000, as detailed above.

**WHEREFORE,** Fabco requests that this Court order as follows to preserve the status quo:

A.   Declaratory relief under Fed. R. Civ. P. 57 that Heidtman has anticipatorily and in bad faith repudiated its obligations under the Contract;

13

B.    Preliminary and permanent injunctive relief, under Fed. R. Civ. P. 65 preventing Heidtman and its parent, affiliates, or subsidiaries from taking any action inconsistent with its supply obligations to Fabco;

C.    Temporary, preliminary and permanent mandatory injunctive relief, under Fed. R. Civ. P. 65, requiring Heidtman and its parent, affiliates, or subsidiaries to supply Fabco with necessary quantities of the Steel Coil to satisfy Fabco's requirements under the Contract throughout the duration of the Contract, or at minimum until such time as established by the Court or by arbitration as a permissible termination date of the Contract (and if such date is prior to September 25, 2006, at least until such time as sufficient production volumes of quality (validated) substitute Steel Coil are obtained by Fabco);

D.    In addition, or in the alternative, an award of money damages in favor of Fabco sufficient to compensate it for all forms of economic loss, including without limitation, coverage damages, incidental damages, consequential damages, lost profits, lost goodwill and other costs incident to having to re-source the Contract;

C.    An award of legal fees and other costs arising out of Heidtman's threatened failure to perform under the Contract; and

D.    All such other relief as this Court may deem just, equitable or appropriate under the circumstances.


Respectfully submitted,

BUTZEL LONG

By:    _____
        Daniel N. Sharkey (P53837)
        Eric M. Mathis (P65384)
        Attorneys for Plaintiff ThyssenKrupp Fabco
        Corp.


Dated:  November 5, 2004

## VERIFICATION OF COMPLAINT

I, Jeff Tessier, having first been duly sworn, depose and state that I have read the foregoing Verified Complaint for Specific Performance and Injunctive Relief, and verify that the facts stated therein are true and accurate, based on my knowledge, information and belief.

Jeff Tessier
Director of Purchasing
ThyssenKrupp Fabco Inc.

Subscribed and sworn to before me
This 5 day of November 2004

_____
Notary Public
My commission expires _____

708270

15



Purchase Order Number
8100158

# ThyssenKrupp Fabco, Corp.

850 Division Rd., P.O. Box 1060,
Windsor, ONT.  N9A 6P7

PO Date
2/17/03

Page
1

Exp Date
9/30/06

Status
CHANGE
2/23/04

Prices Stated In
U.S. DOLLARS

Ordered From   USHEIDTMANSTEEL
HEIDTMANSTEEL

19089 GILBRETER RD

GILBRETER                MI's        SPRINGFIELD          TN
49173       USA                  37172

Ship To:
ThyssenKrupp Fabco Inc.
Springfield Plant
One Fabco Drive

SHIP VIA YOUR TRUCK

**FAX 9,173467598762     **FAIL STADDON                    **CPI 17     **END

| ! BUYER ! | TERMS | ! ACK ! | CNFRM ! | F.O.B. ! | COL/PPD ! |
|-----------|-------|---------|---------|----------|-----------|
| ! 71 ! | Net 30 Days | ! N ! | N ! | SAO ! | ! |

| Line | Sts MY | Our Item Number ShpRtn   Pur Uom   Blanket Maximum   Item Description/Line Comments | Prc UoM | Your Item Number   Blanket Price   Blanket Value |
|------|--------|------------------------------------------------------------------|---------|------------------------------------------|
| 90 | OPN 2004 | 00445360000000000COIL<br>S              LB<br>SP762-4400 | LB | .42300 |

THIS BLANKET PURCHASE ORDER SUPERSEDES
AND CANCELS LINE 50 IN ITS ENTIRETY.
BLANKET PURCHASE ORDER TO COVER SAO'S
REQUIREMENT FOR THE FOLLOWING:
.044/.049 X 56.000" WIDE SLIT EDGE COIL.
SP762-4400.
USED ON PART NO. 93694-79000.
NOTE - COIL WIDTH CHANGE ONLY - ALL
OTHER PERTINENT INFORMATION REMAINS THE
SAME.
NOTE: 04/19/2004 - PRICE CHANGED FROM
.30700/LB. TO .35250/LB. EFFECTIVE
04/01/2004.
NOTE: 08/30/2004 - PRICE CHANGED FROM
.35250/LB. TO .42300/LB. EFFECTIVE
06/01/2004.

| 100 | OPN 2004 | 00555900000000000COIL<br>S              LB<br>SP762-4400 | LB | .41850 |

THIS BLANKET PURCHASE ORDER SUPERSEDES
AND CANCELS LINE 60 IN ITS ENTIRETY.
BLANKET PURCHASE ORDER TO COVER SAO'S
REQUIREMENT FOR THE FOLLOWING:
.055/.061 X 59.000" WIDE SLIT EDGE COIL.

