1    provides that acceptance of an offer is determined

2    based on the conduct of the parties.  For example,

3    in Ludowici-Celadon -- that's L-u-d-o-w-i-c-i -

4    C-e-l-a-d-o-n Company versus McKinley, 307 Mich 149

5    (1943) the Court stated, quote, "In acceptance of

6    an offer to contract may be implied from the acts

7    and circumstances of the parties."

8             Delphi's theory is that there was

9    acceptance of the second contract in the present

10   case, because the second contract dated February 5,

11   2004 was sent to Center stating the new prices and

12   stating the new extension of termination date.

13   Further, Delphi contends that Center performed

14   under that contract by shipping goods and by paying

15   the new price as set forth in the second contract.

16   Delphi points out that the terms of the contract

17   state, "If seller accepts this contract in writing

18   or commences any of the work or services which are

19   the subject of this contract, seller shall --

20   strike that -- seller will be deemed to have

21   accepted this contract and buyer's general terms

22   and conditions in their entirety without

23   modification."

24             It is undisputed that there was no

25   writing in which Center accepted this second

9

1    contract, but the question becomes whether it

2    performed under the contract and thereby signified

3    its acceptance.   Center's position is that it was

4    simply continuing to perform under the former

5    contract which had a termination date of June 30th,

6    2004, that it shipped the exact same parts that it

7    had shipped under the former contract including the

8    bar code, the removal of which was supposed to have

9    justified the price reduction under the second

10   contract.   Therefore, Center argues since it

11   continued to do precisely what it did before, there

12   isn't any evidence that it was performing under the

13   second contract, and because it did not state in

14   writing that it was performing under the second

15   contract or was accepting the second contract there

16   had been no acceptance.

17           Whether or not there was acceptance is

18   a question of fact.   Based on all the evidence that

19   was supplied the Court concludes that there was

20   acceptance of the second contract.   The Court comes

21   to that conclusion based on the fact that Center

22   did pay the new price under the second contract.

23           MR. DERIAN:   Excuse me, your Honor.   Do

24   you mean Center accepted payment?

25           THE COURT:   I'm sorry.   Strike that.


                                                    10

2:04-cv-74331-NGE-MKM   Doc.# 1-2   Filed 11/05/04   Pg 3 of 46   Pg ID 53

1    Center accepted payment under the second contract.

2    There is no document that has been supplied to the

3    Court indicating that Center was accepting payment

4    under protest or that it disagreed with the amount

5    that was being paid to it.  The Court believes that

6    if in fact Center believed that the initial

7    contract so governed, it would have insisted on the

8    prices as set forth in the initial contract.

9    Therefore, by its conduct in accepting the lower

10   price, Center manifested an assent to the second

11   contract.

12          The document that establishes the

13   payment history under the second contract as well

14   as under the first contract is Plaintiff's Exhibit

15   105, and there was testimony from Mr. McCrackin

16   that the prices paid after February 18, 2004

17   reflect the prices under the second contract.

18   There was no dispute of that point by Center.

19          Center points to a letter dated

20   February 25, 2004 sent by Mr. Sorenson to Mr.

21   McCrackin that discusses the increase in steel

22   prices and advises that Center will be reviewing

23   all part numbers to determine the impact of rising

24   costs for steel tubing.  According to Mr. Sorenson,

25   this was his way of registering some disagreement

11

1  with the prices under the second contract and/or

2  manifesting some kind of disagreement with the

3  concept that there had been a second contract

4  entered into.  The letter, however, does not

5  support Center's position.  It does suggest that

6  Center is interested in discussing pricing.  It,

7  however, does not by its terms state that the

8  second contract was never accepted.  It does not

9  state that the price terms of the second contract

10  were not operative.  It does not at all mention the

11  extension of the contract terms under the second

12  contract.  Therefore, Defendant's Exhibit 2 does

13  not present to the Court persuasive piece of

14  evidence to suggest that Center did not accept the

15  second contract.

16              To the contrary, the failure to make

17  specific mention of the second contract either as

18  to price or as to duration suggests to the Court

19  that Center recognized that it had in fact accepted

20  the second contract, but was seeking to renegotiate

21  with Delphi.

22              Further evidence that supports Delphi's

23  position and contradicts Center's position is found

24  in exhibit -- Defendant's Exhibit 4b which was a

25  spreadsheet prepared by Center and sent to Delphi.

12

1   The headsheet indicates that the current price

2   that exists is the price under the second

3   contract -- actually, the prices under the second

4   contract, not the prices under the first contract.

5   That supports Delphi's position that the parties

6   understood that the second contract was in fact

7   accepted and operative.

8            The Court heard testimony that in the

9   real world; that is to say, the real business

10  world, communications between business people are

11  not the type that would necessarily be prepared by

12  lawyers unsuitable for being introduced into court

13  is unequivocle statements of intent.   The

14  suggestion appears to be that there is more

15  informality in the business world than there might

16  be in the legal world.  It is true business people

17  communicate in a less formal manner.  Nonetheless,

18  once a business problem enters the legal world,

19  fact finders can only rely on the testimony of

20  witnesses and the documents that they've generated

21  to determine what the intent of the parties was.

22            Center certainly was in a predicament

23  wanting to maintain a good business relationship

24  with Delphi and with General Motors, and yet found

25  itself on the short end of a steel spike in

13

1   price.   The Court believes that if in fact there

2   had not been an agreement to accept the second

3   contract, Center could have crafted responses that

4   would have preserved some memorialization of its

5   position if there hadn't been a second contract

6   entered into, and at the same time communicate its

7   willingness to continue to negotiate a resolution

8   and not leave its long-time customer in a difficult

9   situation by threatening any immediate cut off.

10   However, the communications between the parties

11   while reflecting a negotiation over price that

12   postdates the onset of the second contract, those

13   communications don't in any way suggest that Center

14   believed or was manifesting a belief, more

15   importantly, that the second contract was not

16   operative.   Therefore, the Court believes that

17   Center did accept the second contract and that that

18   is the contract between the parties.

