UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


THYSSENKRUPP FABCO CORPORATION,

                         Plaintiff,

    v.                                      CIVIL ACTION
                                            NO. 04-74331
HEIDTMAN STEEL PRODUCTS, INC.

                         Defendant.
_____/


MOTION FOR PRELIMINARY INJUNCTION
BEFORE THE HONORABLE NANCY G. EDMUNDS
United States District Judge
226 Theodore Levin U.S. Courthouse
231 Lafayette Boulevard West
Detroit, Michigan
November 29, 2004

APPEARANCES:

        MR. DANIEL N. SHARKEY, ESQ.,
        MR. ERIC M. MATHIS, ESQ.,

           In behalf of Plaintiff.

        MR. JOHN M. CAREY, ESQ.,
        MS. PATRICE AREND, ESQ.
        MR. ROBERT BOHMER, ESQ.

           In behalf of Defendant.
                         -    -    -

## I  N  D  E  X

| Proceeding | Page |
|---|---|

Motion for Preliminary Injunction

Opening Statement by Mr. Sharkey     4
Opening Statement by Mr. Carey     19

**JEFF TESSIER**
Direct Examination by Mr. Sharkey     25
Cross Examination by Mr. Carey     47

**ROBERT MILLAR**
Direct Examination by Mr. Bohmer     91
Cross Examination by Mr. Sharkey     122

Redirect by Mr. Bohmer     132

**MARK RIDENOUR**
Direct Examination by Mr. Bohmer     134
Cross Examination by Mr. Sharkey     143

## E  X  H  I  B  I  T  S

| Exhibit No. | Offered | Received |
|---|---|---|

```
 1                                Detroit, Michigan
 2                                November 29, 2004
 3                                10:10 a.m.
 4                         —    —    —
 5           LAW CLERK:  Court calls Thyssenkrupp Fabco
 6   Corporation versus Heidtman Steel, 04-74331.  Counsel,
 7   please state your appearances for the record.
 8           MR. SHARKEY:  Dan Sharkey on behalf of
 9   plaintiff.
10           MR. MATHIS:  Eric Mathis on behalf of plaintiff.
11           MR. CAREY:  John Carey for Heidtman Steel.
12           MS. AREND:  Patrice Arend for Heidtman Steel.
13           MR. BOHMER:  And Robert Bohmer on behalf of
14   Heidtman Steel, Your Honor.
15           THE COURT:  All right.  I take it from the fact
16   that everybody's here that you didn't settle this.
17           MR. BOHMER:  That's correct, Your Honor.
18           MR. SHARKEY:  That's right, Your Honor.  The
19   parties and I -- Miss Arend can correct me -- but the
20   parties have had significant discussions.  I think they had
21   a two-hour meeting either Monday or Tuesday of last week,
22   and without going into them, it's too big a gap to bridge,
23   they just couldn't do it.  They really did bang their heads
24   together, but it was not to be.  And I know you urged us at
25   the TRO hearing back on the 9th, guys, get together, but it
```

1      didn't happen.  I think I can say for our side and for

2      theirs it wasn't for lack of trying.

3                    MR. BOHMER:  That's correct, Your Honor.

4                    THE COURT:  Okay.  I'm prepared to go forward

5      with this as soon as I grab a legal pad.

6                    Do you wish to make opening statements?

7                    MR. SHARKEY:  Yes, Your Honor.

8                    THE COURT:  All right.  Mr. Sharkey?

9                                               (10:15 a.m.)

10                   MR. SHARKEY:  Your Honor, I'm going to very

11     quickly review the facts because the Court's already had a

12     TRO hearing and knows the essence of the facts.  But I got

13     to say, I've never seen briefs -- I feel like the parties

14     are talking past each other like no other supply dispute

15     I've had.  We're saying one thing -- it's not we're saying X

16     and they're saying it's not X, it's we're saying X and

17     they're saying Y on the legal issues.  But very briefly, as

18     you know, my client, Fabco, buys steel coils from Heidtman,

19     the defendant.

20                   Our position is we have a contract, fixed price,

21     .3585 per pound.  We take their steel, we make a beam, we

22     put it in, we make a beam and we ship that beam every day to

23     Nissan's facility in Tennessee.  They make cars, namely, the

24     SUV's the X-Terra and the Pathfinder.  You know all about

25     just-in-time inventory, sole sources, all those kinds of

1    things; the production part of the approval process, the

2    fact that even if we could find a new supplier today, we'd

3    still have to spend months testing it and getting it

4    approved.

5              So the parties, throughout the automotive

6    industry, the parties really are wedded to each other in a

7    lot of ways which makes divorces extremely painful.  Here we

8    are.

9              There's one thing I got to correct.  I told you

10   something that was wrong on November 9.  I told you the

11   price was .3585 all the way going back to when the contract

12   started in March of '03.  That was not right.  Mr. Tessier,

13   who is in court, he's the only witness we'll call today, he

14   called me last Friday -- or excuse me, sent me an email I

15   guess around 5:30 on the 19th, and said, Dan, I looked at

16   this stuff, I just found out that we actually had, during

17   the prototype phase, when we didn't really have any volume,

18   we're just getting onesies and twosies parts and testing

19   them, the price was .297.  It was lower, and we did give

20   them a price increase to .3585 middle of April, we made it

21   effective April first.

22             So Mr. Tessier sent this email Friday, I read it

23   Monday morning, talked to him.  I called the other side and

24   said, guys, I made a misstatement to the Court and I wanted

25   to make you aware of it right way.  I don't think it changes

1    the legal analysis but I want to kind of get that out.  I

2    said something that was wrong.  I said the price was always

3    .3585 going back the last 19 months.  Not true.  The price

4    was .297 for about a year, March of '03 to April of '04.

5    The part wasn't really in production, it was just in

6    prototype and testing.  Then it went to .3585.  Remember

7    they're asking for .5185 I believe here.

8              The only issue here today is sort of an interim

9    issue.  What happens between now and the point where we can

10   really hash this out with deposition and discovery and cross

11   motions for summary judgment and all those kind of things.

12   It's a straight interim issue.  I'm not going to go through

13   all the factors, because the court has issued more

14   preliminary injunctions and denied more than I could shake a

15   stick at.  But the point is that the Sixth Circuit said as

16   recently as three months ago, the point of preliminary

17   injunction is to try to preserve the status quo.  That was

18   the Edward Rose case I cited in my brief.  U.S. Supreme

19   Court said it's to preserve the relative positions of the

20   parties until a trial on the merits can be held.

21             We understand we have a burden, we're the ones

22   coming in here asking for an injunction, and that is

23   extraordinary relief, and we take that burden gladly.  The

24   point here is what's going to be the price between now and

25   the time when we can hash this out on the merits.  I think

1    the Court got our statement on that Rule 65 issue that

2    they -- we wanted to consolidate this with a trial on the

3    merits, they didn't want to, so we're going to have to keep

4    going on this case.

5            The essence of our position, we're insisting

6    you've got to live up to this 35 cents, guys.  That's what

7    our contract says, you've got to keep shipping.

8            The UCC authorizes specific performance, you

9    know all that.  It's particularly in the automotive

10   industry, particularly in requirements contracts, that's

11   what we have here, there's ample basis for it.  The Court's

12   already read the brief, it's already ruled on a TRO.  We've

13   cited dozens of cases saying it's not commercial

14   impracticability if you have an increase in cost.  So I'm

15   skipping through all that on a summary basis here, but the

16   point is, case after case after case has said just because

17   you have an increase in your raw material cost doesn't mean

18   you have a right to charge a higher price.  You have to

19   stick to your contract price.  That's not just a national

20   thing, and I cited all those national cases going back to

21   OPEC in the 1970's and the higher prices there, but Judge

22   Cleland said that a couple weeks ago in the Intertech case.

23   On the steel beam case, the now Judge Goldsmith, formerly

24   Mark Goldsmith, said that, they actually did consolidate,

25   trial on the merits.  He said sorry, guys, I understand you

1    have a business concern here, you have higher prices, and

2    I'm not unsympathetic to that, but these were fixed price

3    contracts.  That's just not significant on a legal level.

4    It's not a force majeure, they haven't even made that

5    argument, so I'll just skip through that.

6             I'm trying to go too fast here.

7             THE COURT:  I've got nothing but time.

8             MR. SHARKEY:  Okay.  A key point that needs to

9    be made here is even if the Court were to find on the

10   merits, you know what, Fabco, you're just dead wrong, these

11   guys can get out of this contract, we still have the ability

12   to, for reasonable time period to go cover under 2309 of the

13   UCC.  So no what matter what happens, even if you rule

14   completely in their favor, our position is we got to have at

15   least five to six months to try to find another supplier for

16   this steel.  Mr. Tessier is going to take the stand and talk

17   about how hard it was to get the steel on line, how Nissan

18   could not get to it's normal U.S. Steel its huge

19   institutional buyers.

20            Nowhere in any –– they filed a ton of briefs in

21   this case.  Nowhere anywhere did they say we ever agreed to

22   pay .5185.  There's just no assent to that at all.  They

23   don't even allege it, nor did we.

24            The Court expressed concern on the irreparable

25   harm element at the TRO hearing.  That was the one thing

1    that the Court picked up.  I've cited several cases in our

2    reply briefs and in our principal briefs where Judge Cohn in

3    that 1990 Kelsey-Hayes case said a supplier's failure to

4    make scheduled shipments can have immediate dramatic

5    consequences, and we recognize that, and we argued back and

6    forth about what the Kelsey-Hayes case meant.

7         So I'd leave that point alone other than to say

8    it heavily supports our side.  It's not just payment under

9    duress.  The Court has said that's just not good enough

10   sometimes.  Sometimes harm truly is irreparable.  The

11   balance of harms, I think you just take a couple steps down

12   each path here, and one path, that's the only issue, are you

13   going to issue an injunction today or are you not.  You take

14   a couple steps down the path of you issue an injunction,

15   what happens?  They got to keep shipping and we've got to

16   keep paying them .3585, what we say is the contract price.

17   That's what happens.  Maybe they'll not make as much money,

18   maybe they'll lose some money.  I don't really know what

19   their financials are.  Clearly they're not going to do as

20   well as if they had a 17-cent increase, which is what they

21   want.  But that is a risk they took when they agreed to ship

22   under this contract.  That's a risk that they assumed.  I

23   mean, they're implicitly speculating on the commodities

24   market when they bid a contract like this.  If steel prices

25   go way down, they're going to pocket it; if they go up, they

1     may lose money or make very little money.

2              Any harm they experience is the business risk

3     they took.  So that's a couple steps down the injunction

4     path.  A couple steps down the no injunction path, if Fabco

5     loses today, we've got to go back to our little conference

6     room across the street and say what are we going to do,

7     guys?  Are we going to shut down Nissan?  Or do we have to

8     pay this thing under duress, pay all this money?  That's the

9     very choice -- I mean, that was the choice that would have

10    had to be made if Fabco never filed this lawsuit.

11             They filed -- I got their motion in limine, they

12    faxed it to me Wednesday morning, my secretary took a day

13    off, day before Thanksgiving, I just read it this morning.

14    Well, one of the things they say is, well, this Nissan

15    stuff, it's all speculative.

16             Mr. Tessier is going to tell you today Nissan

17    has been shut down this year for hours at a time, and our

18    share, our small share of a two hour shut down was $200,000.

19    It's very real, it happens.  You can imagine how many parts

20    go into a car, I mean, hundreds and hundreds.  You get one

21    little plastic piece or one little screw or one little hinge

22    that's not made, and that can shut down a line.  It happens

23    quite a bit, and when that does, it is extraordinarily

24    expensive.  And if you've ever had GM breathing down your

25    neck on one of their lines, or one of the OEM's, it's an

*Case No. 04-CV-74331*

1    experience like no other.  As Mr. Tessier told me this

2    morning in conference, his boss has told him you can do that

3    one time, and that's the last time you'll ever do it.

4              So those are the choices; injunction, no

5    injunction.  We submit that the harm is much greater if you

6    don't issue an injunction here.

7              The public interest, obviously, keeping plants

8    running, keep people employed, all the suppliers that feed

9    into these plants, we think it's in the interest to keep

10   those plants running.

11             The key thing we've got here is we've got this

12   contract started in February of '03, and we're just about

13   halfway into it.  It's supposed to end in September of '06.

14   That's three and-a-half years, so 42 months or something,

15   and we're about 21, 22 months into that.  Now, the first

16   year or so of that was just testing.  Now we've been in

17   production for I believe four or five months.  Actual

18   volume, they are shipping to us every week.  Usually on

19   Tuesdays, we get a big shipment of coil, we turn it into the

20   beam, we ship it every single day to Nissan.

21             So it's just not speculative.  So that's the,

22   that's the essence of our position, that's why the Court

23   ought to issue an injunction.

24             What has the other side said in response?  In

25   their first reply brief, they brought out the Corbin on

1   Contracts.  There was no contract, there was no mutual

2   obligation, Fabco waived its rights.  It's not supported by

3   consideration.  Heidtman never accepted the contract.  Those

4   things, frankly, I can't even fathom.  We issued, we meaning

5   the buyer, and any automotive buyer, issues purchase orders

6   and it's very rare that the other side actually sits down

7   and says, great, we accept and we'll fax it back to you.

8   They start shipping.  They get the PO, they start shipping,

9   and a contract is formed.  That is a contract.  And they

10  never, they don't have to execute an acceptance to do that,

11  and by shipping, they indicate that they are accepting the

12  contract prices, and that's what we have here.

13           In their latest brief, they said quite a few

14  things.  What they said is, you know, they throw all these

15  purchase orders at you, Your Honor, and they throw all these

16  prices and all these parts, and they just keep throwing

17  stuff and throwing stuff and charging different things, and

18  then at the end they say, you know, it's just a jumble of

19  different PO's and different prices, and the prices were all

20  always changing, and what's the darn difference?  Because

21  this is the only course of dealing between the parties.

22           I have to go back and give ourselves a little

23  gold star on our lapel because -- Fabco -- because this

24  company, like some others, was pretty accommodating.  And

25  Mr. Tessier will tell you when he takes the stand that it

*Case No. 04-CV-74331*

1    was looking to split losses with the suppliers for long-term

2    relationships to keep them in tact.  But Heidtman, that

3    wasn't good enough for them.  They wanted the whole loaf.

4    And they wanted the full increase, and wanted this increase,

5    and they got them in some places.

6              And Mr. Tessier is going to tell you, you know,

7    my hand is forced, I can't shut down Nissan, I did give them

8    price increases on some of these products because I felt I

9    had to, but it kept going and going and going and going.

10   And as he'll tell you, he even forgot that he had issued an

11   increase from .297 cents to .3585 back in April.  So even on

12   this part, we gave a higher price.  We could have stood on

13   our legal principles and said we want .297 until

14   September 25, 2006.  They didn't.  They gave, I guess it's

15   about a nine cent increase or so.  That equates, I believe

16   it's 7 million pounds a year of product is what the contract

17   calls for.  It's a lot to give up in terms of dollars.  But

18   production is king, and Mr. Tessier will tell you he cannot

19   shut down Nissan.  I mean, it just cannot happen.

20             So what they say now --

21             THE COURT:  Well, and let's -- I mean, you keep

22   talking about shutting down Nissan.  That's not going to

23   happen.  I mean, what's going to happen if I don't issue the

24   injunction is that you'll pay the higher price and then

25   you'll take the loss instead of Heidtman.

*Case No. 04-CV-74331*

1          MR. SHARKEY:  That's a decision that would have

2     to be made, and you're probably right, Your Honor.  I mean,

3     if the choice is between shutting them down and paying them

4     a higher price, that's probably the choice they would have

5     to make.

6          THE COURT:  It's really just the issue of who

7     absorbs the additional cost, isn't it?

8          MR. SHARKEY:  I think it's -- no, I don't think

9     it's quite that simple.  You're right, if they decide that

10    they're going to -- we can't shut them down, guys, we've got

11    to pay them under protest, then that's true, you're right,

12    then it's true.  But they've got to make that decision first

13    because what they can't do is tell Nissan, go look to

14    Heidtman, guys, and Nissan will say, no, you're -- what they

15    always say, every car maker, no, you're our contract

16    company, control your supply chain, I don't care what you

17    have to do, I want my beams because I got to build my cars.

18         THE COURT:  Right.

19         MR. SHARKEY:  I follow you, Your Honor, and

20    if --

21         THE COURT:  I just don't believe that you're

22    going to walk away from that.  I mean, Nissan is too

23    important a customer, it's basically your life line.  I just

24    really see this as a pretty straight contract question:

25    Who, under the terms of this contract, absorbs increase in

1     the cost of the steel?

2           MR. SHARKEY:  Yes, ma'am.  And of course our

3     position is they ought to because they bet on it.  But I, I

4     agree with you, you're right.  As soon as we walk out of

5     this door, if Mr. Tessier picks up the phone and calls the

6     CEO of Fabco and says, guys, court said no, what are we

7     going to do?  They probably will say, we can't shut them

8     down guys, we gotta pay 'em the higher price.  I'm just

9     saying it's just one little hurdle to get there.  And the

10    decision has to be made, and it's not mine as their outside

11    lawyer.  That's all.  I follow where you're going which is

12    who took the risk, who's got to pay the 17 cents, or take

13    the loss because of the higher steel price.

14          Then they call this thing spot buys.  This is

15    unreal to me.  They say you know what these were?  These

16    were spot buys.  You were saying we want this price, and

17    it's going to change on this product, and they keep throwing

18    things at you.

19          These are not spot buys.  We need a shipment of

20    that steel coil every single week for the next two years.

21    It's not a spot buy all.  I think the weekly invoices are

22    somewhere around $20,000, or something like that.  It's a

23    big contract and it's a requirements contract.  We need it

24    every single week.  It is the antithesis of a spot buy, Your

25    Honor.

1              In a very limited sense, when we were just

2        buying a couple prototype parts without any significant

3        volume, you could say, yeah, they were spot buys, send us

4        50, we're going to do some engineering tests on them.  But

5        now they've been in production.  For months, it is not a

6        spot buy at all, quite the opposite.

7              They raise a lot of issues about the money.  You

8        owe us money, you're behind on this, behind on that.  Every

9        one of those money issues is a price dispute in a different

10       mask, and I'll explain to you why, just by looking at two

11       pages of an exhibit.  I don't know if the Court has the

12       binder of exhibits in front of it.

13             THE COURT:  I do.

14             MR. SHARKEY:  But if you look at Exhibit 545,

15       Your Honor, this is their exhibit, and if you flip to the

16       third page, ma'am, the third page of 545 should be a check

17       from Fabco to Heidtman for $30,000 and change.

18             THE COURT:  Yes.

19             MR. SHARKEY:  Okay.  Now, if you look at the

20       next page, the next page is invoice, it's in the top

21       right-hand corner, 541269, and then you look down at the

22       weight, which is the second from the right column there, the

23       weight is 42,540, and then they say -- this is their invoice

24       to us, Heidtman.  They're saying pay us the 44.35 plus the

25       7.50, guys, which equates to 51.85.  So at the bottom there

1      they're saying pay us $22,000 and change.  You flip back to

2      the page I had you on a minute ago, Your Honor, the page

3      before.

4                      THE COURT:  They're paying 44.35 plus 7.50?

5                      MR. SHARKEY:  Yes, per pound, ma'am.  Which is

6      51.85 together.

7                      You add, so you take those two together and it

8      totals to about 22,000 and some.  If you flip back to the

9      page I was just on, and you look at that same invoice, which

10     is 541269, this is our check, the top line of the page

11     before, where we're paying that invoice, we paid $15,250.59.

12     What that number represents is the weight, 42,540 times the

13     contract price, .3585.  We're paying them what the contract

14     price is.  What they're claiming is you guys are way behind,

15     you owe us a whole ton of money.

16                     My point here is, if you did the same thing with

17     the very next line, Your Honor, on the page after, you'd

18     see, 541802, and the weight was 43,440, they say pay us

19     22,000 and change, we paid them 15,000 and change.  Both of

20     those numbers on the check, which is the third page of

21     Exhibit 545, equate to the actual weight they shipped us

22     times .3585.

23                     So Mr. Boyce is here, he's the CFO of Fabco.

24     He'll take the stand.  I don't want to call him on direct,

25     but if they make a big deal out of this thing, I'll call him

*Case No. 04-CV-74331*

1          on the rebuttal to say that we've paid every dime they've

2          had coming and more.

3                    What I'm trying to get to here in a couple

4          minutes, Your Honor, is our accounts receivable dispute is

5          really a pricing dispute by another name.

6                    So they have -- and I just got to say, they've

7          thrown this big mess, but I almost feel like we're a victim

8          of our own niceguyness for -- that's not a good word, but we

9          could have kept this real clean and said here's our price,

10         no surcharges, no increases, none of the products, none of

11         the PO's, we're enforcing everything to the last dime and

12         we're going to fight you guys in court, we're going to take

13         it to the wall.  There wouldn't be any email correspondence

14         with all this stuff back.  They did agree to price

15         increases, and they ought not to be harangued for that, or

16         you can't say that's a course of dealing just because they

17         said, guys, the price was 29 cents, we're going to give you

18         35, we're giving you a break here, we're going to try to

19         keep working this out.

20                   For them to come back and say, see, you gave us

21         six cents, it's a course of dealing, now you got to give us

22         17 more cents.  I just don't think that's right, and that's

23         the essence of what they're saying, Your Honor.

24                   THE COURT:  Thank you.  Mr. Carey.

25                                            (10:35 a.m.)