LACASSE 9658 REV 10/02

KINDLY COMPLETE AND RETURN ATTACHED ACKNOWLEDGEMENT

Purchase Order Number
8100150

# ThyssenKrupp Fabco, Corp. 

850 Division Rd., P.O. Box1060,
Windsor, ONT. N9A 6P7

PO Date
2/11/03

Page
2

Exp Date
9/25/06

Status
CHANGE
9/23/04

Prices Stated In
U.S. DOLLARS

Ordered From   USHEIDTMANSTEEL
HEIDTMAN STEEL

19800 GILBRALTER RD

GILBRALTER            MI
                     48173

Ship To:
ThyssenKrupp Fabco Inc.
Springfield Plant
One Fabco Drive

SPRINGFIELD          TN
USA                  37172

SHIP VIA YOUR TRUCK

**FAX 9,17346750760      **PAIL  STADDON                    **CPI 17   **END

| BUYER | TERMS | ACK | CNFRM | F.O.B. | COL/PPD |
|-------|-------|-----|-------|--------|---------|
| 71 | Net 30 Days | N | N | SAC | |

| Line | Sts | Our Item Number | | | Your Item Number | |
|------|-----|-----------------|--|--|------------------|--|
| | MY | ShpFtn   Pur Uom   Blanket Maximum | | Prc Uom | Blanket Price | |
| | | Item Description/Line Comments | | | Blanket Value | |

SP782-4490.
USED ON PART NO. 93692-79020.
NOTE -- COIL WIDTH CHANGE ONLY -- ALL
OTHER PERTINENT INFORMATION REMAINS THE
SAME.
NOTE 04/19/2004 -- PRICE CHANGED FROM
.30700/LB. TO .34750/LB. EFFECTIVE
04/01/2004.
NOTE 08/30/2004 -- PRICE CHANGED FROM
.34750/LB. TO .41859/LB. EFFECTIVE
06/01/2004.

150   OPN   0063548750000000COIL                        LB            .35050
             S         LB
             SP253-590

THIS BLANKET PURCHASE ORDER LINE
SUPERSEDES AND CANCELS LINE 70 IN ITS
ENTIRETY.
BLANKET PURCHASE ORDER TO COVER SAC'S
REQUIREMENT FOR THE FOLLOWING:
.065/.076 X 54.875" WIDE SLIT EDGE COIL.
SP253-590
USED ON PART NO. 76542-EA605/EA505.
          ---------BLANKET COMMENTS---------
Steel Standard Text
MATERIAL TO BE SHIPPED AS RELEASED.
FABCO REQUIRES 100% ON TIME DELIVERY.
MATERIAL CERTIFICATION REQUIRED WITH
EACH SHIPMENT. MATERIAL MUST MAKE PART.

LACASSE 9658 REV 10/02

AND RETURN ATTACHED ACKNOWLEDGEMENT

OCT 14 2004 16:59 FR                                    TO 913132525080          P.02/23

Purchase Order Number
S100158

# ThyssenKrupp Fabco, Corp. 

850 Division Rd., P.O. Box 1060,
Windsor, ONT. N9A 6P7

| PO Date | Page |
| --- | --- |
| 2/11/03 | 3 |

| Exp Date | Status |
| --- | --- |
| 9/25/06 | CHANGE |
| | 9/23/04 |

Prices Stated In
U.S. DOLLARS

Ordered From   USHEIDTMANSTEEL
HEIDTMAN STEEL

19800 GILDRALTER RD

GILBRALTER          MI
                    48173

Ship To:
ThyssenKrupp Fabco Inc.
Springfield Plant
One Fabco Drive

SPRINGFIELD          TN
USA                  37172

SHIP VIA YOUR TRUCK

**FAX 9,17346750760    **FAIL STADDON          **OPI 17    **END

| BUYER | TERMS | ACK | CNFRM | F.O.S. | COL/PPD |
| --- | --- | --- | --- | --- | --- |
| 71 | Net 30 Days | N | N | SAO | |

Line  Sts   Our Item Number                          Your Item Number
      MY    ShpPtn   Pur Uom   Blanket Maximum   Pro Uom   Blanket Price
             Item Description/Line Comments                 Blanket Value
             ____BLANKET COMMENTS____
             CERTIFICATE OF ORIGIN REQUIRED. COIL
             AND SHEET PACKAGING MUST CONFORM TO
             S.A.O. SHIPPING & PACKAGING GUIDELINES.
             ALL PACKING SLIPS MUST BE SIGNED BY AN
             AUTHORIZED TKA FABCO EMPLOYEE, FAILURE
             TO DO SO WILL RESULT IN NON-PAYMENT OF
             INVOICE.