19            The next issue is what is the

20   appropriate remedy in this case.  As mentioned

21   before, if Center were not required to continue to

22   perform under the second contract, there would be

23   serious dislocations that would result.  There was

24   specific testimony about a hundred and fifteen

25   employees at Delphi who would be out of work and

14

1    some one thousand employees at General Motors would

2    suffer the same fate because of the just-in-time

3    supply method that Delphi and GM have employed.

4    Center is the sole source supplier for Delphi of

5    the particular parts that are the subject of this

6    litigation.  The Court heard testimony of the

7    just-in-time supply method and the sole source

8    supply method to provide cost savings, but at the

9    same time leave Delphi as well as General Motors

10   vulnerable to significant harm in the event there

11   is a disruption or a succession of supply.

12              The law recognizes that conjunctive

13   relief is appropriate in the circumstances of this

14   case.  MCL 440.2716 provides, quotes, "Specific

15   performance may be decreed where the goods are

16   unique or another proper circumstance."

17              Comment 2 to the official text of

18   Section 2.716 states, quote, "Output and

19   requirement contracts involving a particular or

20   peculiar available source or market are present

21   today, the typical commercial specific performance

22   situation.  Uniqueness is not the sole basis of the

23   remedy under the section, for the relief may also

24   be granted in other proper circumstances and to

25   cover a strong evidence of the other proper

15

1   circumstances." Here, the parts are unique.  They

2   are specialized parts.  And there was both

3   testimony as well as a stipulation that it would

4   take in excess of ten months for Delphi to find an

5   alternate supplier.  Unless enjoined, that would

6   lead to significant hardship for employees as well

7   as significant financial loss that Center would be

8   hard pressed to make whole.

9           There are numerous cases where specific

10  peformance has been awarded analagous situations.

11  The Court will simply note a few of these:  Jaup,

12  spelled J-a-u-p, The Homestead 334 Mich 614 (1952),

13  Bohnsack, spelled B-o-h-n-s-a-c-k, The Detroit

14  Trust Company 292 Mich 167 (1940).

15          There are cases outside of Michigan to

16  the same affect where specific performance has been

17  awarded where a supply contract is threatened.

18  See, for example, Laclede, spelled L-a-c-l-e-d-e

19  Gas Company versus Amoco Oil Company, 522 F 2nd, 33

20  (8 cir. c-i-r 1975); E Airlines Inc, The Gulf Oil

21  Corp. 415 F sub 429 (S) (D) Florida (1975).  There

22  are several other cases that are referenced in

23  Plaintiff's trial brief to the same effect.  The

24  Court also notes the case of Kelsey-Hayes Company

25  The Galtaco, G-a-l-t-a-c-o, Redlaw, R-e-d-l-a-w.

16

1   Castings Corporation, 745 F Sup __ (E) (DD Mich
2   (1990), where the propriety of equitable relief was
3   recognized in an automotive industrial context.
4            Although it is not necessarily the case
5   in the request for a permanent injunction following
6   a trial where a breach of contract has been
7   demonstrated involving a unique product for the
8   Plaintiff to demonstrate irreparable harm, the
9   Court believes that that has been demonstrated in
10  this case and Defendant does not contest and, in
11  fact, appears to have stipulated that the failure
12  of Center to continue to supply the product to
13  Delphi would amount to irreparable injury.  This is
14  supported by the loss of jobs to so many employees
15  as well as the catastrophic financial loss that
16  would result from the shut downs of the Delphi and
17  General Motors plants, a loss of which would be
18  beyond Center's ability to compensate.
19           Similarily, in this context, it is not
20  clear that a balancing of harms needs to be made or
21  that the public interest needs to be taken into
22  account, but to the extent that it is required, the
23  Court will find as well that the balance of harm
24  does tip in favor of the issuance of an injunction
25  for the reasons previously mentioned, and that the

17

1    public interest is served by enforcing contractual

2    obligations in this setting where the failure to

3    observe contractual obligations were so significant

4    they affect such a wide number of individuals.

5           The Court will grant the request for

6    relief as follows.  The Court does declare that the

7    second contract has been accepted and is in effect

8    and that Center is obligated to perform under it.

9    Those terms are found in Plaintiff's Exhibit 104

10   and the Court specifically finds that the new

11   prices for the subject parts are operative and that

12   the contract extends to June 30th, 2005.

13          The Court also will grant a permanent

14   injunction to require Center to comply with the

15   terms of the second contract.  The Court does have

16   some sympathy for Center's predicament because of

17   its cost increases that it faces, but the Court

18   believes that while that is significant on a

19   business level, it is not significant on a legal

20   level.  These were both fixed priced contracts.

21   There was no provision in them for any escalating

22   costs that Center might face.  And there's no

23   provision of the law that would allow Center to

24   demand a higher price or demand that Delphi accede

25   to Center's request for renegotiation of price.

18

1    Is there anything the parties need

2    clarified?

3           MR. DERIAN:  Your Honor, I believe your

4    ruling is quite clear, and I would like to thank

5    the Court for recognizing the party's needs, the

6    urgency for a quick decision and your extraordinary

7    public service in allocating this Friday afternoon

8    to the parties for this bench trial.

9           MR. MURRAY:  Nothing clarified, your

10   Honor.  Thank you.

11          THE COURT:  All right.  Now, Mr. Derian

12   has submitted to me a proposed judgment.  Has then

13   been presented to Mr. Murray?

14          MR. DERIAN:  No, it hasn't, your Honor.

15          THE COURT:  All right.  What I'm going

16   to do is -- do you have a copy to give to Mr.

17   Murray?

18          MR. DERIAN:  I do not, your Honor.  I'm

19   sorry.

20          THE COURT:  I'll give this back to you

21   Mr. Derian.  Why don't you share it with Mr.

22   Murray.  I'm going to recess for about five minutes

23   and hopefully you can work out the language.

24          MR. DERIAN:  Is your Honor suggesting

25   that this current language comports with the

19

1    Court's ruling?

2              THE COURT:   Well, I want Mr. Murray to

3    take a look at it.   I was under the impression that

4    he had seen it, so I'm not going to offer any

5    comments until he's had a chance to look at it.

6    All right.   I'll be in recess for five minutes.

7                        (At 4:20 p.m., Court in recess.)