1              MR. CAREY:  I won't argue it a great deal, Your

2      Honor, because I think the facts will be more interesting to

3      you, but if you have the exhibits available to you, I direct

4      your attention to Exhibit 532, Your Honor, because I think

5      the case is there in a nutshell.

6              Mr. Sharkey, in his last filing, and indeed the

7      last sentence of his memorandum said, This motion is Fabco's

8      request that Heidtman continue to ship one part, 63 by

9      54.875, on one contract, purchase order S100158, at one

10     price, .3585.  They say that's his whole case, that's what

11     it's all about.

12             I'll represent to the Court that the first and

13     last time you'll see anything like a purchase order with

14     that part is here on 532, and Exhibit A to their complaint.

15     Exhibit A of their complaint is we never received it.  The

16     purchase order we ever saw, Your Honor, is Exhibit 532.

17     It's the first time, and you can see, it says coil width

18     change only.  That's when it became part number 6354 and

19     54.875.  It's 63 because it's a gauge of 63, it's 54.875

20     because it's 54.875 wide, and that's how they would do their

21     part orders, Your Honor.

22             Sent to us on -- faxed to us on July 19 of this

23     year, and you will see that it is faxed back to them, if you

24     look at the top, by Heidtman, and says, Per email of

25     June 24.

1           THE COURT:  I'm sorry, I'm not --

2           MR. CAREY:  I'm sorry.  Are you looking at 532?

3           THE COURT:  I'm looking at 532.

4           MR. CAREY:  Okay.  This is their July 19, you'll

5      see in the upper right, see a July 19, '04 date, Your Honor?

6           THE COURT:  Yes.

7           MR. CAREY:  And you'll see it in handwriting

8      below, coil width change only.

9           THE COURT:  Yes.

10          MR. CAREY:  That's when they first ordered this

11     063 material which is the gauge, 063, by 54.8751.  It's

12     54 inches --

13          THE COURT:  Yes.

14          MR. CAREY:  And that's the first time that

15     they've ever ordered this part number that Mr. Sharkey talks

16     about in the last sentence of his memorandum.

17          They send over a purchase order that says .3585.

18     We can see that, and Heidtman promptly returns it and says,

19     Per email of June 24 '04, the price is 47.85 100 weight

20     delivered.  And if you look at the upper left, you'll see

21     it's to the attention of Tom Staddon, in the upper left of

22     this exhibit.

23          Tom Staddon, if you've had a chance to go

24     through the exhibits, is the person at Fabco that is, that

25     we deal with.  Bob Millar is the person at Heidtman that

```
1    Fabco deals with, who -- the bulk of this case, Your Honor,
2    is really between the emails and the orders back and forth
3    between these two gentlemen.
4              I don't know how they can say that we ever
5    agreed to the, to sell to them at .3585 when we very
6    promptly return it and say no, here's your price.  We'll go
7    through this, but I'm going to tell you, Your Honor, the
8    first item they talk about, which is this February 11, 2003,
9    this is what was represented to the Court at the temporary
10   restraining order.  Nobody's seen it; you've never seen it,
11   I've never seen it, Mr. Sharkey doesn't exhibit it.  Nobody
12   in the world knows what it ever said.
13             The last one --
14             THE COURT:  Well, I have it, it's Exhibit A of
15   their complaint.
16             MR. CAREY:  Not from '03, Your Honor.  You have
17   something from September of this year, Your Honor.  If you
18   look at that upper corner, you'll see status change,
19   9/25/04.
20             THE COURT:  Yes, you're right.
21             MR. CAREY:  Seen by us, Your Honor, for the
22   first time as an attachment to the complaint.  And what
23   you'll see in between are status change orders sent in
24   various times.  And one, for example, is this one of July 19
25   of this year.
```

1           If you look at all their prior versions, Your

2    Honor, they all reference some antecedent contract of

3    2/11/03.  Nobody's ever seen it.

4           THE COURT:  All right.

5           MR. CAREY:  As I say, Your Honor, it may be of

6    more use, but I'm going to say -- hear the facts, but if you

7    go through the exhibits, you'll see here was the real course

8    of dealing between the parties.  I think you've heard

9    enough.  You know this market went nuts.  We don't make the

10   steel, we buy it in this case from Steel Dynamics, we sell

11   it to Fabco which sells it on to Nissan.  Everyone up and

12   down this line of distribution is in tears, except maybe the

13   mills, but they're paying scrap prices.  I don't think

14   there's anybody happy in this entire system.  I also suggest

15   to you there isn't any good guys or bad guys.  There's just

16   people being squeezed, except maybe the scrap dealers.

17   Don't have anybody else that they have to worry about except

18   find supply.

19          We feel we're being, I don't want to use the

20   word gouged, but we've seen prices from the mills like

21   nothing we've ever seen before.  Our customers have never

22   seen anything like it before.  They go back to their end

23   users like Nissan, and everybody is shrieking up and down

24   the line.

25          The truth is that a year and-a-half ago, I'm

1    willing to believe there was probably a purchase order of

2    February 2003.  Thereafter, we did some business.  In

3    January, we told them the prices are going to start to rise.

4    There was no purchase order at .3585 at that time, nor was

5    there a part number, 63 54.875 at that time.  Didn't exist.

6    At that time, they said you're going to shut down Nissan,

7    it's unique material, we can't do anything about it.

8            January of this year, Your Honor, they've had 11

9    months to qualify this material.  This idea that somehow or

10   another that this is a crisis, this is an engineered crisis,

11   this is a contrivance, Your Honor.  They've gone through the

12   year when they short paid invoices.  We said if you don't

13   pay, we're going to stop shipping.  They come current, then

14   we do it again, in January of this year, in June of this

15   year, in July of this year, on August 11 of this year, and

16   most recently at the end.

17           We should get on to the facts.  I'll tell you,

18   Your Honor, the Exhibit 100 which is Attachment A to their

19   complaint, the document they say is the whole shooting

20   match, the one they hang their hat on, I'd invite the Court

21   to look at the bottom of that exhibit, and you'll see

22   that --

23           THE COURT:  My exhibits start with 101.

24           MR. BOHMER1:  101, I'm sorry.  That's that

25   September 25 document.

*Case No. 04-CV-74331*

1          THE COURT:  Yes.

2          MR. BOHMER1:  If you look at the bottom, Your

3    Honor, you'll see that there's a fax number, and you'll see

4    that it was faxed by Fabco to Mr. Sharkey in the middle of

5    October, on October 14.  On October 15, they quit paying

6    their invoices in full, and they ran into this courtroom on

7    November 5, on a Friday afternoon, and claim there was a

8    crisis.

9          I'm going to tell you exactly what's going on.

10   They have paid these prices through the year.  Sometime in

11   October it's -- I don't know what the other documents were

12   they sent Butzel Long at that time, but this hasn't been a

13   course of dealing between them, Your Honor, this has been

14   for about a month and-a-half now.  I think when you see

15   what's going on, you'll be surprised to see what the

16   difference is between the facts and what was presented to

17   you on November 9.

18         You've already had one concession that, well,

19   yeah, it really wasn't a fixed price contract, it changed.

20   It changed a lot.  It's also not long term.  What was

21   represented to you as a 2003 contract, Exhibit A, was

22   September when it was generated.

23         I don't think the Court has had a very honest or

24   fair representation of the facts.  I hope you get through

25   these several exhibits, Your Honor.

1          THE COURT:  Thank you, Mr. Carey.

2          Mr. Sharkey.

3          MR. SHARKEY:  Yes, Your Honor.  Plaintiff calls

4     Mr. Jeff Tessier to the stand.

5

6                         **JEFF TESSIER,**

7      hereinbefore called as a witness, being first duly sworn

8      by the Court to tell the truth, the whole truth, and

9      nothing but the truth, was examined and testified upon

10      his oath as follows:

11          THE COURT:  Before you start with Mr. Tessier,

12     let me tell you where my thinking is on this.  As you know,

13     because I issued the TRO, I'm quite sympathetic to your

14     argument.  If you can establish the fact there is a contract

15     dated February 11, '03.  If the best that you have is this

16     status change of 9/23/04, I think you've got some problems.

17          MR. SHARKEY:  Yes, ma'am.  I'll go right to

18     that.

19          THE COURT:  That's what I would do if I were

20     you.

21                                        (10:45 a.m.)

22                    **DIRECT EXAMINATION**

23     BY MR. SHARKEY:

24      Q.  Mr. Tessier, we'll go through some other stuff in a

25      minute.  Let's go right to that issue.

                    *Case No. 04-CV-74331*

*11/29/04*                          *Witness:  J. Tessier*

1              The court just asked if the best you got is a

2        September '04 version of your February '03 contract, that's

3        not too good.  Why don't you flip to 502, Mr. Tessier.

4        That's a Heidtman exhibit.  What's the date on that one?

5        A.  PO date is February 11, 2003.

6        Q.  Should have been more specific.  What's the status date

7        or the print date -- well, let's back up a second.

8              What does status change mean in your computer

9        system at Fabco, Mr. Tessier?

10       A.  Basically, any time we make a change where we print a

11       new copy, for whatever reason, it will put that date there.

12       Q.  Is that something you type in, or is it the computer?

13       A.  It's computer generated.

14              THE COURT:  I'm sorry, say that again, what a

15       status change means.

16              THE WITNESS:  It's really a printed date.  I

17       mean, any time we make a change to a purchase order, it

18       puts, and you print the purchase order, it puts that date

19       there.  The original PO date is the date I've just -- the

20       next line up to the left of it.

21  BY MR. SHARKEY:

22       Q.  Now, hold on a second there.  Even if you don't make a

23       change, if you went into your computer today and went across

24       the river to Windsor and printed this PO, what would the

25       status change date say?

*Case No. 04-CV-74331*

1   A.   Say today's date.

2   Q.   Just by date of printing?

3   A.   Yes.  I mean, printing is considered within the computer

4   system a change, but any time you make a change or print,

5   reprint the purchase order, it will dump that date in there.

6   Q.   Why do you call it status change, why don't you call it

7   print date?

8   A.   Nomenclature, but that's the way the computer program is

9   written.

10  Q.   What's the date of this status or print on Exhibit 502,

11  Mr. Tessier?

12  A.   3/14/03 so March 14, 2003.

13  Q.   So this is about a month after the PO is issued?

14  A.   That's correct.

15  Q.   Your Honor, unfortunately, and I'm not -- there's no

16  suggestion of untowardness, the exhibit sticker on the

17  bottom right of that page is 502, it says Exhibit 502.  It's

18  a sticker over the original price on this very part that's

19  at issue here, and that's --

20          MR. BOHMER1:  You want a stipulation that it

21  would say .297?

22          MR. SHARKEY:  Yes.  I've got the original here

23  that Mr. Tessier gave to me this morning, I don't know if

24  the Court wants to see it, but right underneath where that

25  Exhibit 502 sticker is the price .297, and that price goes

*11/29/04*                                *Witness:  J. Tessier*

1    back to March of '03.  I guess that's, what, 31 days after

2    the PO was issued.  So we can date it back to about a month

3    after the PO is issued.

4                   Where's the original one here?

5                   THE COURT:  Any objection?

6                   MR. CAREY:  No, no objection.  Are you saying

7    you've got the original?

8                   MR. SHARKEY:  I do.  Do you want to look at it?

9                   MR. CAREY:  Yes.  Only take one moment, Your

10   Honor.  Didn't mean to slow things down, Your Honor.

11                  MR. SHARKEY:  I understand.

12                  THE COURT:  It's all right.

13                  MR. SHARKEY:  Does the Court want to see it,

14   Your Honor?

15                  THE COURT:  No, no that's fine.

16                  MR. SHARKEY:  It's the bottom right hand corner.

17   All it says is .297.  The sticker went over it.

18   BY MR. SHARKEY:

19   Q.  Mr. Tessier, so the price on this product, you'd seen

20   this email last Friday evening, I guess ten days on the

21   19th, and what did you tell me for the first time that day?

22   A.  Well, I told you that the price was, I made a mistake,

23   that I'd missed it, that the price originally back at the

24   beginning of the contract was 29, or 29 cents .297, and part

25   of my -- after having reviewed, having more time to review

*Case No. 04-CV-74331*

 1    the document, I came across that.  It was purely my mistake.

 2    Honest mistake, but I did miss it.

 3    Q.  Let's flip to 109, Mr. Tessier.

 4              MR. CAREY:  Object to one thing.  Are you

 5    suggesting that these are the same part numbers?  This is

 6    .64 material and your memorandum talks about .63 material.

 7              MR. SHARKEY:  I believe that it was the same

 8    part, yeah.  Does it say different, Mr. Carey?

 9              MR. CAREY:  It does.

10              MR. SHARKEY:  I'll go through with Mr. Tessier.

11    But let's go to Exhibit 109.

12              THE COURT:  Well, wait a minute.  What's the

13    part number that we're talking about on 502?

14    BY MR. SHARKEY:

15    Q.  Mr. Tessier --

16              THE COURT:  Show me where I can find that.

17              MR. CAREY:  Your Honor, it would be at the

18    second page.  The line item he's talking about, Your Honor,

19    jumps from the bottom of the first page to the top of the

20    second.  I think we just agreed with him that that

21    Exhibit 502 sticker is covering what would say .297.

22              THE COURT:  Right.

23              MR. CAREY:  You can see the other one above is

24    .307.  I'm saying, then, thereafter, Your Honor, if you go

25    to the top of Page 2, you can see what the part number and

1    the gauge is and the width of the coil.  The gauge is .064.

2              THE COURT:  Wait a minute.  All right.

3              MR. CAREY:  Are you with me, Your Honor?

4              THE COURT:  .064/.070 times 54.650.

5              MR. CAREY:  Yes, and apparently, Your Honor, the

6    way they do things is that becomes their part number.  If

7    you go to the very bottom of Page 1 of Exhibit 502, you'll

8    see they call that part number 6454650, which is 64 gauge at

9    54.65 inches wide.

10             THE COURT:  Okay.

11   BY MR. SHARKEY:

12   Q.  I think I can clear this up, but I may not be able to.

13   Does the gauge change over time, Mr. Tessier?

14   A.  Well, gauge and width can change, and often does,

15   depending on development tooling.  Talking hundred

16   thousandths of an inch here, between 063 and 064.

17   Q.  I think it's real important -- we're not going to go

18   through our script, Mr. Tessier.  What I want to make sure

19   here is we're talking about apples to apples.

20   A.  This is the same steel.  It's the same part.

21   Q.  Let's go through this because I think this is the heart

22   of the deal.  Way back on Exhibit 101, Page 3, what we say

23   is the contract, that is part number -- if you go down about

24   the third line, I'm on Page 3 of 101 right now, which is

25   what we say Fabco says is the contract price.  That's part

1    number SP253-590, correct?

2    A.   That's correct.

3    Q.   Let's go over to where Mr. Carey, Heidtman's counsel,

4    has taken us.  Let's go to the very last, bottom line, 502,

5    Mr. Tessier.

6    A.   Okay.

7    Q.   That's part number SP253-590.  So this is the same part?

8    A.   Yes, yes.

9            THE COURT:  253-590?

10           THE WITNESS:  That's actually the material

11   specification, the same specification on both line items.

12           THE COURT:  Where's the part number?

13           MR. SHARKEY:  The question is -- I want to make

14   sure we're talking about the same part, Mr. Tessier.

15           THE WITNESS:  Yeah, I'm on Exhibit 101, and Line

16   item 150.

17 BY MR. SHARKEY:

18   Q.   Let me back up here a little bit.  The Court's concern

19   as just stated is, can you show me, did you have this

20   purchase order way back in February of '03?  And what you've

21   attached here, lawyers, for plaintiff, is a September '04

22   version of this purchase order.

23           Have you been around the whole time the last couple

24   years when this contract was going on?

25   A.   Absolutely.

1    Q.  Okay.  What was the price back in February of '03 when

2    the PO was issued?

3    A.  .297.

4    Q.  How do you know that?  How can the court know that on

5    this part?

6    A.  Go back to the original purchase order showing that

7    pricing that was on there.  Because each change --

8    Q.  Well, okay.  Well, you don't have the original purchase

9    order as far as I can tell.

10    A.  The way it works, Your Honor, is when the price changed,

11    the line item is canceled, closed.

12          THE COURT:  You know what?  You're really

13    familiar with this stuff, and I'm not, so when you start

14    talking about line items, and I'm looking at a four-page

15    invoice, that's not really useful to me.  You're going to

16    have to walk me through this because all I see here is on

17    502, a status change, which you've told me is not really a

18    status change, it's just printed out, that talks about, you

19    know, it's a four page, five page -- what are you talking

20    about?

21          MR. SHARKEY:  Let me try to help, Your Honor.

22          THE COURT:  Let's let the witness try to help.

23          MR. SHARKEY:  Yes, ma'am.

24          THE WITNESS:  On Exhibit 502, if you go down to

25    the bottom line on the left-hand side, you see 10, 20, 30,

1    40.  Line 40, it says "new" next to it, circled there.

2                THE COURT:  Yes.

3                THE WITNESS:  That is the order for that

4    particular part number, added to that purchase order on, and

5    status change date is 3/14/03, so we added that part number

6    on that date, that was new, .7290.

7                THE COURT:  So this is the first time you've

8    ordered this part?

9                THE WITNESS:  Yes.

10               THE COURT:  That's what the "new" means?

11               THE WITNESS:  That's correct.

12               THE COURT:  And this part number is 006454650,

13   et cetera?

14               THE WITNESS:  Yes.  That is the, an internal

15   number designating coil gauge and width, and then the

16   SP253-590 is the specification of the steel, customer

17   specification, and if you go to the next page, well, part

18   number it's used on, basically, we have, that becomes the

19   customer part number.  So our part number internally is

20   different than the customer part number.  It's a finished

21   good number.

22               THE COURT:  What part number am I looking at

23   here?

24               THE WITNESS:  Go to that, just above, as you go

25   down to the paragraphs there, you see the part number, used

1     on part number --

2                    THE COURT:  Yes.

3                    THE WITNESS:  And that's the actual finished

4     good part number that Nissan recognizes in their system.  So

5     we just use that as a reference.

6                    THE COURT:  Okay.

7   BY MR. SHARKEY:

8     Q.  And those change --

9                    Excuse me, Your Honor.  Are you finished?  I

10    apologize?

11                   THE COURT:  Well, now I need you to tie this to

12    what you're talking about in 101 being the same part number.

13  BY MR. SHARKEY:

14    Q.  That part number will change, Mr. Tessier, based on the

15    change in the specs; in other words, this one changed from

16    63 to 64?

17    A.  I'm looking at 10.  Yes, that is correct.  It went from

18    64 to 63.

19                   THE COURT:  Okay.  Now show me what you're

20    looking at.

21                   THE WITNESS:  Okay.  On the original we just

22    talked about where it said line 40, new, back in 3/14/03,

23    was a 64 gauge by 54 wide, and then the change on 9/23/04,

24    on Line -- I'm sorry, on Page 3 it says on the left-hand

25    side, you see 150, that's Line 15.

1          THE COURT:  Yes.

2          THE WITNESS:  That's the same part number.

3    Well, it's 063 by 54, so it's gone down a thousandths of an

4    inch in gauge, and it's changed a little bit on the width.

5    The specification remains the same, for all intents and

6    purposes, it's the same steel for the same finished good

7    assembly at Nissan.  So it's just an update of the purchase

8    order.  As the program develops --

9          THE COURT:  What does the OPN stand for next to

10   150?

11         THE WITNESS:  It just means it's open line item.

12         THE COURT:  All right.

13         THE WITNESS:  And if I may, as this develops,

14   this is a normal course of action at Fabco, you order steel,

15   and as you develop and you build your tooling and you

16   perfect the process to make these parts, you optimize the

17   width of the coil and the gauge for weight savings and

18   minimizing the amount of scrap you trim off.  So that's

19   typically when we get down later, and just before production

20   you get down to your final size, you know exactly what you

21   need, and you update your purchase order to include the

22   actual production size, but it's a matter of over months, it

23   may change up to an inch in width sometimes, up to two

24   three, four, five thousandths of an inch in gauge, just

25   depending on how you make the part.

1          So that's a normal development, course of action

2     when we're making these parts.  They're pretty

3     sophisticated.

4              THE COURT:  All right.

5  BY MR. SHARKEY:

6     Q.  So back when the contract was let in February of '03,

7     you knew for a year or so you were going to be prototype and

8     engineering, not volume ordering, correct?

9     A.  That's correct.

10    Q.  So the specs change slightly as you refine that process?

11    A.  Uh-huh.

12    Q.  Okay.  You have to say yes.

13    A.  Yes.

14             MR. SHARKEY:  Your Honor, I'm going to go

15    through what I see is the key things, but if the Court wants

16    to speed me along, please do.

17 BY MR. SHARKEY:

18    Q.  Mr. Tessier, you're the director of purchasing at Fabco,

19    correct?

20    A.  That's correct.

21    Q.  You've been there for six years?

22    A.  That's correct.

23    Q.  You've worked in the automotive industry for about 18

24    years?

25    A.  That's correct.

1    Q.  As the name implies, you're responsible for all the

2    direct buys for the company, correct?

3    A.  Yes.

4    Q.  And you were the one who sent me originally what is now

5    Exhibit 101, was Exhibit A to our motion, and that is the

6    purchase order S100158, correct?

7    A.  That's correct.

8    Q.  And you don't dispute Heidtman's contention, do you,

9    that on other parts and at other times that Fabco has

10   granted price increases.

11   A.  No, I don't dispute that.

12   Q.  Why?

13   A.  Well, you mentioned earlier in some of your opening

14   statements, we granted some price increases to secure

15   product on threat of, you know, nondelivery and nonshipment.