             PURCHASE ORDER NUMBER MUST BE REFERENCED
             ON EACH PACKING SLIP AND INVOICE,
             FAILURE TO DO SO MAY RESULT IN DELAY OF
             PAYMENT.

Ordered By AUTHORIZED SIGNATURE

LACASSE 9658 REV 10/02

**KINDLY COMPLETE AND RETURN ATTACHED ACKNOWLEDGEMENT**



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

THYSSENKRUPP FABCO CORP.,
*a Nova Scotia Corporation,*

        *Plaintiff,*

v.

HEIDTMAN STEEL PRODUCTS, INC.,
*a Michigan corporation,*

        *Defendant.*

Case No. 04-
Hon.

_____/

Daniel N. Sharkey (P53837)
Eric M. Mathis (P65384)
Butzel Long
Attorneys for Plaintiff
150 West Jefferson, Suite 100
Detroit, MI 48226
313-225-7000
_____/

**DECLARATION OF JEFF TESSIER IN SUPPORT OF**
**THYSSENKRUPP FABCO CORP.'S MOTION FOR INJUNCTION**

I, Jeff Tessier, declare under the penalty of perjury that:

1.    I am the Director of Purchasing for ThyssenKrupp Fabco Corp. ("Fabco").

2.    I have held this position since January 1999.  I began my career in the automotive industry in 1986 as a shipping supervisor, and I have been in the automotive industry for 18 years.

3.    My present responsibilities include oversight of all production materials, tooling and equipment.  Specifically, my job duties include facilitating purchasing parts from with Fabco's suppliers.

1

4.     I am personally familiar with the February 11, 2003 Purchase Order No. S100158 (the Contract) between Fabco and Heidtman Steel Products, Inc. (Heidtman). **Exhibit A** to the Verified Complaint. The Contract governs Heidtman's supply of flat rolled steel coil, part number 00635487500000 (the Steel Coil), to Fabco. The Steel Coil is designed and formulated to meet specific engineering requirements dictated by Fabco's customer, Nissan Motor Co., Ltd. (Nissan).

5.     Heidtman's plant in Butler, Indiana, sends shipments of the Steel Coil to Fabco's plant in Springfield, Tennessee every week. Heidtman is the only supplier of the Steel Coil to Fabco.

6.     Fabco incorporates Heidtman's Steel Coil into support beam assemblies (the Assemblies) designed for Nissan. Fabco sends multiple shipments of the Assemblies each day to Nissan's assembly plant in Smyrna, Tennessee. Fabco is the only supplier of the Assemblies to Nissan. Nissan incorporates the Assemblies into Nissan's Pathfinder and Xterra vehicle programs.

7.     Thus, the supply flow graphically appears as follows:

| <u>Heidtman</u> | <u>Fabco</u> | <u>Nissan</u> |
|---|---|---|
| the Steel Coil  → | the Assemblies → | Nissan Pathfinder / Xterra |

8.     Fabco cannot make the Assemblies without the Steel Coil supplied by Heidtman; nor can Nissan make the Nissan Pathfinder and Xterra vehicles without the Assemblies from Fabco.

9.     The Contract requires Heidtman to supply Fabco with Fabco's requirements of the Steel Coil until September 25, 2006. **Exhibit A.** The Contract fixes the prices for the Steel Coil at $.3585. **Exhibit A.**

2

10.     On June 24, 2004, Heidtman sent an e-mail to Fabco demanding that Fabco pay an increased price of $.4785 for the Steel Coil, based upon increased raw material costs. June 24, 2004 Email attached as **Exhibit C** to the Verified Complaint.

11.     On June 28, 2004, Fabco informed Heidtman that Fabco would not pay a price above the Contract's fixed price, and that Fabco expected Heidtman to continue shipping the Steel Coil pursuant to the terms of the Contract.  June 28, 2004 Email attached as **Exhibit D** to the Verified Complaint.