8              - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        20

1    STATE OF MICHIGAN)

2    COUNTY OF OAKLAND)

3

4              I, Gwendolyn D. Finley, Certified

5    Reporter of the Sixth Judicial Circuit Court, State

6    of Michigan, do hereby *certify that the foregoing

7    pages 1-21 inclusive, comprise a true and correct

8    transcript of the proceedings and testimony taken

9    in the matter of Delphi Automotive Systems, LLC

10   versus Center Manufacturing, Inc, Case Number

11   04-060078 CK, on Friday, August 13, 2004.

12

13

14              _Gwendolyn D. Finley_

15              Gwendolyn D. Finley, CSR-7127

16              Sixth Judicial Circuit Court

17              1200 N. Telegraph Road

18              Pontiac, Michigan   48341

19              (313) 986-0650

20

21   August 16, 2004

22

23

24

25

                                                    21



UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERTEC SYSTEMS, LLC,

        Plaintiff,

v.                                                          Case No. 04-CV-73661-DT

MULTIMATIC, INC.,

        Defendant.

                                /

## ORDER GRANTING INTERTEC'S "MOTION FOR PRELIMINARY INJUNCTION"

Pending before the court is Plaintiff Intertec System's "Motion for Preliminary Injunction," filed on September 21, 2004.  The court has considered the briefs and the testimony presented at the September 29, 2004 hearing in this matter, and for the reasons set forth below will grant Plaintiff's motion.

## I. BACKGROUND

Plaintiff Intertec is a Tier I supplier of interior automotive systems.  (Pl.'s Compl. at ¶ 5.)  Defendant Multimatic is a supplier of, among other things, steel-based products, to Tier I automotive suppliers such as Plaintiff.  (*Id.* at ¶ 6.)  On July 16, 2002, Plaintiff and Defendant entered into a long-term agreement for the supply of Part No. 4000135, the JSB Cross-Car Beam ("beam").  (*Id.* at ¶ 7.)  The beam is designed and formulated for Plaintiff's specific engineering requirements.  (*Id.* at ¶ 8.)  Plaintiff incorporates Defendant's beam into the dashboard/instrument panel assemblies ("assemblies") it manufactures for Mazda Motors Corporation ("Mazda").  (*Id.* at ¶ 9.)

Plaintiff sends its shipments of assemblies to Mazda's assembly plant in Flat Rock, Michigan. (*Id.* at ¶ 10.) Plaintiff is the only supplier of the assemblies to Mazda, and Mazda cannot make its "Mazda 6" model without the assemblies. (*Id.* at ¶ 10.) In addition, the Flat Rock plant is a joint assembly plant of Mazda and Ford Motor Company. (*Id.* at ¶ 11.) Because the Ford Mustang vehicle works off of the same platform as Mazda, Ford would ultimately be unable to produce the Mustang if not supplied with Plaintiff's assemblies. (*Id.* at ¶ 11.)

The Intertec-Multimatic contract is a requirements contract, requiring Defendant to supply Plaintiff with beams as needed, through June 30, 2007. (*Id.* at ¶ 7.) The Intertec-Multimatic contract language includes a "fixed price for the beam that decreases 4% each year. . . The fixed price for fiscal year 2003 [October 1, 2002-September 30, 2003] was $33.6733 (Canadian Dollars) ("CDN"). On October 1, 2003, the price decreased 4% for the fiscal year 2004 [October 1, 2003-September 30, 2004], from $33.6733 [CDN] to $32.326 [CDN]." (*Id.* at ¶12.) "[The price projected for] October 1, 2004, the beginning of fiscal year 2005, [was] $31.03296 [CDN] [a 4% decrease in price]." (*Id.* at ¶ 12.)

On July 2, 2004, Plaintiff received a letter from Defendant requesting a price increase to be paid by Plaintiff for Defendant's further shipments of its beams. In that letter, Defendant stated that its cost for raw materials had increased to make the beam, and that Inmet [a division of Multimatic] could not remain viable [while] absorbing these costs." (Pl.'s Mot. Br., Ex. B.) In that same letter, Defendant threatened to stop shipment of its beams on August 2, 2004 if Plaintiff did not comply with Defendant's

price increase. (*Id.*) During a series of meetings and correspondence over the next two months, Defendant extended the date that it threatened to stop shipment of the beam. (Pl.'s Compl. at ¶ 17.)

On September 3, 2004, Defendant asked for revised pricing of $37.6394 CDN per beam effective retroactive to August 1, 2004 and also threatened to stop shipping its beams as of Tuesday, September 21, 2004 if Plaintiff refused to agree. (Pl.'s Mot. Br., Ex. C.) Plaintiff asks this court to grant a preliminary injunction to prevent Defendant from ceasing shipment of its beams until this matter is resolved.

## II. STANDARD

### A. Preliminary Injunction

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The court must consider four factors in determining whether to grant a preliminary injunction:

> (1) likelihood of success on the merits;
> (2) potential for irreparable harm;
> (3) potential of adverse public impact; and
> (4) potential harm to the plaintiff weighed against the potential harm to the defendant.

*Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003). None of these factors, standing alone, is a prerequisite to relief; rather, they must be balanced. *In re DeLorean*, 755 F.2d 1223, 1229 (6th Cir. 1985). Thus, "no single factor is determinative as to the appropriateness of equitable relief." *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537 (6th Cir. 1978).

3

The Sixth Circuit has long recognized that "[t]he object and purpose of a preliminary injunction is to preserve the existing state of things until the rights of the parties can be fairly and fully investigated." *In re DeLorean*, 755 F.2d at 1229 (quoting *Blount v. Societe Anonyme du Filtre Chamberland Systeme Pasteur, et al.*, 53 F. 98, 101 (6th Cir. 1892)). In the case at bar, the court finds that a preliminary injunction is warranted.