16   The decision by myself at the time to do that was to keep

17   our customer in parts, which ultimately is more important or

18   the most important thing down the chain.  So we protect

19   against it as best we can.

20        Nissan to us is a very important customer, and you

21   said earlier today, you only shut them down once, and it

22   becomes a very big deal, the company loses a lot of money.

23   It can cost quite a bit to shut them down.  And also

24   there's, I guess what you said is your, if you look in

25   general in the industry, you don't want to be seen as a

1   company that can't manage their supply base, can't deliver

2   on time, can't keep the production line going.  It can

3   damage your reputation quite a bit, quite frankly.

4   Q.  What the Court is saying, come on, guys, you're really

5   not going to shut down Nissan, what you're saying is someone

6   is going to get stuck with the bill until this can be hashed

7   out.

8   A.  No, it can happen.  In fact, it did happen this

9   particular summer.

10   Q.  It being what, what happened?

11   A.  Well, we were late on some parts due to supplier issues,

12   and we shut their assembly line down for a couple hours one

13   day.  Got a lot of high profile, CEO of the companies

14   involved, and it becomes a major issue, quite frankly.

15   Q.  To back up a second, Fabco takes the coil and they build

16   a beam; correct?

17   A.  That's correct.

18   Q.  And how often does Fabco get steel from Heidtman?

19   A.  They ship weekly I believe.  There's, yeah, there's

20   weekly shipments of I believe it's two coils a week.

21   Q.  So Heidtman's plant is in Butler, Indiana, correct?

22   A.  That's correct.

23   Q.  And the steel coil comes down to Fabco in Springfield,

24   Tennessee, correct?

25   A.  Yes.

1    Q.  And does Fabco get this steel coil from anywhere else?

2    A.  No, we do not.

3    Q.  After Fabco gets the steel and makes this beam, how

4    often does it ship to Nissan?

5    A.  We ship daily to Nissan from our plant in Springfield.

6    Q.  Does anybody else supply the steel beam to Nissan?

7    A.  No, that's --

8                    MR. BOHMER1:  Objection.

9                    THE WITNESS:  No.

10                   THE COURT:  What's your objection?

11                   MR. CAREY:  I don't know how he would know about

12   what Nissan's acquisition practice is and purchase practices

13   are.

14                   THE COURT:  Well, if he knows, he can testify to

15   it.  To the best of your knowledge.

16                   THE WITNESS:  Absolutely.

17   BY MR. SHARKEY:

18   Q.  Well, I mean, in point of fact, you deal quite a bit

19   with the Nissan relationship, don't you?

20   A.  Yes, I do.  I mean, I'm the main point of contact.  I'm

21   ultimately responsible for the flow of materials from our

22   suppliers to our manufacturing plants.

23   Q.  Just say today the worse happened and Heidtman stops

24   shipping, no more steel, guys.  How long would it take for

25   what they call the parade of horribles?  And I agree, how

1   long would it take for Nissan to shut down?  How long would

2   it take for that shortage to work its way through the line?

3   A.  Typically, we have our manufacturing inventory work in

4   process or finished goods inventory maximum a week, and then

5   Nissan's a day, two tops, internally, of their inventory,

6   and I know that from our materials people who deal daily

7   with those people at the plant.  This is a very large part

8   that, it's not like a small widget that they might keep a

9   couple weeks' inventory.  This is daily, one or two days max

10  at the assembly plant at Nissan.

11  Q.  Is this something that this part, because I've never

12  seen one of these steel coils.  It's kind of abstract to me.

13  Is this something you could call other steel suppliers and

14  get this thing?

15  A.  No.  As a matter of fact, the reason we're, we bought

16  this coil or this product from Heidtman is that really it

17  was the only spot we could find it, one of the few suppliers

18  we knew.  Typically, Fabco policy is to buy steel,

19  especially of this volume and of this importance off Nissan

20  as a steel resale program we call it.  And typically,

21  through their purchasing, steel purchasing group, we buy our

22  steel through them.  We approach --

23  Q.  Just stop for just a second.  I understand this because

24  you explained it a couple times.  On a lot of steel buys,

25  some of the OEM's, including Nissan, direct the lower tiers,

1    like Fabco, here's where you're going to get your steel

2    from; correct?

3    A.  You -- I mean, yes, that is correct.  You choose to buy

4    out, as we do, Fabco, we buy all our steel, all our steel

5    for this program is bought for this Pathfinder, X-Terra, is

6    bought through the Nissan resale program except for this

7    particular item which was not available at the time through

8    the Nissan program because of the combination of the, I'll

9    call it an exotic, not exotic, but not a common material

10   specification, and the width, size of the coil.

11       The Nissan-approved suppliers are ISG and U.S.

12   Steel, and neither one of those two could produce this type

13   of material.  So that's why we were purchasing it through

14   Heidtman, because they could provide it.

15   Q.  If Heidtman said to you today, you know, we are hereby

16   terminating this contract period, we'll cover you however

17   you long you need it, but you need to use all expedience to

18   go find this product from someplace else, how long would it

19   take you?

20   A.  Typical lead time in the industry is at least, right now

21   is 16 weeks.  We would need at least four or five weeks

22   to -- probably at least five to find somebody.  In that 16

23   weeks, we'd bring it in, test it.  Typically, when you buy

24   steel from a different manufacturer, there are subtle

25   differences.  You have to retune, we call it spotting,

1      retune your dies.  That can take up to a couple weeks.

2              Anywhere between I'd say 20, 24 weeks at a minimum

3      it would take us to secure different steel.

4      Q.  You've got a lot of buyers coming to you for money this

5      year, don't you?

6      A.  Unfortunately, yes.

7      Q.  Why couldn't you work this one out?

8      A.  Well, quite frankly, I had been negotiating with most of

9      our suppliers.  One of the premises is that we try to share

10     the pain, and we have done that with some of our suppliers.

11     I mean, we had nowhere to go with it.  Our customers, the

12     OEM's, are still demanding their annual price reductions.

13     They won't entertain any of the increases, and they want

14     their annual price reductions.

15             So one of the ways senior management does this is

16     if you have at least a minimum of shared responsibilities,

17     at least looked at, I can't get it from OEM, they can't get

18     it from their supplier so a shared responsibility, share the

19     pain so to speak, is something we at least consider.  We've

20     done that in the past, but when I spoke with Bob Millar

21     and --

22             MR. CAREY:  Objection.  I think he's going into

23     settlement discussions that were had between the parties,

24     Your Honor.  I'm not sure why he's testifying about it.

25             THE COURT:  Well, I mean, the exclusion of

1    settlement discussions is only for limited purpose.

2              MR. SHARKEY:  Your Honor, I believe it's just

3    for liability under 407.

4              MR. CAREY:  408.

5              MR. BOHMER1:  Your Honor, I'm certainly not

6    ashamed of Heidtman's position.  I'm just saying I think

7    under 408 it's inadmissible -- undue delay.

8              THE COURT:  No, it's just excludable for

9    specific purposes.  I mean, I read it as saying it's not

10   admissible to prove liability, the liability or invalidity

11   of the claim or the amount.  Well, we're not really talking

12   about that.  And then it gives other purposes such as

13   proving bias or prejudice of a witness, showing a contention

14   of undue delay, et cetera, but that's a "such as," that's

15   not an exclusive list.

16             MR. CAREY:  It's not something I really want to

17   argue about, except, Your Honor, I feel remiss.  I've always

18   read that statement, evidence of conduct of statement, is

19   like it was not admissible.  The conversations he's talking

20   about would have been raised after the litigation was filed.

21             THE COURT:  Likewise not admissible means to me

22   to prove liability as the previous sentence suggests.

23             MR. CAREY:  I understand, Your Honor.  I'll sit

24   down.  Thank you.

25

1          THE WITNESS:  We discussed that, and I had

2     explained to Bob and Mark at the time that, if they were

3     willing to look at sharing the difference in the pricing

4     that I would bring to it up to the executive management and

5     see if there would be an opportunity.  Because that was

6     really, for us as a company, you know, something we try to

7     work with our suppliers on, but we don't -- we expect there

8     to be at least some shared responsibility.

9  BY MR. SHARKEY:

10    Q.  I'd like you to skip to Heidtman Exhibit 520.  I think

11    you'll see the first page is, this is a ThyssenKrupp,

12    different company, same parent, ThyssenKrupp Fabco.  They

13    indicate this is a printout from the website.  Want you to

14    flip to the second page, and I may be not representing this

15    fairly, but my memory of Heidtman's papers was, look,

16    ThyssenKrupp Fabco's parent company is passing on steel

17    price increases to other people.

18         I'd like you to focus your attention to the far

19    right column, about the middle, starting with the words

20    Waupaca's contracts there.  You see it?

21    A.  Yes.

22    Q.  I'm going to read that part of that.

23         Waupaca's contracts with customers include a

24    surcharge clause that provides for a price adjustment in

25    response to changes in the cost of raw materials.

11/29/04                                    Witness:  J. Tessier

1                Does this contract have that kind of clause?

2       A.   Absolutely not.

3       Q.   If we had an escalation -- and you know what an

4       escalation clause is, right?

5       A.   Uh-huh.

6       Q.   Yes?

7       A.   Yes.

8       Q.   If we had an escalation clause, would we be here?

9       A.   Absolutely not.

10      Q.   To finish, I wanted to talk about one thing you

11      mentioned.  I think you mentioned it briefly is, can you

12      pass -- I mean what they're saying is look, guys, contract

13      says 35 cents, we want 51 cents.  Can you just take this 17

14      cents and pass it on to Nissan and say, look it, our

15      suppliers are asking for a higher price?

16      A.   No.  As a matter of fact, I know the automotive

17      industry.  The expectation of the OEM's is annual price

18      reductions, not increases.  Nobody gives increases out

19      there.  We all know, we've been in the business, it doesn't

20      happen.  And as a matter of fact, we spend a lot of effort

21      trying to improve productivity to be able to keep up with

22      the price reductions that they demand annually.

23      Q.   It's not just the automotive industry.  Specifically,

24      Fabco's contract with Nissan requires an annual price

25      reduction, right?

Case No. 04-CV-74331

1    A.  Yes, it does.  This particular program, specifically,

2    that these parts are for, we have to give back year after

3    year productivity.  Our price for those parts reduces each

4    year.

5              MR. SHARKEY:  Thank you, Mr. Tessier.

6              THE COURT:  Let's take a break for about 10, 15

7    minutes.

8              (Recess taken 11:15 until 11:35 a.m.)

9              MR. SHARKEY:  May I bring Mr. Tessier back to

10   the stand?

11             THE COURT:  Please.  Proceed.

12             MR. CAREY:  Your Honor, I do have two

13   preliminary matters.  I think we're about due for our

14   answer, and may I ask for an extension to file our answer?

15             THE COURT:  I granted that.

16             MR. CAREY:  Two weeks is fine.

17             THE COURT:  Two weeks is fine.  If you want

18   three, you can have three.

19             MR. CAREY:  I'll take three then.  Thank you,

20   Your Honor.

21             Second, based on the testimony that was elicited

22   regarding the invoices and what they haven't paid, I think

23   again they've pretty much conceded they have no damages at

24   this time in terms of the jurisdictional amount, and --

25             THE COURT:  Oh, I disagree.  Go ahead.

1            MR. CAREY:  Thank you, Your Honor.

2

3                       **CROSS EXAMINATION**

4    BY MR. CAREY:

5        Q.  Mr. Tessier, John Carey, one of the attorneys for

6    Heidtman.

7            You filed a declaration in which you state -- and

8    it's Exhibit B, I think, but it's the one that was submitted

9    with the complaint.  You state, I am personally familiar

10   with the February 11, 2003, purchase order number S100158.

11           But in fact have you ever seen this purchase order

12   of February 11?  Do you have a copy of it?

13       A.  Yes.

14       Q.  It's not an exhibit, is it?

15       A.  I don't believe so.  Well, no, that's not true either.

16   Actually it is in here.  I think it was 520, we talked

17   about -- no, I'm sorry.  I believe I explained it earlier

18   where it showed -- that was the particular date that that

19   contract was, or that product was added to that purchase

20   order.

21       Q.  That's the one that's dated March 14, 2003.  Is

22   Exhibit 502.

23       A.  That's correct, 502, that's correct.

24       Q.  Have you ever seen the predecessor to 502?

25       A.  Predecessor, I guess I'm not --

1    Q.  Well, Exhibit 502 is dated March 14, 2003.  It's a

2    change from a purchase order dated February 11, 2003, so 502

3    is changing something else.  I want to know if you've ever

4    seen the something else.

5    A.  Yeah, on 502 the change is the addition of Line 40

6    there, adding this part number in question.

7    Q.  Okay.

8    A.  The other three items were previously on there.

9    Q.  Okay.

10              THE COURT:  The question remains have you ever

11   seen -- I mean, I understand what you're saying, but this is

12   the first purchase order that ever referenced this part

13   number that's at issue in this dispute, but is there an

14   original purchase order dated 2/11/03 that we might look at

15   it?

16              THE WITNESS:  I didn't -- yes, we would likely

17   have that at Fabco, but I don't have that.  It's not part of

18   this.  What it would show would be the first three line

19   items on there without the fourth number on there.

20              THE COURT:  Okay.  Could I ask you a couple

21   questions about that, please?

22              THE WITNESS:  Uh-huh.

23              THE COURT:  All right.  Exhibit 101, which is

24   the September change order, right?

25              THE WITNESS:  Yes, ma'am.

*11/29/04*                                    *Witness:  J. Tessier*

1           THE COURT:  Status change, or whatever you're

2     calling it.  Has as its last page some general terms and

3     conditions, right?

4           THE WITNESS:  Yes, ma'am.

5           THE COURT:  Are those general terms and

6     conditions a part of all Fabco purchase orders, or are they

7     different -- I guess my question is how do we know that

8     they're the same with respect to 502, which is the first

9     time that we mentioned the part at issue here, or the

10    underlying purchase order, the one dated February '03 that

11    we don't have at all.  How am I supposed to know the general

12    terms and conditions of the original purchase order?

13          THE WITNESS:  These terms and conditions are

14    preprinted on the back of our forms, so they're actually on

15    the back, boilerplate on the back of the form.  So the form

16    doesn't change.  It's the same for every purchase order that

17    we issue, so it's been in effect since these terms, I

18    believe, 2000 and 2001.  So we've never changed those forms.

19    We continue to use the exact same forms.  It would be the

20    same on every purchase order.

21          THE COURT:  So this is the same general terms

22    and conditions which would have been on the back of the

23    purchase order that is reflected in Exhibit 502 and the

24    original purchase order dated February whatever, 11, '03

25    that is not an exhibit?

*Case No. 04-CV-74331*

1              THE WITNESS:  That is correct.

2              MR. CAREY:  Thank you, Your Honor.

3    BY MR. CAREY:

4    Q.  As to this -- we'll talk about it later.  One question,

5    this part that you're suing over, and you call it part.

6    Actually, it's a coil of steel, right?

7    A.  That's correct.

8    Q.  It's got a gauge of 63 thousandths, it's 54.875 inches

9    wide, right?

10   A.  That's correct.

11   Q.  And it's got a certain specification?

12   A.  Uh-huh.

13   Q.  But that's all it is, it's just a coil of steel, right?

14   A.  Of a specific gauge and width and specification, that's

15   correct.

16   Q.  Will you agree with me that part number 6354875 did not

17   exist on February 11, 2003 because you'd never assigned it a

18   part number?  Or you weren't buying it?  You were buying

19   entirely different material under this 502, right, you were

20   buying the 64 gauge material?

21   A.  I was buying steel for the particular part number for

22   the finish part number.

23   Q.  We don't make the Nissan part, right?  So I don't care

24   about the Nissan part number.  What we're talking about,

25   what you buy from Heidtman is a coil of steel, correct?

1    A.  That's correct.

2    Q.  64 gauge under Exhibit 502, correct?

3    A.  Yes, on this purchase order, it was 064 gauge.

4    Q.  I'm going to represent to you that the first time that

5    Fabco ever had a part number 6354875 was July of this year.

6    A.  Yeah, that could be correct.

7    Q.  Okay.  So purchase order S100158 originally was not out

8    there to buy the part number you're suing over; correct?

9    A.  I would disagree with that.

10   Q.  Well, what part number do you have on -- what's to

11   disagree with?  You can read it on your purchase order.

12   A.  Well, it might be slightly different gauge and width,

13   but it was the same material for the same part.  The intent

14   of the purchase was the same.  Like I explained earlier,

15   there's often changes in gauge and width.  These are very

16   subtle.  We've seen larger swings than this, but a

17   thousandths of an inch, an eighth of an inch in width.

18   Those are typical, normal changes.

19            THE COURT:  And I'm buying that, unless you have

20   something that says to the contrary.

21            MR. CAREY:  Okay.

22            THE COURT:  I mean, unless you have someone who

23   is going to testify that it's a different part, different in

24   that, you know, there's something other than the one

25   millimeter change in the width of the gauge.

1          MR. CAREY:  And several inches change in the

2     width of the coil.

3          THE COURT:  Whatever.  I mean, if it's the same

4     coil for the same, going into the same Nissan part, then --

5          MR. CAREY:  Okay.

6          THE COURT:  I mean, you know, I accept that.

7  BY MR. CAREY:

8     Q.  Would you take a look at Exhibit 501, please?  And we

9     will see Mr. Staddon throughout this correspondence.  Mr.

10    Staddon works for you?

11    A.  That's correct.

12    Q.  What's his title?

13    A.  He's a steel buyer.

14    Q.  And it says March 13, 2003 email to Heidtman, correct?

15    A.  Yes.

16    Q.  And it talks about the model year 2005.  Do you see that

17    at the top?

18    A.  Okay.  2005 model year, WQW, yes.

19    Q.  What is the model year to you, in your business?

20    A.  It's the OEM's, the year that they're bringing out that

21    particular, a particular vehicle.

22    Q.  In terms of manufacturing, it runs from when to when?

23    A.  Typically, the new -- well, it's hard to say.

24    Q.  I'm talking about the model year 2005 for Nissan.

25    A.  October 2004 is when it starts.  The vehicles are

*11/29/04*                          *Witness:  J. Tessier*

1       available to the general public.

2       Q.  When would they begin manufacturing the 2005's?

3       A.  August.

4       Q.  And when would they quit making 2005's?

5       A.  That particular vehicle I believe is four years --

6       Q.  Four years?

7       A.  A 2004 year-long model.

8       Q.  No, the model year 2005 --

9       A.  Okay.

10      Q.  If they start in August, don't they?

11      A.  End of July.

12      Q.  And --

13      A.  End of July.

14              THE COURT:  One at a time, please.

15  BY MR. CAREY:

16      Q.  And in this email, it's asking for a .065 material;

17      correct?

18              THE COURT:  I'm sorry , what exhibit number?

19              MR. BOHMER1:  501, Your Honor.

20              THE WITNESS:  065, that's correct.

21  BY MR. CAREY:

22      Q.  But you'll agree with me that that became the 064

23      material that's in Exhibit 502?

24      A.  Yes.

25      Q.  It's the next day, right?

*Case No. 04-CV-74331*

1    A.  Yes.

2    Q.  And by the next day, go from 065 to 064, and eventually

3    this would become 063, is that --

4    A.  That's correct.

5              MR. CAREY:  Mr. Sharkey, you had the original?

6              MR. SHARKEY:  Yes, this is the original 502.

7    It's got the terms and conditions on the back if you want to

8    see it.

9              MR. CAREY:  May I approach the witness, Your

10   Honor?

11             THE COURT:  Sure.

12  BY MR. BOHMER1:

13   Q.  It's not marked as an exhibit, but the indication is

14   that that is the hard copy original of Exhibit 502.

15   A.  Yes.

16   Q.  And it's signed by whom?

17   A.  That's my signature.

18   Q.  That's signed by you, Mr. Tessier?

19   A.  Yes.

20   Q.  Do you have a copy of this signed by anybody at

21   Heidtman?

22   A.  I don't believe we do.

23   Q.  Okay.  So the original is in your possession, so doesn't

24   that mean that original is not in our possession?  My point

25   is, don't you fax these things to us?

1    A.   There's multiple copies here that would have been taken

2    off, and original mailed to Heidtman.   Initially, we fax,

3    and then we mail the original.   So this is my original copy

4    but Heidtman would have received an original as well,

5    because this is a four-part form.   We send two to the

6    supplier and keep two copies for ourselves.

7    Q.   Do you know if that was the practice by Mr. Staddon and

8    Mr. Millar?

9    A.   That is the practice that's for all purchase orders,

10   that's our procedure.

11   Q.   If we were going to -- if the testimony would be that

12   all of your purchase orders were faxed to Heidtman, would

13   you disagree with that?

14   A.   I would say likely -- no, I wouldn't disagree.   I can't

15   be certain what my buyer did on every purchase order, but

16   typically to get the order out there right away, we fax a

17   copy and then put the hard copy in the mail.

18   Q.   This Exhibit 502 has an expiration date on 12/31/39?

19   A.   That's correct.

20   Q.   It's been indicated that that indicates a spot buy of

21   material, that it represents a one-shot purchase.   Do you

22   agree with that?

23   A.   I would disagree.

24   Q.   You would?

25   A.   If I understand your question correctly, this is not a

1    spot buy, so I would disagree with that.

2    Q.   What is the significance of 12/31/39?

3    A.   That's the expiration date, but that was computer

4    generated.  If you didn't actually put something in there,

5    it was a default date in the computer software in the

6    software program for this.

7    Q.   And this is purchase order S100-158, isn't it?

8    A.   Yes, it is.

9    Q.   Why are there no pounds specified on this purchase

10   order?