12.     On July 2, 2004, Heidtman informed Fabco that Heidtman would continue shipping the Steel Coil to Fabco, but would bill Fabco at the demanded increased price, and that Fabco must pay the demanded increase price to avoid interruptions of Heidtman's shipments to Fabco.  Also attached as **Exhibit D** to Verified Complaint.

13.     On July 15, 2004, Heidtman advised Fabco stating that it was charging a surcharge to each Steel Coil as follows:

| | |
|---|---|
| March 2004 | $5.00cwt |
| April 2004 | $6.25cwt |
| May 2004 | $6.25cwt |
| June 2004 | $3.50cwt |
| July 2004 | $3.50cwt |

July 15, 2004 Email attached as **Exhibit E** to the Verified Complaint.

14.     On July 23, 2004, Heidtman demanded that Fabco pay $.4435 for the Steel Coil, plus a .075 surcharge, equating to a total price of $.5185.  July 23, 2004 Email attached as **Exhibit F** to the Verified Complaint.  Heidtman's demand constitutes a 45% increase over the Contract's fixed price of $.3585.

15.     On August 11, 2004, Heidtman threatened to stop shipping the Steel Coil unless Fabco yielded to Heidtman's demand for a price increase:

3

> Effective today, August 11/04 Heidtman Steel halt [sic] all Direct Sales Shipments to TKA Fabco until all price increases or Surcharges that were deducted from invoices are paid in full.

August 11, 2004 Email attached as **Exhibit G** to the Verified Complaint. Despite Heidtman's threat, and Fabco's refusal to pay a higher price for the Steel Coil, Heidtman continued to ship.

16.     On November 2, 2004, Heidtman advised that it was making its last shipment of the Steel Coil to Fabco that day, and that it would not make the next scheduled weekly shipment of the Steel Coil on Tuesday, November 9, 2004.

17.     On November 3, 2004, Fabco sent Heidtman a letter:

- stating that Fabco would not accept Heidtman's request for a price increase;

- requesting written assurances from Heidtman that it would continue to deliver the Steel Coil at the contractually specified prices; and

- reminding Heidtman of its contractual obligations and the disastrous consequences that would result if Heidtman disrupted its supply of the Steel Coil, including the shutdown of Fabco's and Nissan's plants, causing irreparable harm to our relationships and millions of dollars in damages.

November 3, 2004 Email attached as **Exhibit H** to the Verified Complaint.

18.     Heidtman agreed under the Contract that the price the Steel Coil would be fixed at $ .3585 until September 25, 2006. In direct contravention of the Contract's requirement that Heidtman supply Fabco's requirements of the Steel Coil at $.3585, Heidtman is demanding a total price of $.5185, a 45% increase over the Contract's fixed price of $.3585.

19.     Fabco incorporates the Steel Coil into the Assemblies that it sells to Nissan. Fabco makes the Assemblies and acts as a Tier I supplier to Nissan, which in turn

4

incorporates the Assemblies into its Pathfinder and Xterra vehicles, which are produced and sold to the public.

20.     Even when accelerated, the Production Parts Approval Processes can take several months. Because Heidtman is Fabco's sole supplier of Steel Coil for the Assemblies, Fabco cannot obtain an alternative supplier of Steel Coil in time to avoid catastrophic interruptions of its production operations and the shutdown of its Springfield, Tennessee production plant, and Nissan's Smyrna, Tennessee assembly plant.

21.     Because of the "just-in-time" inventory method employed by the automotive industry, Fabco currently possesses only a one-week supply of the Steel Coil for Nissan's Smyrna, Tennessee plant. Thus, Fabco will begin running out of the Steel Coil on Tuesday, November 10, 2004, and will be forced to stop making the Assemblies.

22.     Nissan maintains less than one-day's worth of inventory of Fabco's Assemblies, relying on daily shipments from Fabco. Thus, Nissan will run out of Assemblies less than a day after Fabco runs out of the Assemblies.

23.     Therefore, if Heidtman does not ship on November 9, Fabco will have to stop manufacturing the Assemblies on November 10, and Nissan will have to stop assembling its Pathfinder and Xterra vehicles either that day or the next day, November 11.

24.     If Heidtman breaches the Contract by refusing to ship the Steel Coil to Fabco, it will result in the shutdown of Fabco's Springfield, Tennessee plant and, as early as November 11, 2004, a shutdown of Nissan's Smyrna, Tennessee assembly plant.

25.     Nissan has informed Fabco that a shutdown of its Smyrna, Tennessee assembly plant will result in damages of millions of dollars per day. Nissan employs thousands of workers at its Smyrna, Tennessee assembly plant, and its plant manufactures approximately

5

1,000 vehicles each business day, an average of 240,000 vehicles per year. Moreover, damages to other suppliers of Nissan resulting from such a plant shutdown will result in additional millions of dollars per day.