## III. DISCUSSION

### A. Likelihood of Success

The first prong of the preliminary injunction test, likelihood of success on the merits, weighs in favor of Plaintiff. Plaintiff and Defendant had an agreement where Defendant committed to providing Plaintiff with its beam at an agreed-upon contract price. Both the Intertec-Multimatic contract language and counsel's representations to the court at the hearing held in this matter provide evidence that the Intertec-Multimatic contract established a fixed price for the beam that decreases at a rate of 4% each year. The fixed price for fiscal year 2003 (October 1, 2002-September 30, 2003) was $33.6733 CDN. On October 1, 2003, the price decreased 4% for the fiscal year 2004 (October 1, 2003-September 30, 2004), from $33.6733 CDN to $32.326 CDN. The price projected for October 1, 2004, the beginning of fiscal year 2005, was $31.03296 CDN (a 4% decrease in price). (*Id.* at ¶ 12.)

In its motion for a preliminary injunction, Plaintiff is seeking the specific performance of its requirements contract with Defendant. Mich. Comp. Laws §440.2716 expressly provides for specific performance of a contract:

4

1) Specific performance may be decreed where the goods are unique or in other proper circumstances.

2) The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.

Mich. Comp. Laws § 440.2716.

Moreover, the court will generally enforce the unambiguous terms of a contract. *D'Avanzo v. Wise & Marsac*, 565 N.W.2d 915, 917 (1997). In this case, the contract terms do not appear to be ambiguous, as the contract language does not seem to be "subject to multiple reasonable interpretations." *City of Wyandotte v. Consolidated Rail Corporation*, 262 F.3d 581, 588 (2001). In addition, the contract's meaning does not appear to be "obscure and its construction does [not] depend upon other and extrinsic facts in connection with what is written." *D'Avanzo*, 565 N.W.2d at 917. Based on the record and the hearing held in this matter, the parties most likely established $33.6733 CDN as the base price for the contract, with a 4% rate of decrease each year. Where a price term is unambiguous, the court may construe the terms of the contract. *Id.* Defendant states that there have been modifications to the contract since the original contract that have altered the meaning of the agreement. Defendant's assertions may be proven true at a later proceeding. But at this stage, the court need only find that the first prong of the preliminary injunction test weighs in favor of Plaintiff. There is a likelihood of success in Plaintiff's goal of proving the original terms of the Intertec-Multimatic agreement and being granted specific performance of the contract because of the unambiguous contract language.

5

## B. Irreparable Harm

A movant seeking a preliminary injunction must prove that any claimed irreparable harm is imminent, with a substantial threat of impending injury. *McDonald's Corp. v. Burger King Corp,* 87 F. Supp. 2d 722, 725 (E.D. Mich.1999). In evaluating irreparable harm, an important factor is whether the potential damages that would result from the defendant's continued action would be "economic in nature and fully compensable monetarily." *Taubman,* 319 F.3d at 778. If the plaintiff's damages are purely economic, the potential harm is not deemed to be irreparable. *Id.* at 778.

In this case, the loss that Plaintiff, Ford and Mazda will experience is substantial and not fully compensable monetarily. If Defendant is allowed to cease shipment of beams to Plaintiff, Plaintiff will very soon run out of the beam. Based on the pleadings presented to the court and the arguments made at the hearing, it is clear that Mazda's Flat Rock Assembly Plant will then run out of Plaintiff's assemblies, and will consequently have to shut down its Mazda 6 line. The evidence also suggests that because Ford shares the Flat Rock Assembly Plant and its Mustang operation works off of the same platform as the Mazda 6, Ford will have to stop producing its Mustang vehicle on the same day.

Indeed, the ceasing of shipments in the automobile industry can wreak particular havoc. For example, in *Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.,* 749 F. Supp. 794, 798 (E.D. Mich. 1990), the *Kelsey* court noted that:

> It is well known that in an effort to promote efficiency, car manufacturers are reducing the size of their reserve banks of parts. As a result, component parts are often incorporated into a finished product within a few hours of their delivery. A supplier's failure to make scheduled

6

shipments may have immediate and dramatic consequences . . . Thus, a breach of contract in the automotive industry may be more coercive than in other industries.

In *In re Autostyle Plastics, Inc.*, 216 BR 784 (Bankr. W.D. Mich. 1997), the court discussed the chain of events that can result from a plant shutdown. The court recognized Debtor Autostyle's fear that:

> any interruption in its production schedules might result in a shut down of certain assembly lines while GM and other customers obtained new suppliers and made the necessary arrangements for new production tooling and dies. In turn, these shut downs might cause the layoff of innumerable employees of GM and Debtor's other customers . . . Debtor Autostyle calculated that a shut down of a GM assembly line could result in a damage claim by GM and an offset against outstanding GM accounts receivable in excess of $9 million per day.

(*Id.* at 788.)

Likewise, in this case, there will be a cascading effect on Plaintiff, Mazda, Ford and their employees if Multimatic cuts off its supply of beams to Plaintiff. For example, Mazda and Ford will face immediate plant shutdowns. These shutdowns could very likely result in Mazda and Ford initiating litigation against Plaintiff. In addition, Plaintiff, Mazda, and Ford will lose employee work hours and productivity as a result of the shut downs.

### C. Public Impact

As described above, the closing of Intertec's plant would have a significant impact on Mazda and Ford and its employees, and would disrupt the local economy where these plants are located. The public interest will be served by granting Plaintiff's requested injunctive relief since it will prevent a shutdown of Plaintiff, Mazda and Ford, consequent layoffs and other harm to the local and state economies.

7

### D. Weighing the Harms

In this case, Defendant will not realize as much profit as it otherwise would if the injunction were not granted, as it indicated in its July 2, 2004 letter. However, Plaintiff and the local economy will suffer the severe harm discussed above if the injunction is not granted.

In order to minimize Defendant's harm in the event that Defendant ultimately prevails in this matter, the court will establish an escrow account that Plaintiff will be required to pay into, in the amount of the difference between $32.326 CDN per beam and $41.30 CDN per beam.