11   A.   The way this purchase order is set up, it's a blanket

12   purchase order, and if you read through the text, it says to

13   shipper releases.  The blanket order basically gives us a

14   price for specific time frame, a contract for specific price

15   and specific time frame.  The material, the actual

16   requirements is estimated based on the customer's wait of

17   the part times of customer's estimated volume.  So our

18   plants actually release material as it's required by our

19   customer, and the customer gives us requirements, and then

20   we release it to the supplier through the plants

21   individually.  At the beginning, we estimate the tonnage

22   required based on the weight of the part times how many

23   vehicles a year Nissan is planning to build.

24   Q.   What was the time frame for this purchase order?

25   A.   Time frame, my opinion, is for the length of the -- we

1    need these parts for the length of the vehicle program which

2    I say runs typically four to five years.

3    Q.  So you thought this might have a four- or five-year life

4    span, this purchase order?

5    A.  That's correct.

6    Q.  But it doesn't say that anywhere, does it?

7    A.  Not in the body of the -- I don't believe so, in the

8    body of the text.  I mean, this is --

9    Q.  How then would Heidtman understand that you thought this

10   was a four- or five-year purchase order?

11   A.  Well, again, in my opinion, and there was a lot of

12   discussion between sales reps from Heidtman and my steel

13   buyer.  Typically, we would buy this material from Nissan in

14   their resale program.  The reason we didn't buy it this time

15   was because it wasn't available through their program.

16   That's why we came to Heidtman.  And I know my buyer and

17   sales representative talked about it.  They knew

18   specifically this was for the Nissan WQW program, platform,

19   which is the Pathfinder and X-Terra, and that, you know,

20   this is a specific job for a specific platform, and it's a

21   new vehicle, new launch, it's a big thing for Fabco and why

22   are we not buying this from Nissan?  Can't buy it from

23   Nissan.  And so I claimed that Heidtman knows specifically

24   what this is for, and that is very program related, and

25   these programs don't typically last six, seven months.  They

1    last three, four, five years.

2    Q.   These were in conversations, or is this what somebody

3    was telling you about?

4    A.   Well, this is conversation with my steel buyer.  I was

5    not specifically at every meeting between sales

6    representation and my steel buyer.

7         MR. CAREY:  Then I move to strike all that, Your

8    Honor.  He has no personal knowledge of the conversation.

9         MR. SHARKEY:  Your Honor, my brief response

10   would be it's in, part of his business duties as a

11   supervisor of all buyers is part of this information.  If we

12   want to call Mr. Staddon, we certainly can call him to

13   testify firsthand, but Mr. Tessier is a supervisor.  If I

14   don't bring the supervisor and I bring the buyer, the buyer

15   is in a very narrow lane, doesn't understand everything, and

16   I get in trouble for not bringing the supervisor.

17        THE COURT:  Well, he can't testify with respect

18   to what the buyer said to Heidtman, but I mean, I'm not

19   going to strike it.  I'll just take it for what it's worth.

20   He has no personal knowledge.  To that extent, it's hearsay.

21        I guess I have a question along these lines.

22   Excuse me for interrupting your examination, but I was kind

23   of flipping through these purchase orders, and I notice 502,

24   503, 504, all of which are status change orders in '03, have

25   that same default expiration date, which I don't know why

1      you guys use that, but I mean it doesn't seem to make sense,

2      but that's through 507, 508, and then in January of '04

3      we're seeing for the first time an expiration date

4      of 9/25/06.  How did that change come about?  This is along

5      the same lines Mr. Carey was asking.

6                THE WITNESS:  Your Honor, you picked up exactly

7      on what the internal auditors at ThyssenKrupp Fabco picked

8      up on, quite frankly.  That default date wasn't acceptable

9      so we changed in January of '04 our computer software

10     program so that you could not default that date anymore.

11     You had to put in an expiration date.  So it was an internal

12     control that was directed from ThyssenKrupp organization

13     that we changed, and we did that in January '04.

14                THE COURT:  Was this a system-wide or

15     company-wide change?

16                THE WITNESS:  Company-wide for Thyssenkrupp

17     Fabco, yes.

18                THE COURT:  So all of your purchase orders prior

19     to this had this default date in it?

20                THE WITNESS:  That's correct, Your Honor.

21                THE COURT:  So what documentary evidence is

22     there that Heidtman was ever informed that this was a

23     contract that was anticipated to -- that they were entering

24     into a requirements contract that was to last until

25     September 5, '06?

1           THE WITNESS:  Other than a copy of the purchase

2      order that has that on there, and again, in conversations

3      with my steel buyer, the conversation with the sales

4      representative that this was, you know, a specific program

5      and things and how long it lasted, but there's nothing in

6      this book that I know of that we provided other than the

7      discussions between buyer and sales representative at

8      Heidtman.

9           THE COURT:  So can you look at Exhibit, I guess

10     this is 509, and find the part that we've been talking about

11     here, and the price?

12          THE WITNESS:  This copy is really difficult to

13     read.

14          THE COURT:  Well, there's a couple copies in

15     here that all seem to be --

16          THE WITNESS:  Okay.  On 509 --

17          THE COURT:  Or you can use 510.  That has a

18     status change of 1/7/04 also, and I can see that there is a

19     Line 70 open.  That's the price, that's the --

20          THE WITNESS:  That's the product in question.

21          THE COURT:  In question, right?

22          THE WITNESS:  That's correct.

23          THE COURT:  And that price is 297?

24          THE WITNESS:  That's correct.  Your Honor, if I

25     may just go further, if you look down further to Line 80,

1    there's additional one there, as well.

2              THE COURT:  Right.  Now, are there purchase

3    orders between that January '03 one and the September '04

4    one we've been looking at?  Or January '04 and

5    September '04.  I thought there were.

6              THE WITNESS:  There is.  There would be, the

7    purchase order number would remain the same, but there would

8    be some changed statuses there.  For example --

9              THE COURT:  Do we have them as exhibits, do you

10   know?

11             MR. BOHMER1:  I can direct the Court to one.

12   The one I referenced earlier, Your Honor, Exhibit 532.

13             THE COURT:  Okay.  Do you know of any others?

14             THE WITNESS:  Off the top of my head, I believe

15   between that period of time, I don't believe anything else

16   was added to that.

17             THE COURT:  So likely we have the one in

18   January, the one in July, and the one in September?

19             THE WITNESS:  I believe that to be correct, Your

20   Honor.

21             THE COURT:  And what prompted the shipments?

22   The shipments were coming weekly without individual orders,

23   or how did Heidtman know how much to ship?

24             THE WITNESS:  They would receive what we call a

25   material release from the plant.  There's planning, figures

1    going out in the future, and it's specific for the next

2    couple months, weekly requirements, and then three or four

3    months further out what the anticipated volumes are going to

4    be.

5                    THE COURT:  But they wouldn't be purchase

6    orders.

7                    THE WITNESS:  No, they would not be.  They would

8    be material releases.  It's just a document that shows

9    numbers, requirements, and dates, basically.

10                    THE COURT:  Okay.  Go ahead.  I'm sorry to

11   have --

12                    MR. CAREY:  Not at all, Your Honor.

13   BY MR. CAREY:

14   Q.  Coming back to this 12/31/39 date, what would you tell

15   people when they'd ask you about that?

16   A.  Quite frankly, I don't recall ever personally myself

17   having somebody complain about that.  I have many suppliers

18   receive exact purchase orders as these with that date on it,

19   so I can't really comment, to be honest with you, Mr. Carey.

20   Q.  And last, Exhibit 502, you'll see at the bottom that

21   there's a, you have to read the bottom upside down, but it

22   shows that there was pages, it says it's from ThyssenKrupp

23   Fabco Windsor, and then it says Page 1 of 1 and then Page 2

24   of 2.  Page 1 of 2 and then Page 2 of 2.  Do you see what

25   I'm showing you at the bottom?

1    A.  I can see something on the first page but not on the

2    second.  Okay.  All right.  Yeah.

3    Q.  That would indicate that, as I -- will you share my

4    understanding that this means that these are two pages that

5    were faxed, and only these two pages?

6    A.  I believe so.

7    Q.  So the terms and conditions would not have been sent.

8    A.  Not in the fax, no, but in the original mailed documents

9    they would have been.

10   Q.  At this time in early 2003, who else were you trying to

11   get steel from besides Heidtman?

12   A.  In terms of for this particular product?

13   Q.  Yeah, we'll say for this 063 material.

14   A.  We approached, naturally approached our customer through

15   their steel resale program.  I'm not quite sure, Tom

16   Staddon, my buyer, might have approached some other

17   potential steel suppliers.

18   Q.  You say in your statement that this part is designed and

19   formulated to meet Nissan requirements.  It's a coil of

20   steel, so who designed this coil of steel?

21   A.  The engineers at Nissan would set the spec.  The

22   engineers at Fabco would determine the width, I believe the

23   Nissan engineers also determine approximate gauge.

24   Q.  You know Heidtman doesn't make steel; correct?

25   A.  That's correct.

1    Q.  Who make the steel?

2    A.  I believe Steel Dynamics is the provider of all raw

3    material of the substrates.

4    Q.  And do you think this steel was designed for you?

5    A.  I believe it is, yes.

6    Q.  By Steel Dynamics?

7    A.  That's correct.  The recipe for the steel would be

8    designed specifically for us.

9    Q.  Can the steel be used for anything else in the world?

10   A.  I believe it could be, sure.

11   Q.  In fact, they were making the deal before there was the

12   part, isn't that true?

13   A.  That I don't know, sir.

14   Q.  You think steel in 063 gauge was not available before

15   February of 2003?

16   A.  At this specification and width, I believe it was.

17   Q.  Right.  So you could buy the steel from Steel Dynamics,

18   couldn't you, because they're still making it?

19   A.  I've never approached but Steel Dynamics.  I suppose

20   it's conceivable that they make --

21   Q.  Sure.  Since that's where we get it, that's where you

22   could get, right?

23   A.  Yes.

24   Q.  You could also make this part from cold rolled steel?

25   A.  I don't know that, to be honest with you.  I'm not sure

1    if cold rolled steel can be purchased in this specification.

2    Q.  Do you know of any other steel mills that make this

3    material.

4    A.  No, I do not.

5    Q.  Do you know if Thyssen could make this material?

6    A.  I don't know that.

7    Q.  You don't know one way or the other?

8    A.  No, I don't.

9    Q.  That's because you've never inquired, have you?

10   A.  No, not that I'm aware of.  I'd have to ask Tom Staddon

11   but --

12   Q.  No, have you ever inquired?

13   A.  Personally, no.

14   Q.  So what does Heidtman do that makes this steel so

15   special?

16   A.  They're the only ones that I'm aware of that were able

17   to supply it in North America that was, that were able to

18   meet the specification and -- width, gauge and specification

19   combination was something unique, so they were the only

20   company that we could find in our market search that --

21   Q.  Gauge comes from the mill, doesn't it?

22   A.  I believe so, yes.

23   Q.  So there's nothing about Heidtman that makes the gauge

24   of the steel, that's Steel Dynamics, correct?

25   A.  That's correct.

*11/29/04*                    *Witness:  J. Tessier*

1     Q.   Width of the coil, Steel Dynamics?

2     A.   Yes, I believe.  They slit it to Heidtman's

3     specification.

4     Q.   How many other slitters are there in this part of the

5     world do you think?

6     A.   Say a hundred, I guess.

7     Q.   In fact, ThyssenKrupp Fabco can slit steel, can't it?

8     A.   Thyssenkrupp Fabco doesn't have slitting capability, no.

9     Q.   How about Thyssenkrupp Steel?

10    A.   There's somebody probably within the Thyssen

11    organization that slits.  I'm not familiar with the steel

12    division of ThyssenKrupp.

13    Q.   So if you've got Steel Dynamic steel from one of our

14    competitors, you'd be identically in the place you are now,

15    wouldn't you?

16    A.   No, I believe we'd still have to have it picked up and

17    slit and packaged and shipped and all that.  That's part of

18    the service that Heidtman provides us.

19    Q.   So if Heidtman picked up a coil of the steel.  And Steel

20    Dynamics and took it to another slitter and they slit it,

21    you'd be in the same place, right?

22    A.   Sure, I believe so.

23    Q.   So all you're trying to get from us is slitting

24    services, right?

25    A.   Slitting, pickling, package --

*Case No. 04-CV-74331*

1           THE COURT:  You're going to talk your client out

2      of a job.

3  BY MR. CAREY:

4      Q.  What would happen if Steel Dynamics stopped making this

5      063 material?

6      A.  We would have a problem.  We'd have to go to our

7      customer and let them know steel would be unavailable, and

8      from that point, I don't know what typically happens, you

9      know, the discussion that begins, what would happen, what we

10     would do.  There would have to be some sort of remedy to

11     that, I guess.

12     Q.  Don't you have a back-up plan of some kind?  Very

13     concerned about shutting down these plants.  If Steel

14     Dynamics decides not to make the steel next week, what

15     happens?

16     A.  We have a big problem, that's for sure.  And this isn't

17     an unenviable position to be in.  This type of steel is

18     difficult to buy.  If there's standard cold rolled steel

19     that's of standard grade and of standard specification that

20     can be bought many places, yeah, you can typically go out

21     and find it someplace else.  But in this case, it's

22     difficult.  This is a difficult specific width and gauge

23     combination.

24     Q.  You've been -- over 11 months, you've been worried about

25     a shutdown of Nissan?

*Case No. 04-CV-74331*

1      A.   No, that's not correct.  Whenever we got the letter from

2      Heidtman that they were going to shut us down, which would

3      have been September or October.

4      Q.   Have you done nothing to try to find other qualified

5      material to deal with this risk, this single source of

6      supply?

7      A.   No, we have not.  We felt we had a supply that was firm,

8      steady, that was reliable.

9      Q.   Do you have any kind of agreement with Steel Dynamics

10     that says they're going to make this steel next week?

11     A.   No, I believe our agreement is with Heidtman.

12     Q.   Right.  I'm saying in terms of shutting down Nissan,

13     what have you done by way of a back-up plan?  Anything at

14     all?

15     A.   At this point, no, we don't.  I mean, you'd have to look

16     world wide for this steel somewhere else.  Maybe Nissan has

17     other opportunities.  I don't believe they do.

18     Q.   And you were worried about a shutdown 11 months ago,

19     weren't you?

20     A.   On this particular part?

21     Q.   Yes.

22     A.   Not that I recall.

23     Q.   Take a look at Exhibit 512 please.  That's you, isn't

24     it, Jeff Tessier?

25     A.   That's correct.

1    Q.  Do you remember this letter?

2    A.  Yes, I do.

3    Q.  Do you remember sending it to Bob Millar?

4    A.  Yes, I do.

5    Q.  Can you read the last paragraph?

6    A.  In the interim, our expectations are that you will

7    continue to supply per your release until the issue is

8    resolved with our customer.  Failure to do so would result

9    in a customer shutdown situation.  Should this occur, we

10   would have no course of action other than to debit your

11   account for any charges levied against us by our customer.

12   Q.  Do you remember when that letter went out?

13   A.  I believe it went out January.

14   Q.  I just asked you that, didn't I?  You were worried about

15   shutdowns as long as 11 months ago.  What have you done to

16   find a backup for a supplier?

17   A.  When this --

18           MR. SHARKEY:  Objection, asked and answered.

19           THE COURT:  He can answer.

20           THE WITNESS:  First of all, it's a boilerplate

21   that went out to all of our suppliers for the exact same

22   reason, but at this time the 063 wasn't an issue because we

23   weren't going into production until August of 2004.  There

24   were some other items that Heidtman had that we were

25   purchasing from Heidtman that they were requesting

1   increases, and we were rebutting those increases, saying no,

2   we can't give you increases, we have to continue to give our

3   customers decreases, you know, we have a problem, that, if

4   you read through the rest of the letter, there's a program

5   at Fabco where our expectations and our supply base, their

6   annual productivity, gives back five percent a year price

7   reduction so that we can keep up with the price reductions

8   we give our customers.  And I was reminding our supply base

9   of that, and Heidtman got this letter, so did about 40 or 50

10  other of our suppliers, and that we were using this as a,

11  you know, notice out in the industry, that, listen, we're

12  not taking these increases; as a matter of fact, we expect,

13  our expectation is decreases to keep pace with the OEM's.

14  And again, at this time, we weren't production on that.  I

15  wasn't worried at that point.  We hadn't got a price

16  increase request from Heidtman on this particular steel yet.

17  Q.  You're buying 044, 055, 193, 153, 063 in two different

18  widths, all on the same purchase order?

19  A.  That's correct.

20  Q.  Anything anywhere that says I really care about the

21  063 --

22  A.  No, it was a general boilerplate.

23  Q.  When you wrote to Heidtman and said we're not going to

24  take any price increases in January, correct?  Take a look

25  at Exhibit 513.  It's a reply to your letter, sir.  Do you

1    remember it?

2    A.   Uh-huh, yes.

3    Q.   You were told that the price increases will go into

4    effect, is that correct?

5    A.   I believe on this particular part number that Heidtman,

6    it wasn't a price issue, it was an issue of supply, that

7    they could not find this type of material.  Again, it was a

8    specialty type steel with a wide width.

9    Q.   Do you want to read 513?

10   A.   And they couldn't supply it at all anyplace else.

11   Q.   Read 513.

12   A.   I'm sorry, I'm on 514.  Okay.  I apologize.

13   Q.   Heidtman said no, the price increases will go into

14   effect, isn't that what it says?

15   A.   It's saying we had to, yeah, we had to -- they wanted

16   them to go into effect, we had to sign an agreement to pay

17   surcharges.

18   Q.   Okay.  And do you place orders after you receive that

19   letter?

20   A.   I don't believe we placed any new orders, no.

21   Q.   You don't think you placed -- your purchase order is

22   dated, this is Exhibit 509 and 510 that the court was just

23   looking at.  And I'm telling you, Mr. Tessier, on

24   January 14, a week later, Heidtman writes to you by name

25   directly and says we are raising prices.  This is within

1     days of your January 7 purchase order.  You write back

2     shortly thereafter, judging from the facts, looks like maybe

3     January 23, said we're not going to accept any price

4     increases.  You're told on January 27, you will accept price

5     increases.  Isn't that what the correspondence shows?

6     A.  I'm sorry, Mr. Carey, I'm having trouble following you

7     here.

8     Q.  Well, the suggestion has been that you were somehow or

9     other surprised by price increases in view of your long term

10    purchase order.  I'm saying your purchase order that comes

11    closest to the material at the time is January 7, you get a

12    letter a week later saying here's the new pricing, you say

13    no, Heidtman says yes.  Exhibits 510, 511, 512, 513.

14    A.  Okay.

15    Q.  By the time you got to 513, was it your impression that

16    Heidtman was going to charge the surcharges, or not?

17    A.  Well, it's my understanding they want to.  But yeah,

18    they want to impose surcharges, that's correct.

19    Q.  Did you place orders?

20    A.  We did not place new orders, no.

21    Q.  You didn't place any orders during January and February

22    and March?

23    A.  Oh, material order releases?

24    Q.  Yes.

25    A.  There was likely releases for some different -- because

1    there's different size here.  I don't believe any orders

2    were placed for the 063.

3    Q.  What's special about 063?  There's nothing in this

4    correspondence that mentioned 063.  Your January 7 purchase

5    order lists seven different items.

6    A.  Uh-huh.

7    Q.  Why would anybody pay attention to 063 especially?

8    A.  At that time, in January, I would say that we were

9    rejecting increases against all items at that point.

10   Q.  But then when you were invoiced at the higher prices you

11   paid them, didn't you?

12   A.  Specifically on every one, I can't say, but I know for a

13   fact that we rejected these, and that we did not pay -- in a

14   lot of cases on this stuff we did not pay the increases.  We

15   paid the contract price until such a time that Heidtman said

16   that we were short paying, and we said no, we weren't.

17   Q.  And then you paid, though, didn't you?

18   A.  Only under duress once they sent us stop shipment

19   letters.  Actually, not letters, but actually shipments

20   didn't arrive at the plants, and I refer back to what I had

21   mentioned earlier was that, at that time, I had to make a

22   decision whether to pay the increase or shut the customer

23   down, and I agreed to the increase only to keep the customer

24   in product.

25   Q.  Well, in January, you already told Heidtman you were

1    concerned about a shutdown at Nissan when they told you they

2    were going to raise prices.  You continue to buy steel.

3    They ship the steel, you use up the steel.  How is that any

4    different from where you are right now other than you don't

5    like having to pay the price for the steel?

6    A.  We're at a point where, at that time, we agreed to keep

7    our customer in product, but at this point now, enough was

8    enough.  We felt that we had been more than fair, and I

9    think at this time, it was really, enough was enough.

10   Q.  Did you know what Heidtman was paying Steel Dynamics for

11   the steel?

12   A.  I'm not in possession of their costing information.

13   Q.  If their prices were going up --

14   A.  My question about Heidtman is why don't you guys have a

15   fixed contract with Steel Dynamics, knowing that this

16   program was a Nissan-specific program starting model year

17   2005, and going out three to five years as a minimum.  This

18   is -- and this is a requirement in the automotive industry.

19   Q.  So this is a fairness issue as far as you're concerned?

20   A.  I'm not quite sure what the question was.

21   Q.  At this point now in January, late January and going

22   into February, you know the prices are going to continue to

23   be increased, don't you?

24   A.  Well, the dynamics of the industry was growing and

25   growing.  Really, January is when it kind of started, so it

1    was all kind of new to us really.  The price increases had

2    taken a lot of people by surprise, myself included.