26.    Also, thousands of other automotive suppliers, ranging from large Tier I Fortune 100 corporations to "mom and pop" tool and die shops that are in the supply chain for the automotive industry will be affected, because production of the Nissan Pathfinder and Xterra vehicles, which incorporates the Assemblies, will be halted.

27.    Fabco cannot obtain sufficient production volumes of and requisite engineering and safety approvals for a substitute Steel Coil from a new supplier for at least three months and perhaps longer. If Heidtman is allowed to refuse to supply Fabco with the Steel Coil, Fabco will be unable to obtain it from an alternative source on a timely basis so as to avoid an interruption of production, resulting in thousands of employees of Fabco, Nissan, and the supply chain that feeds the Nissan Pathfinder and Xterra vehicle assembly programs.

28.    Such shutdowns will cause Fabco to suffer an irreparable loss of customer relations and goodwill. In addition, Nissan will also suffer a loss of customer relations and goodwill as a result of their inability to deliver Pathfinder and Xterra vehicles as ordered by its customers.

29.    Heidtman agreed in the Contract to fix the price for the Steel Coil until 2006, and has absolutely no right under the Contract to the price increases it has demanded from Fabco. Nor is Fabco under any obligation to yield to Heidtman's demands. Fabco has complied in good faith with all of its known contractual obligations to Heidtman.

30.    I have reviewed the Verified Complaint for Specific Performance and Motion for Preliminary Injunction against Heidtman. The Verified Complaint and Motion accurately

describe: (a) Heidtman's contractual obligations to Fabco and the course of dealing between Fabco and Heidtman regarding the Contract; (b) the substance of the communications between Fabco and Heidtman; (c) the projected timing necessary to retain a substitute supplier of the Steel Coil; and (d) the imminent danger of substantial and irreparable harm to Fabco's business reputation, relations with its customers, and undue economic hardship.

31.     I have personal knowledge of the facts stated in this Declaration and I can testify to those facts in court if necessary.

Jeff Tessier
Director of Purchasing
ThyssenKrupp Fabco Corp.

Dated:  November 5, 2004

708098





**"Bob Millar"**
**<Bob.Millar@heidtman.com>**
06/24/2004 02:45 PM

To   <Tom.Staddon@TKA-Fabco.ThyssenKrupp.Com>
cc   "Trish Amigh" <Trish.Amigh@heidtman.com>
bcc
Subject   July Steel Prices.

Tom
Per our phone conversation of today here are the July Steel Prices:

.044/.059 x 56.00 x cl          same as June $40.25cwt plus a $3.50cwt Surcharge.
SP 782-440 Galanl

.055/.061 x 59.00 x cl          same as June $39.75cwt plus a $3.50cwt Surcharge.
SP 782-440 Galanl

.063/.089 x 54.850 x cl         New Price will be $47.85cwt.total.
HRPO SP 253-590
All prices are in U.S.Funds delivered to Springfield,Tenn.
Regards
Bob





"Bob Millar"
<Bob.Millar@heidtman.com>
07/02/2004 09:42 AM

To   <Tom.Staddon@TKA-Fabco.ThyssenKrupp.Com>
cc   <Jeff.Tessier@TKA-Fabco.ThyssenKrupp.Com>,
      <James_Patterson/FABCO@tka-fabco.thyssenkrupp.com>
bcc
Subject   RE: July Steel Prices.

Tom
Heidtman Steel will be shipping and billing on the new July Prices. These
prices will have to be paid so that we can continue to purchase
material for your account and continue to ship without any
interruptions.
Regards
Bob

-----Original Message-----
From: Tom.Staddon@TKA-Fabco.ThyssenKrupp.Com
[mailto:Tom.Staddon@TKA-Fabco.ThyssenKrupp.Com]
Sent: Monday, June 28, 2004 10:39 AM
To: Bob Millar
Cc: Jeff.Tessier@TKA-Fabco.ThyssenKrupp.Com;
James_Patterson/FABCO@tka-fabco.thyssenkrupp.com
Subject: Fw: July Steel Prices.


Bob - please be advised that TKA Fabco is not accepting price increases
at this time. However we do expect Heidtman Steel to ship material as
released and to honour its current Blanket Purchase Order pricing.
Please review and advise.