### IV. CONCLUSION

IT IS ORDERED that Plaintiff's "Motion for Preliminary Injunction" [Dkt. # 3] is **GRANTED.**

IT IS FURTHER ORDERED that Plaintiff pay Defendant $32.326 CDN per beam and place the **monetary difference** between $32.326 CDN and $41.30 CDN into an **interest-bearing escrow account** until the completion of these proceedings. Plaintiff is directed to deposit this amount with the Clerk of Court each time it makes a payment of $32.326 CDN per beam to Defendant for its shipment of beams. Plaintiff is responsible for converting the Canadian funds into United States funds and depositing United States funds into the escrow account. Plaintiff must also include with its deposits a statement detailing how many beams each deposit amount covers and how many beams were shipped in that particular shipment. Pursuant to Local Rule 67.1, the Clerk of Court shall accept only cash, certified check, cashier's check or money order

8

for deposit in an interest-bearing account.  The Clerk of Court is hereby directed to

deduct from the account any fee authorized by the Judicial Conference of the United

States.

ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: October 14, 2004

PURSUANT TO RULE 77 (d), FED. R. CIV. P.
COPIES MAILED TO ATTORNEYS FOR ALL
PARTIES ON _____ 10/14 , 20 04
DEPUTY COURT CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERTEC SYSTEMS, LLC,
*a Michigan limited liability company,*

                *Plaintiff,*

v.

                                     Case No. 04-73661
                                     Hon. Robert H. Cleland

MULTIMATIC, INC.,
*a Canadian corporation,*

                *Defendant.*

FILED

SEP 2 0

CLERK'S OFF
U.S. DISTRICT
EASTERN MICHIGAN

_____/

Philip J. Kessler (P15921)
Daniel N. Sharkey (P53837)
Butzel Long
Attorneys for Plaintiff Intertec Systems, LLC
150 West Jefferson, Suite 100
Detroit, MI 48226
313-225-7000

Steven Susser (P52940)
Young & Susser, P.C.
Attorney for Defendant Multimatic, Inc.
26200 American Drive
Suite 305
Southfield, MI 48034
(248) 353-8620

_____/

## ORDER GRANTING TEMPORARY RESTRAINING ORDER

    This matter is before the Court on Plaintiff Plaintiff Intertec Systems, LLC's ("Intertec")

Motion for a Temporary Restraining Order (the "Motion"). This Court has conducted a hearing

on the Motion. Upon review of the brief and arguments presented by the parties, and being fully

advised of the premises, this Court finds that:

        If Defendant Multimatic, Inc.("Multimatic") does not continue to order steel and make

shipments of the J56 Cross-Car Beam ("the Beam") it produces for Intertec, Intertec will

be irreparably damaged because of Intertec's need for the Beam on or before September

23, 2004. Furthermore, injunctive relief would preserve the status quo and serve to keep the parties in their present condition.

This Order granting Intertec's Motion for a Temporary Restraining Order is being entered because of the immediate danger that would result to Intertec, its customer, Mazda, and other automotive suppliers unless such an order is entered, and the lack of time to prevent such an occurrence.

THE COURT ORDERS that:

1. Defendant Multimatic is immediately restrained and enjoined from: (a) Selling, disposing, hindering, transferring or otherwise discarding all materials, tooling, equipment, forms, cash or other assets necessary to ship the Beam it produces for Intertec under the Contracts; and (b) Taking any activity or making any communication inconsistent with its obligations to timely supply Intertec with sufficient production quantities of the Beam under the Contracts, and this obligation shall continue through September 27, 2004;

2. Defendant Multimatic shall continue to specifically perform its obligations under its Contracts with Intertec, including, but not limited to ordering steel and production and immediate delivery of the Beam through September 27, 2004;

3. Intertec shall pay Multimatic $33.75 per Beam beginning today, September 21, 2004, through September 27, 2004, $1.43 of which is ~~rightly considered~~ to be made "under protest," ~~and the remaining $32.32~~

N₿

~~of which is the current fixed price under the agreement between the parties.~~ NGE

4.   The parties and/or their attorneys shall appear before this Court on a date to be set by the Court for a hearing on Intertec's Motion for Preliminary Injunction.

_SEP 21 2004_                          _Nancy G. Edmunds_
Date                                          Honorable Nancy G. Edmunds
                                              Presiding Judge



**STATE OF MICHIGAN**
**OAKLAND COUNTY CIRCUIT COURT**

RECEIVED FOR FILING
OAKLAND COUNTY CLERK

2004 MAR 11 P 4: 11

BY:_____
DEPUTY COUNTY CLERK

04-056766-CZ

JUDGE GENE SCHNELZ
CONTINENTAL T V TEXTRON FM

CONTINENTAL TEVES, N.A.,
*a Delaware corporation,*

            *Plaintiff,*

vs.

TEXTRON FASTENING SYSTEMS, INC.,
*a Delaware corporation,*

            *Defendant.*

Case No. 04-056766-CZ
Hon. Gene Schnelz

---

**BUTZEL LONG, P.C.**
By: Edward M. Kronk (P16258)
    Herbert C. Donovan (P51939)
    John E. Benko (P58874)
Attorneys for Plaintiff
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000

**KERR, RUSSELL & WEBER, PLC**
By: William A. Sankbeil (P19882)
Attorneys for Defendant
500 Woodward Ave Ste 2500
Detroit, MI 48226-5499
(313) 961-0200

---

## AMENDED TEMPORARY RESTRAINING ORDER
## AND ORDER TO SHOW CAUSE

At a session of said Court, held in the Oakland
County Circuit Court, State of Michigan, on

MAR 1 1 2004

PRESENT: Hon. **GENE SCHNELZ**
        Circuit Court Judge

The Court, having reviewed and considered Plaintiff Continental's Motion for Ex Parte

Temporary Restraining Order and Preliminary Injunction (the "Motion") under MCR 3.310,

Brief in Support, Verified Complaint and exhibits attached thereto, and being otherwise fully

advised in the premises, finds that:

A.    If Defendant Textron Fastening Systems, Inc. ("Textron") does not continue to make and/or resume shipments of the fasteners, machine parts, solenoids, cold formed parts and other products listed in the spreadsheet attached as Ex. 1 to the Verified Complaint (the "Components") it produces for Plaintiff Continental, Continental will be irreparably damaged.

B.    Continental has sufficiently demonstrated the following to serve as a basis for the Temporary Restraining Order:  (1) The harm suffered by Continental in the absence of injunctive relief would be greater than that suffered by Textron; and (2) The public interest is served by the issuance of this Temporary Restraining Order, as the shutdown of plants with consequent layoffs and other harm to the local, state and national economy would be avoided;

C.    Notice of the Motion was given to counsel for Textron by telephone, fax, hand delivery and U.S. mail, and counsel appeared; and

D.    No bond is required as Continental is adequately able to respond in damages if the relief requested herein was improvidently granted and Textron wrongfully damaged.