3    Q.  But everybody in the business understood that was the

4    trend, correct?

5    A.  In January, it was the beginning of a trend.  No one

6    knew how long or how far at that point.

7    Q.  Well, again, as you say, Heidtman you say should have

8    locked up a long-term price with Steel Dynamics because you

9    thought this was a five-year contract based upon an invoice

10   from 2003, or the purchase order.  Why didn't you sue us in

11   January if, if you thought you had a long-term, fixed price

12   contract and you thought from your own correspondence there

13   was some risk of shutting down Nissan?  Why do you wait 11

14   months?

15   A.  I guess we just didn't exercise that right at that

16   point.  Like I said before, we were all hoping in the

17   industry that this was short lived and this wasn't going to

18   continue, but once it continued and continued, we had no

19   other choice.  I mean, I had to get steel into the -- this

20   is a brand new vehicle launch.  It's very important to our

21   company.  Nissan is our number one customer, and we could

22   not jeopardize that.  So I had to somehow secure the supply

23   to our plant so that we could continue to ship product to

24   Nissan.  So that is why we've done what we've done,

25   basically.  Simple as that.

1    Q.  Do you think Heidtman broke its promise or contract in

2    January by upping these prices beyond the purchase order?

3    A.  I believe, yes.

4    Q.  Why do you keep on doing business with us?

5    A.  I believe they're a good supplier.  Always quality in

6    delivery.  Never been an issue.  Up until now, their prices

7    have held firm.  They've been a decent supplier.  I would

8    consider them an approved supplier within our system.

9    Q.  You said a little bit ago, you could buy this material

10   from Steel Dynamics because --

11              THE COURT:  Okay.  Let's move on.

12   BY MR. BOHMER1:

13   Q.  Do you issue new purchase orders every time Heidtman

14   raises the price?

15   A.  I believe the purchase orders were amended and reprinted

16   and sent, yes.

17   Q.  Do you have copies of them?

18   A.  Yes, we would have copies.

19   Q.  For every price increase?

20   A.  Any change amended to a purchase order would have been

21   printed and faxed, mailed, put on file at Fabco.

22              THE COURT:  That was a question I asked you

23   earlier.  I just saw the one, the July, I saw the January,

24   then July, and then September, but you agreed to more than

25   one change in the price along the way.  So where are the

1    other purchase orders?

2                    THE WITNESS:  The other purchase orders would be

3    any time you would change the purchase order on some of the

4    other part numbers, I believe the only change was in April

5    on this, on this particular part number.  We only changed it

6    once.  It was always 297, and then it went to .3585.  Do you

7    mean for every single part, or just this one?

8                    THE COURT:  Well, I'm not clear what the

9    question is then.  I mean, are we only talking about this

10   one part?

11                   THE WITNESS:  Yes, ma'am.

12                   THE COURT:  Okay.  Then, so the only change

13   order that talked about a change in price that I saw, and I

14   don't remember which one it is now, was the one in July.

15                   MR. CAREY:  532.

16                   MR. SHARKEY:  I believe that was the next after

17   the April price increase.  I don't want to speak for

18   Mr. Tessier.

19                   THE COURT:  Where's the April one?

20                   MR. SHARKEY:  April is an internal note.  That's

21   why we missed it, frankly.  The last Page of 109, if you

22   read that, it says note, 4/19, 2004, price change from 297

23   to 3585, and then you got to read the very next page which

24   says April first.

25                   And I don't know what Mr. Tessier did, his

1    office, in terms of issuing a PO, if there was one issued in

2    April or July or not.

3                    THE COURT:  All right.

4                    THE WITNESS:  I believe, Your Honor, that this

5    is the only change that we made to that particular part

6    number was in April.

7                    THE COURT:  That increase to .3585?

8                    THE WITNESS:  That's correct.

9    BY MR. SHARKEY:

10   Q.  And then there's a July change with the handwritten

11   notes on it.  That's 532, saying per email, July 2004

12   prices, 4785.

13   A.  That handwriting is from Bob Millar of Heidtman.  We

14   sent this to him.  I think what's changed here, if you read

15   the --

16                   THE COURT:  Says coil width change only.

17                   THE WITNESS:  That's correct.  And I was

18   alluding to earlier, what my buyer has done is he took the

19   April line item, which is Number 70, canceled it, and

20   created line item 150 for this one, saying just the width

21   change, okay.  We're getting closer to production, our tools

22   are finished, this is the final developed size, what we

23   call -- which would be what will be going into production.

24   Earlier, you got subtle changes here there, until you get it

25   just down to, until it's tweaked to just where you want it.

1    Then you update your purchase order for the ongoing, final

2    size on that.

3                THE COURT:  There's no response from Fabco,

4    though, saying, you know, no, we disagree about the

5    July 2004 price, right?

6                THE WITNESS:  I would disagree with -- well, I

7    believe we responded, Your Honor.  I'd have to look here,

8    but I'm pretty certain that my guy informed Heidtman that we

9    weren't accepting price increases.

10               THE COURT:  Have any idea where that might be,

11   Mr. Sharkey?

12               MR. SHARKEY:  Your Honor, I want to make sure

13   the Court understands what 532 is.  This is their exhibit.

14   They hand wrote on the PO, and it's Mr. Millar, Bob Millar

15   of Heidtman saying per email, we have a higher price.  The

16   email is his own email.  I mean, it's just -- so that could

17   have been written any time.  I'm not saying it was, it could

18   have been written a week ago.  We have no idea when this

19   thing was written.

20               THE COURT:  You're saying it was not

21   communicated to Fabco?

22               MR. SHARKEY:  I'm quite certain it was, probably

23   vociferously, and Mr. Tessier can talk about the response.

24   But these guys are talking on the phone a lot, too, it's

25   mostly a phone and email thing, where, no way, we're not

11/29/04                    Witness:  J. Tessier

1     paying you, going back and forth.

2             MR. CAREY:  You can see it was sent to Tom

3     Staddon, at the top of 532, to his attention.

4             MR. SHARKEY:  I just don't know when Mr. Millar

5     wrote, hand wrote this in, and said based on my e-mail from

6     about a month ago, we want a higher price.  And I see what

7     Mr. Carey is saying which is it was sent back to Mr. Staddon

8     saying, hey, we want this 47 cents, and I think we covered

9     this in the affidavit, but we did respond.  The

10    telecommunications, here's Exhibit D to the verified

11    complaint which would be 104, here it is.  June 28, how many

12    days later is that, four days later?  Page, Exhibit 104,

13    ma'am, right in the middle there.  There's an email from Tom

14    Staddon to Bob Millar.  That's Monday, June 28.  They sent

15    us this thing, an email saying we want a higher price on

16    Thursday.  The following Monday, Bob, please be advised that

17    Fabco is not accepting price increases at this time, however

18    we expect you to keep shipping, blah, blah, blah, Tom.

19             THE COURT:  All right.  Okay.

20  BY MR. CAREY:

21    Q.  The judge asked one of the questions is you can

22    apparently -- your internal accounting system let's you, for

23    example, show a price change of April 1 without actually

24    generating a document that Heidtman ever receives; correct?

25    A.  Yeah, that would be correct.

1    Q.  Okay.  And Exhibit 109 are some printouts from your

2    system, and I think they're intended for the proposition

3    that every part number in your system should match up to a

4    purchase order.  Isn't that right?

5    A.  These are, these documents in 109 are basically screen

6    dumps of the purchase order.  These are the same line items,

7    that's correct.  They're off the purchase orders.

8    Q.  Can you find me the part that you're talking about on

9    this printout --

10   A.  109, first page.

11   Q.  -- or any of them?

12   A.  I see them, Line 80.

13   Q.  6354875.

14   A.  I see it on Line 70 and 80.  Yes, that's correct.

15   Q.  Which one?

16   A.  70 and 80.

17   Q.  Neither of those are 875, are they?

18   A.  They are not.  At the time, developed varying in prices.

19   Q.  But this was developed on February 19.

20            THE COURT:  I've got to tell you, this is a

21   losing argument for you.  I'm very satisfied that this part,

22   even though there are a little differences in the width, is

23   the same thing, and that's what we're talking about here

24   today.

25            MR. CAREY:  I'm sorry.  My point is, Your Honor,

1    no, this system doesn't even know about 875 part, it doesn't

2    know about the purchase order.  You obviously buy and price

3    without communication by purchase order, you know, and this

4    was offered up as proof that, my gosh, we can't even pay a

5    bill without having this particular part in our system.  Of

6    course they do, and of course they place orders without

7    having parts like this in the system, and of course they

8    modify prices without sending new purchase orders.

9              THE WITNESS:  I would disagree with that.  We

10   modified price, we sent out purchase orders to our

11   suppliers.

12             MR. CAREY:  No, I understand, and it's not my

13   suggestion at all that this is the 63 material that they use

14   for this part, religiously following some written process of

15   procurement by purchase order, and nothing to be paid unless

16   we have a purchase order.  The record is replete that they

17   do business by email and by telephone and by releases.

18   BY MR. CAREY:

19   Q.  You will agree with me, you were told during January if

20   you don't pay the prices, Heidtman won't ship.  You were

21   told that again in June, correct?

22   A.  I believe those dates to be approximate, yes.

23   Q.  Told in July, told on August 11.  Now, after those four

24   circumstances, did you continue to place new orders with

25   Heidtman for steel?

1    A.  New orders, releases?

2    Q.  New releases, sir.

3    A.  Releases, yes.

4    Q.  And you were invoiced at the prices that you were quoted

5    each month, correct?

6    A.  Yes, I believe that's correct.

7    Q.  And you paid those invoices, correct?

8    A.  Not at first we didn't.  Then when Heidtman said they

9    would discontinue shipping if we didn't pay their increased

10   demand as opposed to the purchase order price, then we paid

11   it.  As a matter of fact, I remember Bob Millar came in and

12   hand delivered a check to Bob Millar in the summer so that

13   we would get our steel for the variance of what they gave us

14   and what was on our purchase order.

15   Q.  So when you came into the courtroom on November 9 and

16   told this court that you were in the midst of a crisis, what

17   was different on November 9 from January or June or July or

18   August other than you were receiving monthly invoices of

19   prices higher than you wanted to pay, and if you were short

20   paid, you were told if you don't pay our bills, we won't

21   send you the steel?

22   A.  I don't believe it was any different.  The same

23   situation arose as we were placed in production.  The same

24   argument came up again that, you know, Heidtman wanted X

25   number of dollars, and Fabco felt we had a contract at Y and

1    again, I can only go back to saying that at that point,

2    basically enough was enough, this had escalated to a point

3    where it was getting very serious.

4    Q.  On this Exhibit that you're most concerned about, this

5    Exhibit 101 from September, anything in your file that would

6    show that it was uncommunicated to Heidtman at all?

7    A.  I'm sorry, Mr. Carey, could you repeat the question?

8    Q.  Sure.  You have the September 23 version of the purchase

9    order?  It's Exhibit A to your complaint.  It's I think

10   Exhibit 101.  It's your most, arguably your most recent.  I

11   can't testify, but I'll ask you to consider the possibility

12   that Mr. Millar of Heidtman has copies of, had copies of all

13   of these PO's, including the kind of mangled one from

14   January that's hard to read, has no copy of that in his file

15   to his knowledge at the time of the complaint.  Do you have

16   any way of saying that that was communicated to Heidtman in

17   any way?

18   A.  This is the same purchase order that was given to them

19   in April, Mr. Carey.  Quite frankly, this is the same price

20   on the same part number.  They would have got this in April.

21   The changed status, 9/23.  I'm not sure.  That could have

22   been something very well we printed, it could have been

23   printed on an additional copy print which would make the

24   same status, 9/23.  I believe this here was the April

25   purchase order.

1    Q.  So you're not surprised if you wouldn't have that?

2    A.  Oh, yeah, if nothing --

3    Q.  Is this the April purchase order?

4    A.  I believe so.

5              THE COURT:  What's the number of the April

6    purchase order, what exhibit?

7              THE WITNESS:  521 I think.  No, I'm sorry.  I'm

8    sorry, Your Honor.  I don't remember.

9              THE COURT:  Mr. Sharkey, do you have it?

10             MR. SHARKEY:  No, Your Honor.  I don't see an

11   April PO.  We've got the 109, which is the indication of the

12   price increase, but I don't see one issued between April and

13   July which I think was 509, or somewhere in there.  So

14   obviously we would have told Heidtman.  I'm sure they were

15   happy at the time to get a price increase, but I don't know

16   if we have a PO to that.

17             The thing is, if you don't print one of these

18   that day, the system feeds over itself.  And Mr. Tessier can

19   talk about this.  But you sort of lose the chance forever to

20   go back to that day.  In other words, we couldn't print an

21   April 2004 PO because it will automatically read November of

22   2004.

23             THE COURT:  Well, let's just use the July one

24   which is 532.  Is there any difference between the July

25   purchase order and the September purchase order?

1            THE WITNESS:  No, ma'am, I do not believe there

2       is.  There shouldn't be.

3            THE COURT:  Is it possible that the last one

4       that was sent to Heidtman was the July one?

5            THE WITNESS:  It's quite possible.  That's, if

6       you see on the, 532 on the left-hand side, Your Honor, it

7       says 150 new.  That would have been superseding the other

8       previous line.  This is the final developed size so that the

9       width changed a bit, and we send this out, and this is the

10       new final one.  So that could very well be the very last

11       one, yes.  If you look at the bottom, faxed was a total of

12       two pages.  You got to look at that little footer at the

13       bottom of the exhibit.  I'm directing you to Exhibit 532.

14            THE COURT:  I see it.  It's fine.

15            MR. CAREY:  Could we take a -- do you want to

16       break for lunch?  Because I think I'm done.  I'm more likely

17       to be done if I can think about it, rather than trying to

18       stand here.

19            THE COURT:  Yeah, we could break for lunch.

20            MR. SHARKEY:  On this point, I think what

21       happened is they just printed this one up for me.  I don't

22       want to interject testimony, but I think I said I want the

23       PO, and they said we'll print it up.  I remember this thing

24       starting about late September, the first go round.  So 532

25       and 101, I should have used 532, I may not have had it.

 1                    THE COURT:  They look the same to me.

 2                    MR. SHARKEY:  If you wanted it put it to bed.

 3                    THE WITNESS:  I believe that to be the case,

 4       that I don't believe we would have made a change after this

 5       date.

 6                    THE COURT:  I think I have -- let's just start

 7       again at 2:00.

 8                         (Lunch and recess were taken 12:40

 9                         until 2:10 p.m.)

10                    MR. CAREY:  Your Honor, I don't have anymore

11       questions of Mr. Tessier.

12                    MR. SHARKEY:  Your Honor --

13                    THE COURT:  Yes?

14                    MR. SHARKEY:  I just want to ask Mr. Tessier one

15       follow-up.  Can we sit?

16                    THE COURT:  I think it's just easier for the

17       court reporter if you use the podium.

18     BY MR. SHARKEY:

19       Q.  Mr. Tessier, would you flip to 502, sir?  I want to

20       clear up one thing from the cross examination.  You

21       understand the Court's concern here that, guys, you keep

22       talking about this February 11, 2003 purchase order.  I

23       don't see it.  It's not in front of me.  502 is dated about

24       a month later, March 14, 2003.  The bottom left-hand corner

25       there, that's Line 40, that's the part we've been talking

1    about, correct?

2    A.   That's correct.

3    Q.   And "new" means this is the first time that it's ever

4    been on a PO, correct?

5    A.   That's correct.

6    Q.   So if we were to go back, if you were to go back and get

7    the February 11, 2003 purchase order, I don't know if that's

8    possible or not because it's probably been trumped by the

9    computer, but would that have anything to do with the part

10   that is at issue here?

11   A.   No, it would not.

12   Q.   So the very first time that we order, and I understand

13   it wasn't in production yet, it was just a prototype, was

14   March 14, 2003, correct?

15   A.   That's correct.  That's why we updated that purchase

16   order to include that particular product.

17   Q.   And did you ever get an objection from Heidtman as to --

18   starting on I believe it was Exhibit 510, the January 7,

19   2004 purchase order, did Heidtman ever object to you at any

20   time, hey, that wasn't the deal, we don't have a PO with you

21   through the end of this Nissan program?

22   A.   No, I'm unaware of any objection to that PO.

23            MR. SHARKEY:  That's all I have, ma'am.

24            THE COURT:  I just have one clarifying question

25   because I'm looking at Exhibit 532 which is the July

1    purchase order, July status change.

2              THE WITNESS:  Yes, ma'am.

3              THE COURT:  That also says "new" at Line 150.

4    This isn't the first part that this part has shown up,

5    right?  I mean, this is, again, a slightly different

6    dimensional version of the part that we see for the first

7    time in the purchase order dated 3/14/03.

8              THE WITNESS:  That's correct.

9              THE COURT:  So what does the "new" refer to

10   here, the different dimensions?

11             THE WITNESS:  Yeah, what my guy has done here is

12   effectively he's canceled Line 40 and just issued Line 150,

13   new, with the new dimensions.

14             If you look, the other dimension is 54,

15   54.65 inches wide, and this one is 54.875 inches wide, so

16   the only difference is that nominal amount of width.  It's

17   the exact same.

18             So instead of changing Line 40, what he does is

19   cancels that and just issues a whole new line item, but it's

20   for the same part.

21             THE COURT:  Okay.

22             MR. SHARKEY:  Your Honor, I'm going to rest.  I

23   just want to repeat on the record.

24             THE COURT:  Let me ask Mr. Carey if he has any

25   additional questions.

1          MR. CAREY:  No other questions, Your Honor.

2          MR. SHARKEY:  We had an agreement off the

3     record, put on the record, that all the exhibits for both

4     sides are admitted without objection in this hearing.  Is

5     that --

6          MR. CAREY:  Yeah, although I will say, just

7     before we broke at lunch, there seemed to be some question

8     as to whether 101 wasn't simply printed for you for exhibit

9     purposes.

10          THE COURT:  Well, I'll take it for what it is.

11          MR. SHARKEY:  At lunch I talked to

12     Mr. Yatzic(ph), ThyssenKrupp house counsel, and he said hey,

13     late September I asked them to print that out for me and I

14     sent that to you, Dan.  So I don't think they ever got the

15     September 23 version of the PO.

16          THE COURT:  I understand that.

17          MR. SHARKEY:  Okay.

18          MR. CAREY:  And Your Honor, with that

19     understanding, yes.

20          MR. SHARKEY:  The only other thing, and then I

21     will sit down, is if the Court wants, we can give you front

22     and back of every single one of these PO's, they all have

23     our terms and conditions on them.

24          THE COURT:  Unless someone has something else to

25     say about it, I accept Mr. Tessier's representation that

*11/29/04*                                *Witness:   J. Tessier*

1     it's the standard language that appears on the backs of all

2     the purchase orders.

3                    MR. SHARKEY:  Then I don't, and the plaintiff

4     rests subject to its ability to call Mr. Boyce if the

5     financial issues arise on defendant's case.

6                    THE COURT:  All right.  Thank you.  You may step

7     down.

8                    (Witness Tessier excused 2:15 p.m.)

9                    THE COURT:  Mr. Bohmer?

10                    MR. BOHMER:  Bob Millar please, M-i-l-l-a-r.

11

12                         **ROBERT MILLAR,**

13     hereinbefore called as a witness, being first duly sworn

14     by the Court to tell the truth, the whole truth, and

15     nothing but the truth, was examined and testified upon

16     his oath as follows:

17                                                (2:16 p.m.)

18                       **DIRECT EXAMINATION**

19   BY MR. BOHMER:

20     Q.  Could you please state your name for the record?

21     A.  Bob Millar.

22     Q.  Are you employed?

23     A.  I'm employed by Heidtman Steel.

24     Q.  How long have you been with Heidtman?

25     A.  In my 15th year.

1    Q.  And what is your position?

2    A.  I'm the Canadian salesman.

3    Q.  As a Canadian salesman, what do your duties entail?

4    A.  Well, I call on all the Canadian stampers.  And I say

5    Canadian salesman, it's basically Ontario.  I do have some

6    accounts outside the province of Ontario, but mainly because

7    of, you know, the area, I call it Ontario and Windsor and

8    Toronto are the big areas.

9    Q.  Is there a reason why you deal principally in Canada?

10   A.  Well, that's what I was hired to do.  I'm a Canadian,

11   and to have a home boy, you know, call on your fellow

12   Canadians, if I don't like their prime minister, if I state

13   that, they don't get too upset with me.

14   Q.  Have you ever had a dealing with ThyssenKrupp Fabco?

15   A.  Oh, sure.

16   Q.  If I use the term Fabco --

17   A.  Oh, Fabco, yes, Fabco, I've known Fabco for years.

18   Q.  And what relationship did you have with Fabco as the

19   Canadian sales rep for Heidtman Steel?

20   A.  Oh, I thought I always had a good relationship with

21   them.

22   Q.  Were they one of your accounts?

23   A.  Oh, sure, good customer, sold them a lot of steel.

24   Q.  Who do you principally deal with?

25   A.  Tom Staddon.

1   Q.  And you understand him to be a Fabco employee?

2   A.  Yes, he's the buyer, steel buyer.

3   Q.  Now, in the interest of time, I will try to get, I'm

4   going to take you through a series of exhibits, Mr. Millar.

5   A.  Okay.

6   Q.  If you can start by turning to Exhibit 502.  Should be

7   the second document there.

8   A.  Okay.

9   Q.  These are sequential, so we'll go quickly as I can, but

10  particular to the order in which they're presented, what is

11  Exhibit 502?

12  A.  That's the purchase order for some 044, 055, 043, 064

13  and-a-half, and that's basically it.