Tom
----- Forwarded by Tom Staddon/FABCO on 06/28/2004 10:37 AM -----


                "Bob Millar"

                <Bob.Millar@heidt

                man.com>

        To
        <Tom.Staddon@TKA-Fabco.ThyssenKrupp
                06/24/2004 02:45          .Com>

                PM
        cc
                                    "Trish Amigh"

                                    <Trish.Amigh@heidtman.com>


        Subject

                                    July Steel Prices.

Tom

Per our phone conversation ~~~~~~~~~~~~~~~~~~~~~~~ uly Steel Prices:

.044/.055 ~~~~~~~~ x cl          same as Ju~~~~~~~~~~ plus a
~~~~~~~~~~~~~~
SP 782-440 Galanl

.055/.061 x 59.00 x cl          same as June $39.75cwt plus a
~~~~~~~~~~~~~~
SP 782-440 Galanl

~~~~~~~~~~~~~~~~ x cl          New Price ~~~~~~~~
$47.85cwt.total.
IIRPO SP 253-590
All prices are in U.S.Funds delivered to Springfield,Tenn. Regards Bob

This message was scanned by GatewayDefender
10:40:35 AM ET - 6/28/2004



 **"Bob Millar"**
<Bob.Millar@heidtman.com>

07/15/2004 09:10 PM

To  <Tom.Staddon@TKA-Fabco.ThyssenKrupp.Com>

cc

bcc

Subject  Surcharges 2004

Tom

Here is the list of surcharges by month:

March 2004   $9.00cut

April 2004   $9.25

May 2004   $9.25

June 2004   $9.40

July 2004   $9.50

Bob





**"Bob Miller"**
**<Bob.Miller@heidtman.com>**
07/23/2004 02:34 PM

To   <Tom.Staddon@TKA-Fabco.ThyssenKrupp.Com>
cc   "Trish Amigh" <Trish_Amigh@heidtman.com>
bcc
Subject   Steel prices August 2004

Tom
The new prices for your items for the Month of August 2004 will be as follows:

.044/.049 x 56.00 x cl
SP782-440 Galanl                $42.30cwt plus $7.50cwt Steel Surcharge

.055/.061 x 59.00 x cl
SP782-440 Galanl                $41.85cwt plus $7.50cwt Steel Surcharge

.063/070 x 54.875 x cl          $44.35cwt plus $7.50cwt Steel Surcharge
SP253-590  HRPO
All prices are delivered your plant Springfield,Tenn.
Regards
Bob





**"Bob Millar"**
**<Bob.Millar@heidtman.com>**
08/11/2004 11:11 AM

To   <Tom.Staddon@TKA-Fabco.ThyssenKrupp.Com>

cc   <Jeff.Tessier@TKA-Fabco.ThyssenKrupp.Com>

bcc

Subject   Shipments Halted

Tom
Effective today August 11/04 Heidtman Steel will halt all Direct Sales Shipments to TKA Fabco until all price increase or Surcharges that were deducted from invoices are paid in full.

Regards
Bob Millar



A ThyssenKrupp
Automotive
Company

# ThyssenKrupp Budd



ThyssenKrupp

November 3, 2004
*Via-Facsimile (734.675.0760) and Regular Mail*

Mr. Robert Millar
Account Manager
Heidtman Steel Products Inc.
19800 Gilbralter Road
Gilbralter, MI 48173

### Re: ThyssenKrupp Fabco Purchase Order No. S100158

Dear Mr. Millar

The purpose of this letter is notify Heidtman Steel Products that ThyssenKrupp Fabco Inc. ("Fabco"), a subsidiary of ThyssenKrupp Budd Company, rejects Heidtman's attempt to impose a unilateral increase to the price of parts sold to Fabco pursuant to the referenced purchase order ("Products").

Heidtman has demanded that Fabco enter into a revised or new blanket purchase order reflecting price increases relating to the production and supply of the Products to Fabco. Because Fabco is under no contractual obligation to pay the requested price increase, Heidtman's demands for price increases and its move to cease shipping the Products are unacceptable and a represent an anticipatory breach of Heidtman's contract with Fabco.

You advised Fabco on July 23, 2004 that you were increasing price on all products supplied to Fabco for the month of August. Fabco is particularly concerned about part number 0635487500000 coil on line 150 of purchase order #S100158. Fabco has not agreed to pay this increase or the surcharges, and has omitted the added amounts from our payments, yet you continue to invoice at higher than purchase order price. Today, you informed Fabco that you were suspending further shipments of the Products.

As you know, Heidtman is currently Fabco's sole source for this Product. Fabco will not be able to obtain equivalent or better quality products from an alternative source in a timely manner if Heidtman stops supplying the Product to Fabco. Therefore, even a short supply interruption is likely to result in production

ThyssenKrupp Budd Company - Corporate Offices
P.O. Box 2601, Troy, MI 48007-2601
3155 W. Big Beaver Road, Troy, MI 48084
Telephone: (248) 643-3500
www.thyssenkruppbudd.com

Page Two
November 3, 2004
Re:  ThyssenKrupp Fabco Purchase Order No. S100158

shut downs for both Fabco and its customer, Nissan.  The damages resulting from Heidtman's breach and the resulting production shut downs could easily exceed millions of dollars per day.