THE COURT ORDERS that:

1.    Defendant Textron shall resume immediate delivery of the identified Components to Continental.

2.    The parties and/or their attorneys shall appear before this Court on May 5, 2004, at 1:30 p.m., and show cause, if any, why the Court should not issue a preliminary injunction compelling Textron to specifically perform its obligations to Continental under the Contracts.

2

3.  This Temporary Restraining Order was originally issued on the 9th day of

March, 2004, at 3:45 p.m.  This Order shall remain in effect until May 5,

2004, at 1:30 p.m., or until a decision is made on Continental's Motion for

Ex Parte Temporary Restraining Order and Preliminary Injunction.

**GENE SCHNELZ**
**Circuit Judge**
_____

Circuit Court Judge

APPROVED AS TO FORM:

BUTZEL LONG, P.C.

By: Edward M. Kronk (P16258)
    Herbert C. Donovan (P51939)
    John E. Benko (P58874)
Attorneys for Plaintiff
150 West Jefferson, Suite 100
Detroit, MI  48226
(313) 225-7000

A TRUE COPY
G. WILLIAM CADDELL
Oakland County Clerk-Register of Deeds
By _____
        Deputy

KERR, RUSSELL & WEBER, PLC

By:  William A. Sankbeil (P19882)
Attorneys for Defendant
500 Woodward Ave Ste 2500
Detroit, MI  48226-5499
(313) 961-0200

648112

3.    This Temporary Restraining Order was originally issued on the 9th day of March, 2004, at 3:45 p.m.  This Order shall remain in effect until May 5, 2004, at 1:30 p.m., or until a decision is made on Continental's Motion for Ex Parte Temporary Restraining Order and Preliminary Injunction.

_____
Circuit Court Judge


APPROVED AS TO FORM:

BUTZEL LONG, P.C.                                KERR, RUSSELL & WEBER, PLC


_____                       _____
By:  Edward M. Kronk (P16258)                    By:   William A. Sankbeil (P19882)
     Herbert C. Donovan (P51939)                 Attorneys for Defendant
     John R. Benko (P58874)                      500 Woodward Ave Ste 2500
Attorneys for Plaintiff                          Detroit, MI 48226-5499
150 West Jefferson, Suite 100                    (313) 961-0200
Detroit, MI 48226
(313) 225-7000


648112


3



# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

INTIER AUTOMOTIVE, INC. d/b/a
CAMSLIDE MFG.-AURORA, CAMSLIDE MFG.-
NEW MARKET and SLIDE-MASTER, an Ontario
corporation, INTIER AUTOMOTIVE SEATING
OF AMERICA, INC. d/b/a ROMECH, a
Delaware corporation, INTIER AUTOMOTIVE
INTERIORS OF AMERICA, INC. d/b/a
INNERTECH-NASHVILLE, a Delaware
corporation, and INTIER AUTOMOTIVE
CLOSURES, INC. d/b/a DORTEC INDUSTRIES,
KTM LOCKS and WINDO MOTION I and II,  an
Ontario corporation,

     Plaintiffs,

-vs-

TEXTRON FASTENING SYSTEMS, INC.,
a Delaware corporation, AVDEL, INC., an
Ontario corporation, CAMCAR TEXTRON,
an Ontario corporation, and BURKLAND TEXTRON,
INC., a Michigan corporation,

     Defendants.

04-059492-CK

JUDGE WENDY L. POTTS
INTIER AUTOMO V TEXTRON FASTE

Case No.

Hon.

Edward H. Pappas (P23224)
Kathleen A. Lang (P34695)
Brian M. Akkashian (P55544)
DICKINSON WRIGHT PLLC
Attorneys for Plaintiff
500 Woodward Avenue
Suite 4000
Detroit, MI  48226
(313) 223-3500

## TEMPORARY RESTRAINING ORDER

At a session of said Court held in the Courthouse in
the City of Pontiac, County of Oakland and State of
Michigan on _____ JUL 0 1 2004 _____

# RICHARD D. KUHN

PRESENT: Hon. _____
                        Circuit Court Judge

This matter has come before the Court on Plaintiffs' Motion for *Ex Parte* Temporary
Restraining Order and Preliminary Injunction under MCR 3.310.  The Court, having read the
Verified Complaint and all other documents submitted in connection with this motion and brief
in support and being otherwise fully advised, finds as follows:

If Defendants Textron Fastening Systems, Inc. ("Textron Fastening Systems"), Avdel,
Inc. ("Avdel"), Camcar Textron ("Camcar") and Burkland Textron, Inc. ("Burkland")
(collectively "Textron") fail to provide the parts to the Plaintiffs Intier Automotive, Inc. d/b/a
CamSlide Mfg.-Aurora, CamSlide Mfg.-Newmarket and Slide-Master ("CamSlide"), Intier
Automotive Seating of America, Inc. d/b/a Romech ("Seating"), Intier Automotive Interiors of
America, Inc. d/b/a Innertech-Nashville ("Interiors") and Intier Automotive Closures Inc. d/b/a
Dortec Industries, KTM Locks and Windo Motion I and II ("Closures") (collectively "Intier"),
Textron will be in breach of its contractual agreements with Intier and Intier will be irreparably
damaged as the injury caused by Textron's conduct is substantial, difficult to measure and would
injure Intier's relationships with its customers as well as its goodwill and reputation in the
automotive industry.  Moreover, Textron's conduct would likely impact the employment and
livelihood of thousands of workers and cause the shut down of several manufacturing facilities.
Further, issuance of a temporary restraining order will preserve the status quo pending a hearing
on Intier's Motion for Preliminary Injunction.

2

IT IS HEREBY ORDERED that Textron shall continue to produce and ship the quantity and quality of parts ordered by Intier during the period this Order remains in effect and that Textron shall not take any action or make any communications to cause Textron to cease or reduce such shipments during the period this Order is in effect.