14  Q.  Okay.  And if you look at it, what is the purchase order

15  number?  And I'll ask you to look at the top of both pages

16  of this exhibit to give me the purchase order number.

17  A.  S100-158.

18  Q.  Can you look at the second page.

19  A.  Yeah, it the same thing.

20  Q.  Thank you.

21        And this is dated March 14, '03 but references back

22  to a February 11, 2003 purchase order.  Do you see that?

23  A.  Yes, I do.

24  Q.  Did you ever see a February 11, 2003 purchase order to

25  your knowledge?

1    A.  February 11, 2003, yeah, I would say yes, I have.

2    Q.  Do you know where that is today?

3    A.  A copy, it is probably attached to the write-up to, you

4    know, to order the material.

5    Q.  I see an expiration date of December 31, '39.  Do you

6    see that?

7    A.  Yes, I see that.

8    Q.  Did you ever, when looking at any invoice from Fabco,

9    have occasion to question Fabco about those dates?

10   A.  I questioned the date 12/31/39 somewhere in the last two

11   years, I can't be exact, and I was told that it was

12   something to do with their computer and I didn't have to

13   bother with it, so obviously I didn't pay any attention to

14   it from that time forward.

15   Q.  Looking at Exhibit 502, at the top has your name, two

16   pages, Tom.  Do you see that?

17   A.  Uh-huh.

18   Q.  You have to say yes or no.

19   A.  I'm sorry, yes.

20   Q.  Was it your understanding -- strike that.  How did you

21   respond to these purchase orders?

22   A.  By fax.

23   Q.  Do you maintain a file for each of your customers on

24   these particular orders?

25   A.  Yes.

1   Q.  And do you have anything other than fax copies in your

2   file?

3   A.  No, I do not, to my knowledge.

4   Q.  If you look at Exhibit 504, again, this appears to be

5   another purchase order?

6   A.  Uh-huh.

7   Q.  Or at least another version of it?

8   A.  Yes.

9   Q.  What is the purchase order number on this purchase

10  order?

11  A.  S100158.

12  Q.  Is that the same as Exhibit 502?

13  A.  That is correct.

14  Q.  Does it also have the 12/31/39 expiration date?

15  A.  Yes, it does.

16  Q.  And when is this particular version of the purchase

17  order dated?

18  A.  It was dated 2/11/03.

19  Q.  Excuse me, that's the PO date.

20  A.  I'm sorry, 5/13/03.

21  Q.  Does this appear that this one was also faxed to you?

22  A.  Yes.

23  Q.  If you look down at the body of this particular status

24  change, it says Line 70, can you see where it says, it says

25  this blanket purchase order line supersedes and cancels line

*11/29/04*                  *Witness:   Robert Millar*

1    40 in its entirety?

2    A.   Yes.

3    Q.   What would that mean to you as a salesperson for

4    Heidtman Steel looking at this purchase order?

5    A.   Well, I would look at the other purchase order that I

6    had received, and change, make the changes to Line 40.

7    Q.   Okay.  Is it ordinary that if a change comes in on a

8    purchase order from Fabco that they would issue, for any

9    change whatsoever, something that would say here's our

10   change, this is what's --

11   A.   Yes.

12   Q.   -- different?

13   A.   Yes.

14   Q.   And you do need to wait until I finish my question.

15   A.   I'm sorry.

16   Q.   You did it again.

17         So this is where you would look for changes to any

18   purchase order.

19   A.   Yes.

20   Q.   So if there was a change in quantity on a different

21   purchase order, you'd expect to find it here.

22   A.   Well, they don't have quantities on the purchase order.

23   Q.   I'm talking in general.

24   A.   Oh, in general, yes.

25   Q.   A specification of a particular type of steel.

*Case No. 04-CV-74331*

1    A.   Yes.

2    Q.   Would that include any piece of information to be found

3    on the purchase order, you'd expect the change to be found

4    in the body indicating the change?

5    A.   Yes.

6    Q.   Again, you've already indicated that this was faxed to

7    you.  It appears that it is a two-page fax.

8    A.   Yes.

9    Q.   When you received these purchase orders from Fabco, to

10   your knowledge was there ever a third page or fourth page

11   with terms and conditions or something on it?

12   A.   Not to my knowledge.

13   Q.   If you can now turn to Exhibit 506.  For the record,

14   this appears to be an email with some handwriting.

15             What are we looking at here in Exhibit 506, if you

16   know?

17   A.   Excuse me, I was reading it and I --

18   Q.   Oh, sure.  Are you completed with your reading of it?

19   A.   Yes.

20   Q.   What is Exhibit 506?

21   A.   It's the 063 material at a slightly wider, slightly

22   narrower.

23   Q.   Okay, and --

24   A.   -- width.

25   Q.   And it notes, and I'll read for the record, Bob, please

1    provide cost and timing to provide the following tool

2    development steel, and then it has the 06354.800.  Did I

3    read that correctly?

4    A.  Yes.

5    Q.  When you received this, what was your understanding of

6    why you were asked to look at this?

7    A.  They were changing the width of the material that they

8    had originally ordered.

9    Q.  And they were asking for what?

10   A.  Excuse me.

11   Q.  Please --

12   A.  They were asking me if we could supply the narrower

13   width material and how quickly could we supply it so that

14   they could try it out.

15   Q.  Did they ask about what the cost might be?

16   A.  Well, doesn't say there, so obviously they didn't.

17   Q.  If you look up at the very first paragraph, the part I

18   read into the record, and reread that please.

19   A.  Oh, excuse me, please provide cost and timing.  Okay.

20          Then I wrote a note down there, 8/11/03, advised

21   Tom Staddon via phone (email down).  He will want week of

22   9/1/03.  So I must have advised him of the price and

23   delivery date.

24   Q.  So he did ask for a price?

25   A.  Well, yeah, says that up there, yes.

Case No. 04-CV-74331

1    Q.  They asked whether there would be a different price?

2    A.  Yes.

3    Q.  For the --

4    A.  Yeah, yes.

5    Q.  If you can turn to Exhibit 507, and again I'll ask you

6    to look at the top.  This appears to be another purchase

7    order version.  Which purchase order does this one

8    reference?

9    A.  S100158.

10   Q.  Is that the same as the prior versions we've looked at

11   today?

12   A.  Yes.

13   Q.  And again, this appears to be a status change of

14   August 11, 2003?

15   A.  Yes.

16   Q.  And, again, this version has an expiration of

17   December 31, 2039, correct?

18   A.  That's correct.

19   Q.  Does this one, like the other ones, appear to be

20   something that was faxed to you?

21   A.  Yes.

22   Q.  And can you tell how many pages were faxed to you?

23   A.  It looks like it says Page 1 of 2 and 2 of 2, so I'd say

24   it was two pages.

25   Q.  Okay.  Looking at Exhibit 508, and I'll ask you again,

1    this is another version of a purchase order.  I'll ask you

2    to look at the purchase order number at the top of both

3    pages, and let me know, what is the purchase order that this

4    is referencing?

5    A.   It's referencing S100158.  I'm going to say it's 58.

6    It's tough to read, but that's what I'll say it is.

7    Q.   So if there has been some confusion off the first page

8    that this might be S100159, it could be due to the

9    difficulty of reading this?

10   A.   Yes, I think so.

11   Q.   Looking down at the material that is being ordered, 193

12   and 153 material, do you remember this type of material

13   being discussed?

14   A.   Yes.

15   Q.   And in fact was this type of steel ever ordered?

16   A.   Yes, it was.  It was brought into our plant.

17   Q.   And again, if you look down -- strike that.  And again,

18   if you have S100158 as the purchase order, this is some of

19   the material purchased for this particular series of

20   purchase orders.

21   A.   Yes.

22   Q.   If you can go to Exhibit 510.

23           For the record, this appears to be another purchase

24   order.  Is the purchase order the same as the ones we've

25   been talking about?

1    A.  Yes, it is.

2    Q.  And what is the date on this particular version of the

3    purchase order?

4    A.  1/7/04.

5    Q.  Do you remember how you received this version?

6    A.  Yes, I went into Fabco, and what I wanted was the

7    tonnage figure so that we could order steel for the items,

8    and I went in, and Mr. Tom Staddon printed it out for me and

9    gave it to me.

10   Q.  This wasn't presented to you by Fabco as a new purchase

11   order?

12   A.  No, it was just to write the tonnage figures down

13   without having to hand write them all.  It was given to me.

14   Q.  So you asked that this be printed out so you could do

15   your handwritten notes on it?

16   A.  Yes.  I didn't ask for it to be printed out.  I was

17   asking for the tonnage, and Mr. Tom Staddon printed it out

18   for me, and I wrote the tonnage figures on it.

19   Q.  So that would -- strike that.  So this particular

20   version was never faxed to you?

21   A.  Now, it could have been -- this particular one here was

22   not faxed to me, no.

23   Q.  Again, because you requested it in --

24   A.  Yes.

25   Q.  -- person?

1    A.   Yes.

2    Q.   -- at Fabco?

3    A.   Yes.

4    Q.   Are you aware of a change in pricing that Heidtman and

5    other companies received sometime in the last year or two

6    from the mills?

7    A.   Well, we receive them monthly.

8    Q.   Okay.  Is there anything that caused it to be in need of

9    being addressed sometime say in January of this year?

10   A.   Yes, because we were being charged surcharges by the

11   mill because of the scrap shortages, the steel surcharges on

12   scrap.

13   Q.   Okay.

14   A.   And we were passing them along, plus the mills were

15   increasing our extras, which they hadn't done in the past,

16   and we were forced to pass those along.

17   Q.   What are extras?

18   A.   Well, if you take this product here, it's a high

19   strength, an 80 gauge material, and there's a large extra on

20   that, what they call a grade extra, and in the past, we were

21   getting it from the mill, and the mills, because they want

22   to move steel, they haven't been charging us the full

23   extras, and come January, it was like no holds barred, they

24   were charging for everything, whether it was gauge and width

25   or grade of material.

1    Q.  How would you characterize steel prices, to the best of

2    your knowledge, now, during the year 2003?  Were they in

3    flux, relatively stable, what were --

4    A.  Well, excuse me, I was talking over you.

5         If you take the middle of 2003, you know, I think

6    we were buying hot roll bands fairly inexpensively, and so

7    they were, prices were very, quite low, and come January

8    first, they just snowballed to where now they're probably

9    tripled.

10   Q.  To your knowledge -- strike that.  Did the increased

11   charges from steel mills also include surcharges of any

12   kind?

13   A.  Well, they passed surcharges along to us, yes.

14   Q.  If, to the best of your knowledge, Heidtman didn't pay

15   those particular surcharges to any particular mill, what

16   could happen to the supply?

17   A.  They wouldn't give us any steel.

18   Q.  If you look at Exhibit 511, I'll ask you to indicate

19   once you've had a chance to look at it, what this is.

20   A.  That's just advising Fabco of the surcharges and the

21   passing along of the price increases, plus the terms being

22   net 30.

23   Q.  Okay.  And who did you address this letter to?

24   A.  Mr. Tom Staddon.

25   Q.  And this is Mr. Staddon of Fabco?

1    A.   Yes.

2    Q.   Okay.  And did you send this letter just to Fabco?

3    A.   Yes.

4    Q.   Were there other letters or other --

5    A.   I sent this letter to several of my other customers

6    also.

7    Q.   So this wasn't a special letter?

8    A.   Oh, no.

9    Q.   Other than the heading of who it was going to?

10   A.   No.

11   Q.   If you look at Exhibit 512, have you ever seen Exhibit

12   512 before?

13   A.   Yes.  That was sent to me by Mr. Jeff Tessier.

14   Q.   And this is, was sent to you approximately when?

15   A.   The date was -- there's no date.

16   Q.   It's undated?

17   A.   It's undated.

18   Q.   Was it in the same time period as Exhibit 511?

19   A.   Yes, yes.

20   Q.   If you turn to Exhibit 513, what are we looking at in

21   Exhibit 513?

22   A.   That was sent by me to Mr. Jeff Tessier.

23   Q.   In the last paragraph -- strike that.  Was this in

24   response to what is Exhibit 512, Mr. Tessier's letter to

25   you?

*11/29/04*                    *Witness:   Robert Millar*

1    A.  I would say that it probably is.

2    Q.  Okay.  In the last paragraph, it seems to indicate that

3    if surcharges aren't paid that shipments would be stopped.

4    Is that a fair characterization of the final paragraph?

5    A.  In a roundabout way, yes.

6    Q.  Okay.  How would you better characterize it?

7    A.  I would say that it's telling them to be, you know,

8    instead of just saying we're not going to ship you anything,

9    it's just that, you know, we suggest that you sign this, the

10   surcharge form, and so that we wouldn't stop shipping.

11   Q.  If after sending this, if Fabco in particular didn't

12   accept invoices for what the current market price was from

13   Heidtman, what would have happened?

14   A.  Well, I would have had to contact my superiors and let

15   them know what the situation was.

16   Q.  Okay.  And what could happen?

17   A.  Well, we could stop shipping.

18   Q.  To the best of your knowledge, were steel products

19   shipped during the month of January 2004?

20   A.  Yes.

21   Q.  To the best of your knowledge --

22   A.  To the best of my knowledge, yeah, yeah.

23   Q.  Okay.  And is it fair to assume that invoices were

24   generated for the steel that was shipped?

25   A.  That's correct, yes.

*Case No. 04-CV-74331*

1    Q.  Okay.  What price would have been indicated on invoices

2    from Heidtman Steel?

3    A.  Well, in that time, of course, we were only shipping

4    against the 044 and the 055.

5    Q.  Certainly.  Let me break there for a second.  You were

6    only shipping two types of steel at that time?

7    A.  That is correct.

8    Q.  On the same purchase order.

9    A.  That is correct.

10   Q.  Okay.  So it's part of this purchase order.

11   A.  Yes, it is.

12   Q.  And beginning, let's say, in January of 2004, let's keep

13   it the relevant time period, and thereafter, what prices did

14   Heidtman invoice to Fabco?

15   A.  We would -- from January first coming forward, we would

16   have invoiced the price that I had stated on the emails that

17   I had sent to Mr. Staddon about the price increases.

18   Q.  And how often did you send an email to Mr. Staddon with

19   price increases or decreases, whatever they may be?

20   A.  Yes, there was some decreases starting, I believe it was

21   February 1.  Excuse me, January 28th, maybe, for February.

22   I'm not sure.

23   Q.  And to the best of your knowledge, were Heidtman

24   invoices reflecting these increased prices paid in the

25   January/February time frame?

1    A.  Yes, because as soon as those prices were relayed by

2    email to Mr. Staddon, the prices would be changed in our

3    computer system so that we billed the proper cost.

4    Q.  If you look over to Exhibit 516, Mr. Millar, I believe

5    you just said a moment ago emails.  This appears to be an

6    email.  Do you recognize this?

7    A.  Yes.  It's an email I sent to Tom Staddon.

8    Q.  Dated February 23, 2004?

9    A.  That is correct.

10   Q.  And what is the subject line?

11   A.  Steel surcharges March 2004.

12   Q.  Okay.  And reading it in its entirety, it says, Tom, the

13   steel surcharge for TKA Fabco for the month of March 2004

14   will be five dollars per cwt.  Is that hundred weight?

15   A.  Yes.

16   Q.  Please acknowledge acceptance for the surcharge by

17   returning e-mail.  Do you see that?

18   A.  Yes, I do.

19   Q.  Did Fabco order release steel for the month of March?

20   A.  Yes.

21   Q.  And would Heidtman generate invoices for the steel that

22   was shipped?

23   A.  Yes, we would.

24   Q.  And what price would there be on those invoices?

25   A.  There would be the current price plus the five dollars

1    surcharge.

2    Q.  To the best of your knowledge did Fabco pay those

3    invoices?

4    A.  Yes.

5    Q.  Without complaint or discussion?

6    A.  Well, they didn't acknowledge my email.

7    Q.  Did they pay the invoices?

8    A.  Yes.

9    Q.  Did other customers, not Fabco, did they also not like

10   the surcharges or price increases?

11   A.  No one likes price increases.

12   Q.  If you look over at Exhibit 517, which for the record

13   appears to be another email from you to Mr. Staddon; is that

14   correct?

15   A.  That is correct.

16   Q.  And what's the date that you sent this?

17   A.  March 1, 2004.

18   Q.  And what was the purpose of this email?

19   A.  Mr. Staddon had asked him what I thought the prices were

20   going up to in 2005, and I responded by -- and I'm sure

21   we're only interested in the 063, 54.65, 35.85 hundred

22   weight delivered plus a applicable surcharge.

23   Q.  So this was --

24   A.  It was an estimate, yes.

25   Q.  And that was for this material, 35.85, delivered plus

1    surcharge.

2    A.   That's correct.

3    Q.   And again, you did this at Mr. Staddon's request?

4    A.   Yes.

5    Q.   If you look at Exhibit 518, and for the record, these

6    have been provided in the way in which they were kept.  If

7    you look at the bottom, it appears that the email from

8    Exhibit 517 was the very last thing.  This appears to be in

9    sequence, but I didn't want to change the order in which

10   these were presented.

11            Mr. Millar, look at Exhibit 518.  Does this appear

12   to be another email from you to Mr. Staddon?

13   A.   Yes, it is.

14   Q.   And in response to Exhibit 517, again, assume for the

15   sake of this question that the last paragraph in Exhibit 518

16   is the very top of Exhibit 517 where you quoted the 063

17   material, the 193 and the 153 material, okay?  Do you see

18   what I'm talking about?

19   A.   Okay, yes.

20   Q.   Okay.  Can you tell on Exhibit 518, in response to your

21   estimated pricing done at the request of Mr. Staddon, what

22   was Mr. Staddon's response to you?

23   A.   He says, What about the other items on this PO?  Is it

24   safe to assume that the pricing did not change for them?

25   Please review and advise.

1    Q.  So Mr. Staddon comes back and asks what about the other

2    items.  What was your response?

3    A.  Per our phone conversation of early today, effective

4    April 1, 2004, prices on the following two items will be

5    increased as will the steel surcharge.  That's on the 044

6    and the 055 items.

7    Q.  So in response to his request, you informed him of the

8    April pricing?

9    A.  That is correct.

10   Q.  Turning now to Exhibit 521.  Hold on for a second, two

11   more questions on Exhibit 518.  Is it safe to assume that

12   the month of April, product was released due to the, this

13   purchase order or the ongoing relationship between Heidtman

14   and Fabco and material was shipped?

15   A.  That is correct.

16   Q.  And at what price would Heidtman invoice at?

17   A.  The current, the price that I had specified on the

18   email.

19   Q.  Okay.  Now to Exhibit 521.  And for the record, this

20   appears to be another email.  Is this another email from you

21   to Mr. Staddon?

22   A.  Yes, it is.

23   Q.  Dated when?

24   A.  April 26, 2004.

25            THE COURT:  I'm sorry, I was reading.  I'm lost.

*11/29/04*                    *Witness:  Robert Millar*

1      What are you referring to?

2                     MR. BOHMER:  Exhibit 521, Your Honor.

3   BY MR. BOHMER:

4      Q.  So this is dated April 26, 2004?

5      A.  Yes.

6      Q.  And what was the purpose of this email?

7      A.  To advise them of the price increase for May 2004.

8      Q.  And it indicates that the items would be increased in

9      base price but that the surcharge would be reduced.

10     A.  That is correct.

11     Q.  Did the surcharges change over time?

12     A.  Surcharges fluctuate, yes, they do, depending on the

13     price of scrap.  It's based on scrap being $170 a ton, and

14     currently I think it's $410 a ton.

15     Q.  And the surcharges, how do they relate to the charges

16     Heidtman is paying to the mill?

17     A.  We pay the surcharge right along with everything else to

18     the mill.

19     Q.  So it's pass-through?

20     A.  Yes.

21     Q.  In the month of May, 2004, did Fabco order steel coils

22     from Heidtman Steel?

23     A.  Yes, they did.

24     Q.  And did Heidtman Steel deliver coils?

25     A.  Yes, we did.

*11/29/04*                    *Witness:   Robert Millar*

1    Q.   What price would Heidtman invoice that material?

2    A.   The price is indicated on the email for May first, May

3    pricing.

4             MR. SHARKEY:  We'll stipulate that they always

5    invoiced us at the price that they wanted and that they kept

6    shipping, shipping the whole time.  That may help things go

7    along.

8             MR. BOHMER:  Thank you.

9             THE COURT:  Yeah, I don't really need you to go

10   through all of these invoices one by one.

11            MR. BOHMER:  Okay.  I was nearing the end, but I

12   will speed it up.

13   BY MR. BOHMER:

14   Q.   If you look at Exhibit 522, and I just have a couple of

15   questions.  This appears to be another email dated April 29,

16   2004.  Is that accurate?

17   A.   That is correct.

18   Q.   And does this particular email, what were the prices set

19   for May of this email?

20   A.   Well, I had given him the price for May on Exhibit 521,

21   which was 38.50 and 38.

22   Q.   Okay.

23   A.   And then in having conversation with our people, it was

24   considered that we could go and we could hold them, we

25   didn't have to increase the price in May, we could give them

1    the same price as we had in April.

2    Q.  So you lowered your price.

3    A.  Or we didn't raise our price.

4    Q.  Okay.  You lowered your price from your anticipated --

5    A.  That is correct.

6    Q.  And just very, very quickly, Exhibit 524 appears to be

7    an e-mail setting prices for June?