At a minimum, Fabco expects Heidtman to continue to supply the Product to Fabco and honor the terms of its existing contractual agreements.  We urge you to reconsider your actions, which are in clear violation of Fabco's contractual rights under these agreements, and to acknowledge immediately that Heidtman will continue to supply the products in the quantities and at the prices agreed.  In light of Heidtman's recent actions and statements, we must demand immediate, written assurances from Heidtman that it will continue to abide by the terms of our contract.  Failure to do so will leave Fabco with no recourse but to seek appropriate legal remedies to protect our interests.

We look forward to your immediate reply to this letter.

Yours truly,

Michael Bauer
Assistant General Counsel
ThyssenKrupp Budd Company
Tel.:  (248) 643-3755
Fax:  (248) 543-3554
bauerm@tkus.thyssenkrupp.com

cc:    Jeff Tessler
bcc :  Daniel Sharkey, Esq.



# STATE OF MICHIGAN
## SIXTH JUDICIAL CIRCUIT COURT OAKLAND COUNTY

DELPHI AUTOMOTIVE SYSTEMS, LLC.

                                    Circuit Court Number
   vs                               04-060078 CK

CENTER MANUFACTURING, INC.

_____/

## BENCH TRIAL

BEFORE THE HONORABLE JUDGE MARK GOLDSMITH, CIRCUIT JUDGE

Pontiac, Michigan – Friday, August 13, 2004


APPEARANCES:

For the Plaintiff:          JAMES G. DERIAN   (P33580)
                            KIMBERLY HORSLEY ALLEN
                            100 Bloomfield Hills Parkway
                            Bloomfield Hills, MI   48034
                            (248) 258-4473
                            (248) 258-1305


For the Defendant:          DANIEL MURRAY      (P18121)
                            300 Ottawa Ave NW
                            Suite 650, The Frey Building
                            Grand Rapids, MI   49503
                            (616) 458-7795

Reported by:                Gwendolyn D. Finley, CSR-7127
                            (313) 986-0650

TABLE OF CONTENTS

PAGE

Court's Ruling                                                3

Friday, August 13, 2004 - 3:32 p.m.

THE COURT:  Please be seated.

All right.  We are back on the record in Delphi

Automotive Systems, LLC versus Center

Manufacturing, Inc., 04-060078 CK.  And your

appearances, please, for the record.

MR. DERIAN:  Yes, James Derian on

behalf of Plaintiff, Delphi Automotive Systems.

MS. ALLEN:  Kimberly Allen on behalf of

Delphi.

MR. MURRAY:  Dan Murray on behalf of

Center Manufacturing, Inc.

THE COURT:  All right.  We conducted a

trial in this matter earlier today.  The Court

retired to consider its decision.  Before I do

that, I want to congratulate both Counsel for very

effectively representing their respective clients

in this matter.  The trial was conducted very

professionally and the papers that were submitted

before trial were also prepared in a very dilligent

and informative manner and greatly assisted the

Court in understanding the issues that were

presented by this case for the Court's decision.

In this case, Delphi Automotive

3

1    System, LLC had a contractual relationship with

2    Center Manufacturing, Inc under which Delphi had

3    purchased certain automotive parts for use in

4    Delphi's assembly of automotive cockpits that had

5    been sold to General Motors.  That relationship

6    went back several years.

7              The specific part of that relationship

8    that brings the parties to court in this action

9    concerns two specialized steel tie bars, Part

10   Number 15422593 and 22675334.  These tie bars had

11   been the subject of a contract that had been

12   entered into and was marked as Exhibit 102,

13   Plaintiff's Exhibit 102.  It bore a version date of

14   June 11, 2003.  It covered a number of parts

15   including the two parts that are the subject of

16   this action.  That contract was a requirements

17   contract.  It required Center to supply 100 percent

18   of Delphi's requirements for those parts.  It had a

19   specific fixed price and had a termination date of

20   June 30th, 2004.

21             In January of 2004 the parties

22   negotiated with respect to the two parts that are

23   the subject of this action.  Those numbers I've

24   already recited into the record.  Exhibit 103 is a

25   document that was prepared as a result of those

4

registrations which was prepared by Center to
reflect a twelve cents per part reduction that had
been discussed between a representative of Delphi,
Mr. David McCrackin (phonetic) and the
representative of Center whose name is Mel Halloway
(phonetic).

> According to Mr. McCrackin's testimony
there was an agreement with respect to the twelve
cent reduction for the part or parts, and there was