IT IS FURTHER ORDERED that this Temporary Restraining Order is issued on ~~June~~ July \_\_\_, 2004 and that no security is required as a prerequisite to the issuance of this Order because it appears that Textron will not be damaged by issuance of this Order as it preserves the status quo and, in any event, Intier appears to be able to respond in damages if the relief requested herein were to be improvidently granted and Textron be wrongfully damaged.  The Order shall remain in effect until a decision is made on Intier's Motion for Preliminary Injunction or until fourteen (14) days after entry of this Order, whichever occurs first.

IT IS FURTHER ORDERED that the parties will appear for a preliminary injunction hearing on July 6, 2004 at 8:30 A.M. o'clock.  Intier shall serve a copy of this Order on Textron at their office located at 840 West Long Lake Road, Suite 450, Troy, Michigan 48098.

**RICHARD D. KUHN**
Circuit Court Judge

Date: June 30, 2004

DETROIT 99993-926 819316

A TRUE COPY
G. WILLIAM CADDELL
Oakland County Clerk - Register of Deeds

By _____ Deputy

3



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

04-060634-CK

INTIER AUTOMOTIVE INTERIORS OF
AMERICA, INC. d/b/a INNERTECH-
SHREVEPORT, a Delaware corporation,

RECEIVED FOR FILING
OAKLAND COUNTY CLERK

2004 AUG 24  P 12: 56

JUDGE FRED M. MESTER
INTIER AUTOMO V NYX INC

      Plaintiff,

v.

      Case No. 04-     -CK

      Hon.

NYX, INC., a Michigan corporation, and
NYX SHREVEPORT, LLC, a Michigan
limited liability company,

      Defendants.

_____/

Edward H. Pappas (P23224)
Kathleen A. Lang (P34695)
Brian M. Akkashian (P55544)
Dickinson Wright PLLC
Attorneys for Intier
500 Woodward Avenue, Suite 4000
Detroit, MI 48026
(313) 223-3500

_____

## TEMPORARY RESTRAINING ORDER

At a session of said Court held in the Courthouse in
the City of Pontiac, County of Oakland and State of
Michigan on _____ AUG 24 2004 _____

PRESENT: Hon. _____ FRED M. MESTER _____
                    Circuit Court Judge

This matter has come before the Court on Plaintiff's Motion for *Ex Parte* Temporary

Restraining Order and Preliminary Injunction under MCR 3.310. The Court, having read the

Verified Complaint and all other documents submitted in connection with this motion and brief in support and being otherwise fully advised, finds as follows:

If Defendants NYX, Inc. and NYX Shreveport, LLC ("Defendants") fail to provide the Parts to Plaintiff Intier Automotive Interiors of America, Inc. d/b/a Innertech Shreveport ("Intier"), Defendants will be in breach of their contractual agreements with Intier and Intier will be irreparably damaged as the injury caused by Defendants' conduct is substantial, difficult to measure and would injure Intier's relationships with its customers as well as its goodwill and reputation in the automotive industry. Moreover, Defendants' conduct would likely impact the employment and livelihood of thousands of workers and cause the shut down of several manufacturing facilities. Further, issuance of a temporary restraining order will preserve the status quo pending a hearing on Intier's Motion for Preliminary Injunction.

*[handwritten: ☐ 8/24/04]*

IT IS HEREBY ORDERED that Defendants shall continue to produce and ship the quantity and quality of parts ordered by Intier during the period this Order remains in effect and that Defendants shall not take any action or make any communications to cause Defendants to cease or reduce such shipments during the period this Order is in effect. *[handwritten: & that Plaintiff shall pay Defendants the prices stated in Intier's August 18, 2004 purchase order, PO # 2004, Rev 5.]*

*[handwritten: ☐ 8/24/04]*

IT IS FURTHER ORDERED that this Temporary Restraining Order is issued on August 24, 2004 and that no security is required as a prerequisite to the issuance of this Order because it appears that Defendants will not be damaged by issuance of this Order as it preserves the status quo and, in any event, Intier appears to be able to respond in damages if the relief requested herein were to be improvidently granted and Defendants be wrongfully damaged. The Order shall remain in effect until a ~~decision is made on Intier's Motion for Preliminary Injunction or until fourteen (14) days after entry of this Order, whichever occurs first.~~ *[handwritten: ~~September 1, 2004~~ further order of the court.]*

*[handwritten: ☐ 8/24/04]*

2

IT IS FURTHER ORDERED that the parties will appear for a preliminary injunction hearing on _Sept. 1_, 2004 at _1:30 pm_ o'clock.   Intier shall serve a copy of this Order on Defendants.

_(signature)_
Circuit Court Judge

Date: August 24, 2004

DETROIT 99993-926 819316

Approved as to Form:

_(signature)_

Brian Akkashian P55544
Counsel for Plaintiff

_(signature)_

James E. DeLine   P45205
Attorneys for Defendants

A TRUE COPY
G. WILLIAM CADDELL
Oakland County Clerk - Register of Deeds
By _(signature)_
Deputy
C. TUCKER

3



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELPHI AUTOMOTIVE SYSTEMS, INC.
a Delaware Corporation,

        Plaintiff,

v.

CENTRAL DIE CASTING and MANUFACTURING
COMPANY, INC., an Illinois Corporation,

        Defendant.