8    A.  Yes, that's correct.

9    Q.  And as was the case with the others, material was

10   ordered and material was shipped and was invoiced at --

11   A.  That is correct, yes.

12   Q.  At Heidtman's current prices?

13   A.  Yes.

14   Q.  Exhibit 526, and a very brief email, appears to be from

15   Mr. Staddon to you.  In its entirety, Tom, Heidtman Steel

16   will need your company's decision on our June price

17   increases by tomorrow, June 11 '04, so that we can continue

18   to ship product to you and purchase material for future

19   releases.  Did you in fact send this email?

20   A.  Yes, I did.

21   Q.  And why did you have to send this?

22   A.  I was wanting to have them pay the prices that, you

23   know, that we had charged, price increases.

24   Q.  And did they ultimately pay those price increases?

25   A.  Yes, they did.

1    Q.  Looking now to Exhibit 527, and I'll be very brief on

2    this.  Looking again at the purchase order number at the top

3    of Pages 1 and 2, is this again the same purchase order that

4    we've been discussing?

5    A.  Yes, it is.

6    Q.  The two materials referenced, 193 and 153, do you

7    remember those materials being added new in this purchase

8    order?

9    A.  Yes, I do.

10   Q.  When you received this, did you make any attempts to

11   acquire material to fill this order?

12   A.  Well, these are the items that we purchased the material

13   and brought it in to supply them.

14   Q.  Okay.  So based on this, you bought material?

15   A.  Yes, we did.

16   Q.  Looking now to Exhibit 529 which appears to be an email

17   to you from Mr. Staddon, is that correct?

18   A.  That is correct.

19   Q.  What did this email tell you?

20   A.  It canceled those two items off our purchase order.

21   Q.  Did they ask you if it was okay to cancel those two

22   items, or did they just do it?

23   A.  No, they just did it.

24   Q.  What did Heidtman do with the steel that they acquired

25   to fill these particular line items?

1    A.   We were able to use it elsewhere.

2    Q.   Sold it to another customer?

3    A.   That's correct.

4    Q.   Going back one exhibit to Exhibit 528, and ever so

5    briefly, is this email setting the July steel prices?

6    A.   Yes.

7    Q.   What was the July steel price for the 063 material?

8    A.   I haven't -- oh, I'm sorry, 47.85.

9    Q.   Okay.  It says per hundred weight total.

10   A.   That's right.

11   Q.   I notice there's not a surcharge on that line item.

12   A.   When I did the pricing, I incorporated the whole thing.

13   It was the first time I had done that one, and I

14   incorporated the surcharge within the total price of the

15   steel.

16   Q.   So there was no surcharge at this time on that material,

17   because it was in the actual price?

18   A.   It was in the actual total price, yes.

19   Q.   Okay.  Thank you.

20           Can you turn to Exhibit 530?

21              MR. BOHMER:  May I approach, Your Honor?

22              THE COURT:  You may.

23              MR. BOHMER:  Thank you.

24   BY MR. BOHMER:

25   Q.   Mr. Millar, I handed you what I believe was discussed

1    this morning.  I believe it is Exhibit 104, and it appears

2    to be a series of emails.

3    A.  Yes.

4    Q.  Is that the -- can you compare that with Exhibit 530?

5    How do these two relate?

6         If I can speed it up, I'm just trying to establish

7    that these are the same, just two different --

8              MR. SHARKEY:  So stipulated, Your Honor.

9              THE WITNESS:  Yes.

10   BY MR. BOHMER:

11   Q.  If you look at either version.  It matters not to me

12   which one you look at.  Do you remember hearing this morning

13   a conversation about you sending the steel prices and Fabco

14   not accepting steel price increases; that was their

15   response, Mr. Staddon's response?

16   A.  Yes.

17   Q.  One thing that was not mentioned this morning in that

18   discussion was what was your response to Mr. Staddon?  Can

19   you read that into the record?

20   A.  Tom, Heidtman Steel will be shipping and billing at the

21   new July prices.  These prices will have to be paid so that

22   we can continue to purchase material for your account and

23   continue to ship without any interruptions.

24   Q.  Okay.  And you did forward this on to Mr. Staddon?

25   A.  Yes.

*11/29/04*                    *Witness:  Robert Millar*

1    Q.  And for the month of July, were invoices generated for

2    material shipped to Fabco?

3    A.  Yes.

4    Q.  And were those invoices paid?

5    A.  I believe at the 063, I think that's when they did not

6    pay the price increase.

7    Q.  Did they pay the price increase, to the best of your

8    knowledge, on the 044, the 055?

9    A.  To the best of my knowledge, yes.

10   Q.  Looking now to Exhibit 532, for the record, this appears

11   to be another version of the purchase order numbered

12   S100158; is that correct?

13   A.  That is correct.

14   Q.  And was this like all the others that you received, that

15   Heidtman received by fax?

16   A.  Yes.

17   Q.  And looking, it says at Line 150, new.  Do you see that?

18   A.  Yes.

19   Q.  And it says 063 by 04.875.  Is that the material we've

20   been talking about?

21   A.  That is correct.

22   Q.  And what was your response -- strike that.  What was the

23   price that they proposed or that was at least indicated on

24   the front of Exhibit 532?

25   A.  They put .3585 -- .3585 cents a pound on the --

1    Q.  Do you recall approximately when you quoted that price

2    to them?

3    A.  Basically when I gave you, sent that email saying that

4    the prices would be .3585 with applicable surcharges back

5    in, I guess, February.

6    Q.  So you forwarded this onto them with a response, did you

7    not?

8    A.  I forwarded this onto them, yes, I did.

9    Q.  What was your response?

10   A.  It says, Per email 6/24/04, July 2004 price, is 47.85

11   cost delivered.

12   Q.  At some point earlier on, you had quoted this material

13   at .3585 plus the surcharge, correct?

14   A.  Correct.

15   Q.  Here, you respond and say the total price is 47.85,

16   doesn't it?

17   A.  Correct.

18   Q.  So it's not completely an apples-to-apples comparison

19   because one includes, one does not include the surcharge --

20   A.  I understand, yes.

21   Q.  -- in the base price.

22   A.  Yes.

23   Q.  And who did you send this response to?

24   A.  Mr. Tom Staddon.

25   Q.  And after sending this back to Mr. Staddon, do you

1      recall ever seeing -- strike that.  Did Fabco order material

2      of the 063 material?

3      A.   Yes.

4      Q.   And what price did Heidtman invoice it at?

5      A.   We invoiced them at the price that we stated that we

6      were going to invoice them.  They knew what the price as of

7      July and as of August would have been.

8      Q.   Did you get anything back from Mr. Staddon after you

9      sent this to him saying, no, we don't think that's the right

10     price, or otherwise?

11     A.   No, not to my knowledge.

12     Q.   From your review of your file that you keep on, for the

13     Fabco orders, do you have in your possession any other

14     purchase orders that come later in time than this July 19,

15     2004 status change?

16     A.   To the best of my knowledge, no.

17     Q.   When this one was received, did you receive a third,

18     fourth or fifth page that included any other terms or

19     conditions?

20     A.   No, sir, not to my knowledge.

21     Q.   Looking at Exhibit 533, is this an email from you

22     setting the steel prices for August 2004?

23     A.   Yes, it is.

24     Q.   After accepting this, did Heidtman receive orders for

25     the delivery of more material?

1    A.   Yes.

2    Q.   And did Heidtman invoice at the price we indicated?

3    A.   Yes, we did.

4    Q.   Looking at Exhibit 534, another email from you to

5    Mr. Tessier at this time.  Excuse me, copy to Mr. Tessier.

6    It's Mr. Staddon, is that correct?

7    A.   That's correct.

8    Q.   And in its entirety, Tom, Effective today, August 11

9    '04, Heidtman Steel will halt all direct sales shipments to

10   TKA Fabco until all price increase or surcharges that were

11   deducted from invoices are paid in full.  Do you see that?

12   A.   Yes.

13   Q.   Did I read that accurately?

14   A.   Yes, you did.

15             THE COURT:  Can we please move through this more

16   quickly?  I mean, I can read, so I don't need him to read

17   these emails to me.

18             MR. BOHMER:  I understand, Your Honor.

19             THE COURT:  Please.

20   BY MR. BOHMER:

21   Q.   After you sent this, did Fabco bring their invoices

22   current as of that date?

23   A.   I would have to say, to the best of my knowledge, no.

24   Q.   Did Heidtman continue to ship product?

25   A.   Yes, we did.

1    Q.  Did Heidtman continue, did you continue to send emails

2    to Mr. Staddon setting prices in the months that followed?

3    A.  Yes, I did.

4    Q.  Were there price increases and decreases?

5    A.  Yes, there was.

6    Q.  Did you hear the discussion between the 063, 64, 065

7    material?

8    A.  Yes, I did.

9    Q.  Can you explain very briefly the differences between

10   those materials?

11   A.  Well, that's only a, that's like two thousandths between

12   the 063 and 065.  The price really would remain the same

13   within that gauge range and also on the width because of the

14   small amount of decrease in the width.  That would remain

15   basically, it would not affect the price at all either.  So

16   there's really, there's not a whole lot of difference

17   between the items.

18   Q.  Would you have to order different steel, if I came in

19   and said I want a 65 today and a 63 tomorrow, are they two

20   different coils?

21   A.  Oh, absolutely, yes.  But that's your minimum that you

22   could use.  If they're asking for an 063 minimum, or let's

23   say they're asking for an 065 minimum, you certainly can't

24   ship an 064 or 063 because you're going to get coil

25   rejected.  If they're ordering an 063, of course 064, 065

11/29/04                    *Witness:  Robert Millar*

1    are within tolerance, certainly, and there's not a problem.

2              MR. BOHMER:  No further questions at this time,

3    Your Honor.

4                                                (3:02 p.m.)

5                        **CROSS EXAMINATION**

6    BY MR. SHARKEY:

7    Q.  Good afternoon, Mr. Millar.

8    A.  Good afternoon.

9    Q.  Sounds like you went over to Fabco's shop and said, hey,

10   I want to figure out tonnage, and Staddon printed you up a

11   PO that you were just using as a reference basically?

12   A.  I asked him for the tonnage that we were going to be

13   supplying on the various sizes so that we could order the

14   steel.  He, for convenience for him, and I don't blame him,

15   he printed out the --

16   Q.  Sure, just to have a list of everything.

17   A.  Just to have a list instead of going through his

18   computer.

19   Q.  Did you ever object to that or any of the subsequent

20   purchase order end dates of September 25, 2006?  I think we

21   figured out this morning that it didn't have this 2039.

22   A.  Well, I was told about the 12/31/39 date on the purchase

23   orders, I was told not to pay any attention to it.  From

24   that time on, I never checked on the expiration date on the

25   purchase order.

*Case No. 04-CV-74331*

1    Q.  Did you know that Fabco was using this for the Nissan

2    Pathfinder, X-Terra program?

3    A.  Yes, I did.

4    Q.  Did you know what the life of that program was?

5    A.  This is, we don't -- this is not a life purchase order.

6    If you have a life of the purchase order, you have to get,

7    just use the people that are involved.  You have to get

8    Heidtman involved, SDI involved, Fabco involved, and Nissan

9    involved all together to say what your actual quantity, what

10   it is that you're going to be supplying, and everybody has

11   to buy into that program.

12   Q.  But you don't object that you received, you received

13   these two, on January 7, going forward, you did receive PO's

14   and they did have the September 25, 2006 expiration date.

15   You're just saying that you didn't pay any attention to

16   them.

17   A.  That is correct.

18   Q.  We talked about the terms and conditions.  You've seen

19   original PO's with the backs on them, correct?

20   A.  I haven't gotten -- I've seen other PO's with the

21   originals, yes.

22   Q.  From Fabco?

23   A.  No, they fax their PO's to us.

24   Q.  You've never seen --

25   A.  To my recollection, they've always faxed them to us.

1   Q.  Are you aware that the terms and conditions are attached

2   as Exhibit 1 to your lawyer's brief?

3   A.  Well, I can see that on the back of the one that Tom

4   gave me, yes.

5   Q.  Who is --

6   A.  Tom Staddon, that I wrote the tonnages down, yes.

7   Q.  And I understand that you're not a lawyer, you're not

8   going to sit here and read 30-some paragraphs of terms and

9   conditions, but you're generally aware that they're on the

10  back of purchase orders, correct?

11  A.  Yes.

12  Q.  Real quick, Exhibit 501, Heidtman's first exhibit, the

13  email from Tom Staddon to you says, Bob, let's try this one.

14  It will be tricky.  That's the product at issue here, right?

15  It started out at .065, we went through that whole thing

16  this morning.  But what did that mean, it will be tricky?

17  A.  I can't answer for him.  I don't know what he means on

18  that.

19  Q.  Do you recall having discussions with Mr. Staddon of

20  Fabco that this was a special product and it was going to be

21  a little bit difficult to produce and that they were not

22  able to get it from U.S. Steel and some of their other major

23  suppliers?

24  A.  No, he didn't say that to me, no.

25  Q.  You just don't remember what it will be tricky means in

1    the context of this email?

2    A.   No, I don't.

3    Q.   Okay.  On 508, sir, you got your note here in the bottom

4    right-hand corner, and the, it says is this -- looks like a

5    sticky was put over, or some kind of note.  Is that your

6    handwriting, sir?

7    A.   No, it's not.

8    Q.   Do you know whose that is?

9    A.   Yeah, I believe that is our inside salesperson.

10   Q.   It says --

11   A.   Yeah, it's Trish, yeah.

12   Q.   You know Trish?

13   A.   Yes.

14   Q.   It says, Per Bob M, conversation with Tom Staddon,

15   September 25, '03, this PO blanket will not start until

16   September 2004.  That was your understanding also?

17   A.   Oh, yes, yes.

18   Q.   Okay.  Think that this thing wasn't actually going into

19   production until summer of '04?

20   A.   That's correct.

21   Q.   And all these PO's going back 15 months or so, or

22   before, spring of '03, the total type, and the engineering

23   parts, onesies and twosies, you send out to be tested?

24   A.   Well, I supplied the material a year before for them

25   to --

1    Q.  Well, sure, but it wasn't weekly huge shipments, it was

2    testing parts.

3    A.  That was the original coils I sent them, yes.

4    Q.  Okay.  Like you, on 511, this is the letter you sent to

5    Mr. Staddon in January of '04, and I saw a lot of these

6    letters in January of '04.  They're almost all worded the

7    same going back and forth.  Due to these increasing steel

8    prices, we've walked through surcharges.  I notice that the

9    surcharge acceptance form is not attached.  See the second

10   to last line there of the letter?  It says, Tom, I am

11   sending along a surcharge acceptance form.

12   A.  Yes.

13   Q.  It's not attached to 511, but originally when you sent

14   this letter there was some kind of form with it, correct?

15   A.  That's correct.

16   Q.  But Mr. Staddon, nobody from Fabco ever executed that or

17   returned it, did they?

18   A.  To the best of my knowledge, no.

19   Q.  And then to flip to 513, a couple weeks later,

20   January 27, again you say -- actually this letter is to

21   Tessier, who says, hey, we think it's imperative that you

22   respond by signing the surcharge form.  So you reminded them

23   a couple weeks later, we need the surcharge form signed.

24   And still same thing, they didn't return it, correct?

25   A.  That's correct, to the best of my knowledge.

1    Q.  Why did you want them to sign this form and get it back

2    to you?

3    A.  Just as a course of having it in the file.

4    Q.  And they never did?

5    A.  No.

6    Q.  On Exhibit 529, sir, you testified this is about some

7    parts that aren't in this case, but the 193 and 153.

8    A.  Yes.

9    Q.  Didn't Mr. Staddon tell you that the reason, and I know

10   this is a curt, terse email, but didn't he say the reason

11   they're terminating those two products is because Heidtman

12   wanted a half million dollars in increase, and Nissan agreed

13   to put it in their CSP steel buy?

14   A.  No.

15   Q.  No?  What happened?

16   A.  They were going into Nissan CSP program.

17   Q.  Well, it says, Please be advised that materials have

18   gone into the Nissan CSP program.  You know --

19   A.  It's an off-load program.

20   Q.  It's a steel purchase program, right?

21   A.  Yes, best of my knowledge, yes.

22   Q.  I called it group steel buy.  Used wrong term maybe.

23   A.  Okay.

24   Q.  And you said on 532, you said okay, here's the July 19,

25   '04, and it's the first time we have a new PO with the April

1    price, and in fact you had asked for that .3585, and I

2    understand you wanted a surcharge, too, back in March.  You

3    went through that with your lawyer.

4    A.   Uh-huh.

5    Q.   Fabco actually gave you the price, but not the price,

6    right, and that was the problem?  In other words, they

7    issued a new PO but for the .3585, but --

8    A.   No, I had, they had put down .3585.  When I had sent

9    them the pricing for 2005, that they had asked me the

10   estimated pricing, I said that the price was going to be,

11   our best guess, it would be a .3585 plus applicable

12   surcharge.  That's what I said.

13   Q.   You're right.  Exactly what your email says, March 1

14   email.  That's what it says, that's the price you were

15   asking for, but you wanted the surcharge, too, right?

16   A.   That is correct, yes.

17   Q.   .3585?

18   A.   Yes.

19   Q.   And Fabco had this .297, and they gave you whatever

20   increase to .3585 but they didn't give you the surcharge,

21   right?

22   A.   No, they did not, no.

23   Q.   Now, on 532, this is the thing we've been over ten times

24   so I'll keep this real quick, this is the July 19, 2004 PO.

25   And this is the first dated PO we have with the new price of

1   .3585, which is what you'd asked for back in March,

2   understanding that you asked for the surcharge and they

3   didn't give it to you.

4   A.   I didn't ask for that.  I said the current price is

5   estimated to be .3585 plus applicable surcharge.

6   Q.   Right.

7   A.   That's what we feel the price is going to be for 2005.

8   Q.   2005, okay.

9   A.   You know, to start.

10  Q.   But in 532, I thought I just heard you testify, and I

11  might be wrong, that you got this PO, which is 532, and you

12  send it back to Tom Staddon, see at the top there, Attention

13  Tom Staddon?

14  A.   Yes.

15  Q.   Per email 6/24/04, July 2004 price is 47.85.

16  A.   Right.

17  Q.   Hundred weight?

18  A.   Right.

19  Q.   And I thought I heard you testify that you didn't get a

20  response, is that right?

21  A.   Best of my knowledge that I remember, I did not, no.

22  Q.   And I'm not playing gotcha here because I understand you

23  got a lot of customers and a lot of things flying around,

24  and you're going a hundred miles an hour, but just flipping

25  back one exhibit to 531, do you see in the middle of the

1    page where four days later on Monday, June 28, Tom Staddon

2    of Fabco tells you, hey, Bob, please be advised Fabco is not

3    accepting price increases at this time?

4    A.  No, it's not 531.

5    Q.  530, I'm sorry, go back to 530.  Do you remember getting

6    that email, sir?

7    A.  Yes.

8    Q.  So Fabco did in fact tell you, you sent this thing on a

9    Thursday, June 24, following Monday Fabco tells you no,

10   we're not paying them, didn't they?

11   A.  Let me just see here.  Yeah, I sent him an email and he

12   responded back, Please be advised that --

13   Q.  Yeah, same day you sent him an email, Thursday June 24,

14   you also sent this little note.  Looks like you did both.

15   But your note is dated, your handwritten note is dated

16   June 24, email dated June 24, they both have 47.85, correct?

17   A.  Yes.

18   Q.  And then four days later, Friday, Saturday, Sunday,

19   Monday, Tom at Fabco says no, correct?

20            THE COURT:  I'm sorry, where do you see the

21   June 24 date on Exhibit 532?

22            MR. SHARKEY:  Very right lower corner, says per

23   email, 6/24/04.

24            THE WITNESS:  That's June 24th.

25            MR. SHARKEY:  Yeah, right.

```
 1                   THE COURT:  But we don't know --

 2                   THE WITNESS:  But --

 3                   THE COURT:  Just a minute.

 4                   THE WITNESS:  But I'm telling him down below,

 5        Tom put our phone conversation, here are your July steel

 6        prices.

 7   BY MR. SHARKEY:

 8        Q.  Yes, sir, and my only point is that they timely told you

 9        no, the following Monday, and you remember getting this

10        email that's in the middle of Exhibit 530.

11        A.  Yes.

12        Q.  Okay.  Did you ever ask -- you say your supplier is

13        Steel Dynamics, Inc?

14        A.  Steel Dynamics, yes.

15        Q.  Steel Dynamics.  Did you ever ask them, hey, I'd like a

16        long-term fixed price contract?

17        A.  Not to my knowledge, no.

18        Q.  And you testified that they, meaning Steel Dynamics

19        Inc., passed along a surcharge to you.

20        A.  Yes.

21        Q.  And you testified that that came from the mill and the

22        mill is --

23        A.  Steel Dynamics, yes.

24        Q.  But isn't Heidtman the single largest shareholder of

25        Steel Dynamics, Inc?
```

*11/29/04*                    *Witness:  Robert Millar*

1    A.  I can't answer that.  I don't think we are, but I'd only

2    be guessing.

3    Q.  Have you told either Tom Staddon or Jeff Tessier at

4    Fabco that Heidtman is the principal shareholder of Steel

5    Dynamics, Inc?

6    A.  I have not told him that, no.  I've told him we have an

7    equity position in Steel Dynamics.

8    Q.  Have you told Jeff Tessier or Tom Staddon that not only

9    does Heidtman want to break even but this 51 cents, they

10   actually want to make a profit on the steel?

11   A.  My boss relayed that to --

12   Q.  Thank you.  No further questions.  Your Honor.

13                                          (3:15 p.m.)