also a discussion regarding adding a year to the
contract so that it would be extended to June 30th,
2005. Mr. Halloway did not testify at trial. Mr.
David Sorenson on behalf of Center did testify. He
did not deny that there had been a discussion
regarding the twelve cent per part discount. He
testified he knew nothing about any discussion
regarding an extension of the contract to June
30th, 2005.

> After Exhibit 103 was sent by Center to
Delphi, Delphi sent a purchase order which was
admitted here as Plaintiff's Exhibit 104. That is
the document that Delphi relies on to establish
that there was a new contract between the parties
that contained two critical terms; first, the
twelve cent per part discount and secondly, an

5

1    extension of the contractual relationship to June

2    30th, 2005.  Mr. McCrackin testified that

3    Exhibit 104 was sent in hard copy to Center and

4    that some notification either of this contract or

5    its essential terms was sent electronically as

6    well.   Mr. Sorenson testified that Exhibit 104 had

7    in fact been received on February 9th, 2004.  It's

8    dated February 5, 2004.

9              Delphi takes the position that this

10   contract that is set out as Exhibit 104, which I

11   will call the second contract, was accepted by

12   Center.  Center disputes that fact, and that is the

13   essential threshold issue in this case.  If the

14   second contract was not accepted by Center, then

15   Center is under no obligation to continue to supply

16   parts to Delphi, and Center is free to negotiate

17   for a higher price for the parts.  Center in fact

18   claims that it is essential for it to negotiate for

19   a higher price because of the extraordinarily high

20   spike in steel prices, upwards of 50 percent

21   according to Mr. Sorenson.  Steel is an essential

22   component of the parts at issue in this case.

23             Delphi has taken the position that

24   because the second contract never was accepted, its

25   stated intention not to continue to supply parts

6

1   unless Delphi would agree to a higher price and/or

2   to pay certain steel surcharges was entirely

3   legitimate.  Delphi's position by contrast is that

4   the second contract was accepted, it does govern

5   the relationship of the parties, binds Center to

6   supply the parts in accordance with the terms of

7   the contract as set out in Exhibit 104 and binds

8   Center until June 30th, 2005.

9           The Court was presented with testimony

10  supporting how the stakes are extraordinarily

11  important to both parties.  Delphi presented

12  evidence that unless Center is required to continue

13  to supply the parts in accordance with the second

14  contract, Delphi will have to shut down its

15  assembly plant in Lansing because it works on a

16  just-in-time inventory concept under which it has

17  approximately one day's worth of inventory that is

18  immediately available.  It's a customer.  General

19  Motors, according to the testimony, operates on the

20  same basis but with an even shorter inventory time

21  of some three to six hours.  A shut down at Delphi

22  would potentially leave some one hundred and

23  fifteen employees unemployed and potentially over

24  one thousand employees at the General Motors

25  Assembly Plant in Lansing.

1    Center, on the other hand, maintains that

2    if it is forced to live under the second contract

3    it will suffer significant economic loss because of

4    the spike in steel prices.  The specific amount of

5    dollar loss was not put forth in the testimony

6    before the Court, although the Court gathered that

7    it was a significant number.

8         The first issue for the Court then to

9    address is whether or not the second contract in

10   fact was accepted.  The parties have symboled the

11   authorities dealing with acceptance.  The concepts

12   have been stated in a variety of ways.  The Uniform

13   Commercial Code would appear to govern because this

14   is a sale of goods.  The code states in MCL 440.

15   2206 (1), "Unless otherwise unambiguously indicated

16   by the language or circumstances, an offer to make

17   a contract shall be construed as inviting

18   acceptance in any manner and by any meaning and

19   reasonable under the circumstances."

20        Another relevant provision is found in

21   MCL 440.2204 (1), "Contract for sale of goods may

22   be made in any manner sufficient to show agreement

23   including conduct by both parties which recognizes

24   the existence of such contract."

25        The general law of contracts similarily

8