**FILED**

OCT 26 2001

CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

*Case No. 01- 74034*

---

BUTZEL LONG, P.C.
James G. Derian (P33580)
Daniel N. Sharkey (P53837)
Attorneys for Plaintiff
100 Bloomfield Hills Parkway, Suite 200
Bloomfield Hills, Michigan 48304
(248) 258-4473

KANTER, MATTENSON, MORGAN
  & GORDON
Alan J. Morgan, Esq.
Attorney for Defendant
25 E. Washington Street, Suite 1500
Chicago, Illinois 60602
(312) 715-0637

Charles E. Brown (P46400)
Delphi Legal Staff
Co-Counsel for Plaintiff
5725 Delphi Drive
Troy, Michigan 48098-2815
(248) 813-2000

*(vertical text left margin:)* BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

---

## TEMPORARY RESTRAINING ORDER

At a session of said Court, held in the U.S.
Courthouse located in Detroit, Michigan,
on    OCT 26 2001

PRESENT: HON.    AVERN COHN
           U.S. District Court Judge

Plaintiff, Delphi Automotive Systems, Inc. ("Delphi") having filed a Motion for

Temporary Restraining Order and Preliminary Injunction and Possession of Machine

Tooling Pending Final Judgment (the "Motion") under Fed.R.Civ.P. 65, the Motion having been presented to the Court, and the Court having considered the Motion, Brief in Support, Verified Complaint and exhibits attached thereto, and the Court being otherwise fully advised in the premises:

THE COURT FINDS that :

A.    If Defendant does not immediately resume shipments of the Components it produces for Delphi, such would constitute a breach of Defendant's Contract with Delphi and, if such shipments are not immediately resumed, Delphi will be irreparably damaged because the injury caused by Defendant's conduct is substantial, difficult to measure and threatens to injure Delphi's reputation in the community. Furthermore, injunctive relief would preserve the status quo and serve to keep the parties in their present position.

B.    Delphi has sufficiently demonstrated the following to serve as a basis for the Temporary Restraining Order: (1) Substantial likelihood of prevailing on the merits; (2) Irreparable injury without granting injunctive relief because there is no adequate remedy of law; (3) The injuries suffered by Delphi in the absence of injunctive relief would be greater than that suffered by Defendant; and (4) The public interest is served by the issuance of this Temporary Restraining Order, as the shutdown of plants with consequent layoffs and other harm to the national economy would be avoided. This Order is being entered because of the immediate danger that would result to Delphi, its customers, and other automotive suppliers unless such an order is entered, and the lack of time to prevent such an occurrence.

THE COURT ORDERS that:

2

1.    Defendant, Central Die Casting and Manufacturing Company, Inc. is immediately restrained and enjoined from: (a) Selling, disposing, hindering, transferring or otherwise discarding all materials, tooling, equipment, forms, cash or other assets necessary to ship the Components it produces for Delphi under their Contract; and (b) Taking any activity or making any communication inconsistent with its obligations to timely supply Delphi with sufficient production quantities of the Components under the Contract.

2.    Defendant shall deliver to Delphi no later than October 26, 2001 all the Components that were to be delivered to Delphi between October 19 and October 26, 2001.

3.    Immediately upon execution of this Order, Defendant shall allow Delphi to take immediate possession and remove of all of Delphi's tooling and machinery, including:

(1) Die No. 10471666;

(2) Die No. 10471669 (first die);

(3) Die No. 10471669 (second die);

(4) Die No. 10478000;

(5) Die No. 10470961;

(6) Die No. 1880039;

(7) Die No. 1875956;

(8) Die No. 1989318;

(9) Die No. 10467221;

(10) Die No. 10470693;

(11) Die No. 10475952;

3

BUTZEL LONG, A PROFESSIONAL CORPORATION, ATTORNEYS AND COUNSELORS

(12) Die No. 10475954;

(13) Die No. 1892954;

(14) Die No. 1979702;

(15) Die No. 10476597;

(16) Die No. 10476794;

(17) Die No. 10476639;

(18) Die No. 10476221;

and all associated trim dies, and all associated assembly equipment, bushings, packaging and trays, jigs, gauges, fixtures, and mold patterns located at the facilities of Defendant and its subcontractor, Tennessee Aluminum Die Corporation.

4.     The parties and/or their attorneys shall appear before this Court on the _____ day October 2001, at _____, for a hearing on Delphi's motion for a preliminary injunction.

5.     This Temporary Restraining Order is issued this ___26___ day of October, 2001, at _____9:25 am_____.

This Order shall remain in effect until a decision is made on Delphi's Motion for Preliminary Injunction or until ten (10) days after entry of this Order, whichever occurs first.

_____
U.S. District Court Judge

Surety bond $6to, ooot to
portier @

A TRUE CC
CLERK, U.S. DISTRICT C
EASTERN DISTRICT OF M
BY _____

4

Document: 888888888/0001/324656/6y$801!.DOC

JS 44 11/99

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE: **Wayne**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the clerk of the Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

ThyssenKrupp Fabco, Corp.

**DEFENDANTS**

Heidtman Steel Products, Inc.

04 - 74331

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Nova Scotia Corp.
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Michigan Corp.
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Daniel N. Sharkey (P53837)
Eric M. Mathis (P65384)
Butzel Long, P.C.
150 W. Jefferson, Suite 100
Detroit, MI 48226           (313) 225-7000

ATTORNEYS (IF KNOWN)

John M. Carey
Watkins, Bates & Carey
National City Building
405 Madison Avenue, Suite 1900
Toledo, OH 43604-1207        (419) 214-2100

MAGISTRATE JUDGE MONA K. MAJZOUB

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in
Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only)        FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

|  | PTA | DEF |  | PTA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated or Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☒ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | ☐ 620 Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patents | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety Y Health | ☐ 840 Trademarks | ☐ 810 Selective Services |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suit | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | | ☐ 861 HIA (1395FF) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW(405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matter |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS** | ☐ 720 Labor/Mgt. Relations | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 730 Labor/Mgt. Reporting & Disclosure Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 790 Other Labor Litigation | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Sec. Act | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

Appeal to District
☐ 7 Judge from Magistrate Judgment

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. § 1332(a)(2)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND: In excess of $75,000

Check YES only if demanded in complaint:
JURY DEMAND:  ☐ YES  ☒ NO

## VIII. RELATED CASE(S) IF ANY

(See Instructions):

JUDGE

DOCKET NUMBER

DATE

11/5/04

SIGNATURE OF ATTORNEY OF RECORD

X _____
Daniel N. Sharkey (P53837)
Eric M. Mathis (P65384)

501720v2

# PURSUANT TO LOCAL RULE 83.11

1.      Is this a case that has been previously dismissed?        ☐ Yes

                                                                  ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.      Other than stated above, are there any pending or previously
        discontinued or dismissed companion cases in this or any        ☐ Yes
        other court, including state court?  (Companion cases are       ☒ No
        matters in which it appears substantially similar evidence will
        be offered or the same or related parties are present and the
        cases arise out of the same transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes: _____