14                    **REDIRECT EXAMINATION**

15   BY MR. BOHMER:

16   Q.  Do you recall this morning that Mr. Tessier testified

17   that any purchase order saying December 31, 2039, that was

18   fixed by some internal computer?

19   A.  Yes.  I was told the same thing within the last couple

20   of years, and I don't remember when it was.

21   Q.  You were told that they just spit out that date?

22   A.  Yes.

23   Q.  Did you hear Mr. Tessier say this morning that they had

24   some information technology person fix that or change that?

25   A.  I heard that, yes.

*Case No. 04-CV-74331*

*11/29/04*                    *Witness:   Robert Millar*

1    Q.  Did you also hear Mr. Tessier say that when a change was

2    made to the face of a purchase order that it would show what

3    was changed in the body of the purchase order?

4    A.  Yes, I did.

5    Q.  At any time that you received purchase orders -- this

6    particular series of purchase orders, any of them, did you

7    ever see in the body of any of those purchase orders a

8    notation that the date was being changed from 12/31/39 to

9    9/25/06?

10   A.  No, I did not.

11                MR. BOHMER:  No further questions.

12                THE COURT:  All right.  You may step down.

13   Thank you.

14                (Witness excused 3:17 p.m.)

15                THE COURT:  Let's recess for 15 minutes or so.

16                (Recess taken.)

17                MR. BOHMER:  Your Honor, the defendant would

18   call Mark Ridenour.

19                MR. SHARKEY:  Let the record reflect Mr. Mathis

20   stepped across the street to cover a 3:30 for me.

21                THE COURT:  This is taking a lot longer than you

22   guys said it would.

23                MR. BOHMER:  It is, Your Honor.

24

25                        **MARK RIDENOUR,**

*Case No. 04-CV-74331*

1    hereinbefore called as a witness, being first duly sworn

2    by the Court to tell the truth, the whole truth, and

3    nothing but the truth, was examined and testified upon

4    his oath as follows:

5                                          (3:37 p.m.)

6                    **DIRECT EXAMINATION**

7    BY MR. BOHMER:

8    Q.  Mr. Ridenour, sitting here today, are you employed?

9    A.  Yes, I am.

10   Q.  And where are you employed?

11   A.  Heidtman Steel.

12   Q.  And what is your position?

13   A.  Chief financial officer.

14   Q.  And can you briefly describe your duties as chief

15   financial officer?

16   A.  All financial, accounting, credit, and MIS duties fall

17   under my title.

18   Q.  Again, I don't want it to be a long answer, but what

19   types of things does Heidtman do for customers?

20   A.  Heidtman Steel is basically a steel service center

21   that's really a distributor.  We buy steel from mill

22   sources, we do something to it in terms of processing, such

23   as pickling, slitting, galvanizing, cut to length, temper

24   passing, and then ship it on to the customer.

25   Q.  Does Heidtman make any steel?

1   A.  No, sir.

2   Q.  In the world of the purchasing and sales of steel, are

3   there multiple gauges or thickness of steel, and widths, or

4   is there just one kind of steel?

5   A.  No, it's basically infinite.

6   Q.  The material that we're primarily talking about today is

7   called 063.  Do you understand that to be the case?

8   A.  Yes.

9   Q.  Can you describe what 063 material is to the best of

10   your ability?

11   A.  It's "of an inch," so it's relatively thin steel.

12   Q.  Is this a new type of steel, to the best of your

13   knowledge?

14   A.  No, sir.

15   Q.  Is there anything special or unique about it?

16   A.  No, it's high strength, but high strength is not that

17   new.

18   Q.  And are you aware that this material that we're talking

19   about today was purchased from Steel Dynamics?

20   A.  Yes, I am.

21   Q.  Are you aware of anyplace elsewhere this material can be

22   acquired?

23   A.  Yes, we think that Newcore(sp) Berkley makes it, or can

24   make it, and then there are a couple of foreign sources, as

25   well.

1    Q.  And Steel Dynamics, does it sell to just Heidtman, or

2    other companies as well?

3    A.  It sells to all kinds of customers.

4    Q.  Including competitors of yours?

5    A.  Unfortunately, yes.

6    Q.  When did you first learn that there may be issues of

7    some type or form between Fabco and Heidtman?

8    A.  Well, when we got served the lawsuit, obviously, that

9    was the red flag, which then causes me to, you know, go and

10   start poking around, what's going on, and in looking at the

11   account, just the accounts receivable account, there were

12   some deducts which we call charge backs in our system

13   whereby they deduct from a check that they send us.  I

14   didn't know at the time exactly what that was, but that does

15   tend to make you believe there's a problem somewhere.

16   Q.  Can you explain what you found in addition to, if

17   anything, in addition to deducts when you looked at the

18   account for Fabco?

19   A.  Well, up to that point, looked like the account was

20   pretty clean.  I didn't see a lot that was late, or anything

21   of that matter.  If there were other problems or other

22   deducts, it would show up, because you just don't clear

23   those types of things off the accounting system that

24   quickly.  So everything appeared to be in order until, you

25   know, right at the top of the list you see these deducts

1    from checks, and sometimes I can't tell by looking at that,

2    it could be a reject or some other deduct.  We now know that

3    it was some other deduct.

4    Q.  Looking at the historical -- well, let me ask this, did

5    you look historically at how Fabco had been paying?

6    A.  It appeared everything was fine.  I didn't go back in

7    history a long time, but there might have been a deduct here

8    or there that got cleaned up.  You never know what those

9    are, but it didn't appear that this was a problem account.

10   Q.  Looking back at the historical data, can you put a

11   ballpark on where every invoice Heidtman had paid that was

12   due and payable had been paid in full?

13   A.  I went back about a month, and everything appeared to be

14   in order, so that would be more or less at the end of

15   August, first part of September, probably, looking back 30

16   days in our system, but I didn't see any problems.

17   Q.  Would it be a fair characterization to say that the

18   account was current as of that time?

19   A.  Yes, it would be.

20   Q.  Do you remember what the terms were for Fabco's payment

21   of Heidtman invoices?

22   A.  Net 30.

23   Q.  When you were here for the temporary restraining order

24   hearing, did you look that day at the status of Fabco's

25   payment on the net 30 terms?

1    A.  Yes, I did.

2    Q.  And what was it?

3    A.  They were over 30 days by some 37, $38,000.

4    Q.  And you were here in the courtroom when Fabco was

5    ordered to pay outstanding invoices, with some caveats to be

6    sure, but they were to pay something?

7    A.  Correct.

8    Q.  Did they?

9    A.  Yes, they did, and with deducts.

10   Q.  So do you recall approximately what the check was or

11   checks that Heidtman received?

12   A.  It's about $31,000, give or take, what we received.

13   Q.  And how much was the invoice?

14   A.  37, 38.

15   Q.  So they deducted what they didn't want to pay?

16   A.  That appears to be the case.

17   Q.  Have you had occasion to look at the, if I use the term

18   trial balance, what does that mean to you?

19   A.  That would be out of the accounting system, just a

20   literal history of what's still open in the account.

21   Q.  Okay.  Have you had occasion recently to look at the

22   Fabco trial balance within the Heidtman computer system?

23   A.  Yes, I looked this morning.

24   Q.  And what did you find?

25   A.  We still have invoices over, actually over 45 days now.

1    I don't have the last couple of days receipts in there but

2    it's far over 30, to the tune of some 60-some thousand

3    dollars.

4    Q.  Okay.

5                THE COURT:  Is it fair to say that that amount

6    represents the difference between what Fabco thinks it is

7    obligated to pay under the contract and what Heidtman

8    believes that it is entitled to charge because of the

9    invoices that it sent?

10               THE WITNESS:  No, ma'am.  What they are is we

11   have a total invoice price on an invoice.  That would be the

12   base price plus the surcharge that's been talked about.  It

13   appears what they're doing is deducting the surcharge.

14               THE COURT:  Right, because they don't think

15   they're required to pay it under the contract.

16               THE WITNESS:  But when I look at the 60-some

17   thousand dollars, that represents base price plus surcharge.

18   The surcharge is six, seven dollars compared to, you know,

19   35 a ton for --

20               THE COURT:  Haven't they paid you the point,

21   what is it, 3585 per hundred weight, I don't know, is it per

22   pound?

23               THE WITNESS:  It goes both ways.

24               THE COURT:  Okay.

25               THE WITNESS:  Not within 30 days.  That's I

```
 1   think the point.  We have three or four invoices, they're 20
 2   to 30,000 apiece that have not been touched, nothing has
 3   been paid on them.
 4   BY MR. BOHMER:
 5   Q.  And again you checked this when?
 6   A.  This morning.
 7   Q.  Just to make sure it's perfectly clear, these invoices
 8   that are now over 45 days old and unpaid as of this morning,
 9   you heard this morning that it was described by Mr. Tessier
10   as part of the dispute or it was those are the overcharges.
11   I just want to make it clear, does that explain the 60-plus
12   thousand dollars that is over 45 days on net 30 terms today?
13   A.  No, it does not.
14   Q.  So that would include charges at the 35.80?
15   A.  That is correct.  Nothing on these invoices have been
16   paid.
17   Q.  You're aware -- are you aware that some invoices have
18   not been paid in full?
19   A.  Yes, I am.
20   Q.  Okay.  And sitting in front of you, I've left a couple
21   of exhibits, being Exhibits 543, 544, 545 and 546, and just
22   so we have it in the record, can you state what these are,
23   can you state what I've left you?
24   A.  Yes.  543 is a series of invoices that we would have
25   sent Thyssen for shipments, and we invoice per shipment, and
```

1    545 are what we call charge backs, and a charge back would

2    be if we receive what we call a short pay on the check, this

3    is our write-up, so that we can get the payment into the

4    system.  But it creates a charge back, as well, to be

5    cleared, and Exhibit 546 is just the period end receipts

6    journal.

7    Q.  I don't want to take the length of time it would take to

8    go through these in detail, so if I can ask a couple more

9    general questions and put an end to this line, that would

10   probably be best.  Exhibit 543, this series of invoices, is

11   it your understanding that these are invoices that were or

12   were not paid in all or part?

13   A.  Well, without going through all of them, what happens is

14   that when they, one of these invoices or some of these

15   invoices were short paid, that's when a charge back is

16   created for that.

17   Q.  Okay.  And if I were to go through here, you indicated

18   earlier that sometime late August, early September, Fabco

19   had paid current.

20   A.  Correct.

21   Q.  And that includes any charge backs or surcharges.

22   A.  There were no unclear charge backs in the system.

23   Q.  Okay.  So whatever was invoiced and that was due and

24   payable as of that date had been taken care of.

25   A.  That's what it looks like to me.

1    Q.  Just before we took that brief break, recess, a question

2    was asked of Mr. Millar regarding the ownership of Steel

3    Dynamics.  Do you recall that?

4    A.  Yes, sir.

5    Q.  What stake, if any, does Heidtman have in Steel

6    Dynamics?

7    A.  Heidtman Steel has approximately five percent of the

8    outstanding public shares of Steel Dynamics.

9    Q.  Is Steel Dynamics a publicly traded company?

10   A.  Yes, it is.

11   Q.  Does Heidtman Steel to your knowledge have control of

12   the board of directors?

13   A.  No, it does not.

14   Q.  Does Heidtman Steel have any control over the

15   management?

16   A.  No, it does not.

17   Q.  Can you characterize the relationship between Steel

18   Dynamics and Heidtman Steel?

19   A.  Sure.  We were one of the original founding partners.

20   We had other investors, as well.  It wasn't just Heidtman.

21   The company went public about six, seven years ago, and like

22   I said, we own about five percent of the company, and it's

23   held as an equity investment, and we have a client next door

24   to them so we have a supplier-vendor relationship, and we

25   obviously know them but we in no way control them.

*11/29/04*                     *Witness:  M. Ridenour*

1    Q.  And when they make steel, they can ship it to any other

2    supplier, as well?

3    A.  And they do.

4         MR. BOHMER:  No further questions at this time,

5    Your Honor.

6                                              (3:49 p.m.)

7                      **CROSS EXAMINATION**

8    BY MR. SHARKEY:

9    Q.  Good afternoon, Mr. Ridenour.

10   A.  Good afternoon.

11   Q.  You said Fabco's a pretty good customer until end of

12   August or so, that's when they started getting behind?

13   A.  No, I did not say that.

14   Q.  What did you say?

15   A.  I said at the end of August, appears everything was paid

16   up.  There was no outstanding.

17   Q.  September they started getting behind?

18   A.  It was either toward the end of September, sometime in

19   October.

20   Q.  Do you know when volume production started on the part

21   we're talking about today?

22   A.  No, I do not.

23   Q.  August sound about right?

24   A.  I have no idea.

25   Q.  Your counsel just asked you about Exhibit 545 there, and

                    *Case No. 04-CV-74331*

1    I was hoping in my opening to avoid all this, but --

2              THE COURT:  Please do.

3  BY MR. SHARKEY:

4    Q.  I'm going to follow up on the judge's question, and she

5    asked you -- I don't even want to call Mr. Boyce to the

6    stand.  I want to avoid this and just keep this streamlined.

7    Is your testimony -- I understand you're saying that Fabco

8    hasn't paid Heidtman everything that Heidtman has invoiced

9    to Fabco.  So stipulated, okay.  But the question is has

10   Fabco paid what is owed to Heidtman for what's been shipped

11   times .3585?

12   A.  I'd have to look through that and tell you, but what I'm

13   saying is, and to the judge's question is we have whole

14   invoices that are unpaid over 30 days.  That means that

15   nothing has been paid on that.

16   Q.  60 some thousand dollars, 45 days out?

17   A.  That's correct.

18             THE COURT:  Well, but that's not really, I mean,

19   depending how you really account for that, that's not really

20   responsive to the question, because if you've got an invoice

21   for $50,000, and Fabco pays $35,000 on it because they don't

22   think they're required to pay that last 15,000, and then you

23   have another shipment and another 15,000 invoice, or $50,000

24   invoice, and Fabco pays 35 again.  If you take the first 15

25   of that 35 and apply it to the last invoice, okay, now

1    you've got only 20 paid on the 50,000 invoice and you're

2    going to say, well, no, they didn't pay the full --

3              THE WITNESS:  Oh, I --

4              THE COURT:  Yeah, so every time you get a check,

5    if you're putting it toward the first invoice, then of

6    course you're going to have some at the end that don't look

7    like they have anything paid on them at all.  Is that what's

8    happened here?

9              THE WITNESS:  No, we don't do balance

10   accounting.  So that's where I explained where you have a

11   charge back.  If you had a $50,000 invoice, to use your

12   example, and they paid 35 on it, we would post 35 against

13   that invoice and then we create a charge back for 15,000

14   that would have to be accounted for and cleared later.

15             THE COURT:  And what happens with the

16   next $50,000 invoice when the next $35,000 payment comes in?

17             THE WITNESS:  Same thing.  We post the 35

18   against what they said they wanted to pay for it, and create

19   a charge back.

20   BY MR. SHARKEY:

21   Q.  I had a conversation with your lawyer last week, and he

22   gave me four invoices that were about 21, 22 range.  Was

23   that based on a conversation with you?

24   A.  Those are the invoices we're talking about.

25   Q.  Those are the four we're talking about, okay.

1          Does your system, which you checked this morning,

2     and today is Monday, I assume -- when is it current through,

3     Tuesday, Wednesday last week?

4     A.   Should have been through Wednesday.  I said we haven't

5     accounted for anything we received over the last couple

6     days.

7     Q.   Understood.  Did you get a check -- I'm just going to

8     tell you right now, I told my guy, I don't want you paying

9     what's current, I want you to be ahead when we get to this

10    court today.  That's what he's going to say when he gets up

11    here.

12    A.   That may be.

13    Q.   What do you mean that it may be?

14    A.   If it's in the mail.  I don't have it.

15    Q.   I'm sorry, I'm arguing with you a little bit here.  What

16    he's going to say on the stand, what he told me last Monday,

17    a week ago today, I overnighted, we didn't pay the full 85

18    you guys were asking for, but whatever the 3585 works out to

19    be, and I don't know what that number works out to be, but

20    did you get that check?

21    A.   No, it's not in the system.  If it's sitting there in

22    our office today, I do not know that.

23    Q.   I understand, and you just pull up a screen and you

24    can't account for every piece of paper Heidtman receives.

25    A.   7:00 this morning.

1   Q.  You're not aware of getting a check for 60-some thousand

2   dollars overnighted?  You would have received it six days

3   ago last Tuesday.

4   A.  No, I'm not.

5   Q.  And those, what my guy is telling me, and I keep looking

6   backwards here, but Mr. Boyce, CFO of Fabco, is telling me

7   those are not even due until tomorrow, the 30th, is that

8   right?

9   A.  No, I wouldn't believe so, or they wouldn't be 45 days.

10   Q.  But at worst, according to your computer this morning,

11   when you checked it at 7:00 before we drove up here, we were

12   60-some thousand out.

13   A.  60, 70, those invoices in question.

14   Q.  And it wasn't until you got the lawsuit that you went

15   and looked at all this and the red flags went up for you.

16   A.  That's correct.

17              MR. SHARKEY:  I have nothing further, Your

18   Honor.

19              MR. BOHMER:  No further questions, Your Honor.

20              THE COURT:  Thank you, Mr. Ridenour.

21              (Witness excused 3:55 p.m.)

22              MR. BOHMER:  No further questions.

23              MR. SHARKEY:  It's five to 4:00.  I can call

24   Mr. Boyce to ask him about the current state of the account.

25              THE COURT:  I don't think that the current state

1     of the account is really all that critical here.  I asked

2     you to pay it, ordered you to pay it.

3             MR. SHARKEY:  And we did.

4             THE COURT:  I assume you did.

5             MR. SHARKEY:  What you said -- I just got the

6     transcript.  I don't remember this exchange, but they said,

7     hey, you're 30 some behind, and I said I don't know exactly

8     what we're behind, and I said no matter what, I promise

9     we'll pay at least 30,000 to them by the end of the week.

10    Mr. Ridenour handed me something after the hearing I think

11    that was you said you actually owe us 37, I said fine.  I

12    handed it to Mr. Boyce, he says no, we actually owe him 31.

13    So here we are back to this difference.  So we paid them 31

14    that Friday, and what Mr. Boyce would say, if the Court

15    would like to hear, is last Monday, he's going to say none

16    of these are due until tomorrow, the end of the month, but

17    they just override them just to remove the issue.

18            THE COURT:  I don't understand how, if they were

19    overnighted, presumably Federal Express, they should have

20    got there Tuesday, they certainly should be in the system.

21    I know Thanksgiving was not a mail day.

22            MR. SHARKEY:  My secretary took Wednesday off

23    and I didn't get my faxes on Wednesday.  People take the day

24    off.

25            THE COURT:  What about Friday and Saturday?

*11/29/04*

1    There's mail.

2                MR. SHARKEY:  I'm just saying, I'm not making

3    excuses for the other side.  I'm just saying the reality is

4    sometimes the holiday week, things don't happen the way they

5    should.

6                THE COURT:  All right.

7                MR. SHARKEY:  So I just want to be clear, if the

8    Court wants to hear from Mr. Boyce, the CFO, I'll make a

9    proffer.  If you won't accept that, I'll --

10               THE COURT:  I'll accept the proffer.  As I said

11   I don't think this preliminary injunction hearing rests on

12   that anyway.

13               MR. SHARKEY:  Yes, ma'am.  We have nothing on

14   rebuttal anyway.

15               THE COURT:  I suppose you want me to do

16   something today, right?

17               MR. SHARKEY:  Well, I am sympathetic to the

18   Court and its law clerk because you can't crank out a long

19   order --

20               THE COURT:  That's true.

21               MR. SHARKEY:  I understand.  But we need this,

22   we need the parts, and if the Court wants to take two weeks

23   to issue a lengthy ruling, then we would just ask the TRO be

24   extended ten more days.  If the Court, you know, you're the

25   Court.  Do what you want.  I'm just saying we do need

11/29/04

1        something done today, yes, ma'am.

2                    THE COURT:  Here's what I'm going to do.  I will

3        tell you that my preliminary thought on this is that Fabco

4        is correct, that it has a long-term contract with a fixed

5        price and that Heidtman is the one who bore the risk of the

6        price going up.  I mean, I have a lot of analysis to do with

7        respect to these invoices, but it certainly looks to me like

8        this was a fixed price contract that Fabco agreed to pay a

9        surcharge on out of the, I'm not going to say out of the

10       goodness of its heart, but out of its best business judgment

11       until they felt they had been squeezed as far as they could

12       be squeezed.  And I am not at all impressed by this argument

13       that their payments, their agreement to pay as their arm was

14       getting twisted in the summer and early fall constitutes any

15       kind of waiver of their right under the contract.  I just

16       don't see it that way.  So that's my preliminary thought

17       about this.

18                    I'm going to continue the TRO for an additional

19       20 days while I work on an opinion and order, and if I

20       change my mind as I go through my exhibits and notes, I'll

21       let you know, but that's my thought at the time.

22                    And that, of course, that TRO of course is

23       contingent on Fabco continuing to pay at the original

24       invoice price of .3585 net 30.  Okay.  Thank you.

25                    (Proceedings concluded 4:00 p.m.)

11/29/04

1                      —      —      —

2

3

4

5

6

7

8

9                    CERTIFICATE OF COURT REPORTER

10

11

12      I certify that the foregoing is a correct transcript

13      from reported proceedings in the above-entitled matter.

14

15

16

17      _____        _____

          SUZANNE JACQUES, CSR, RMR                     Date
18        Official Court Reporter
          Eastern District of Michigan
19

20

21

22

23

24

25